# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

2012-5067

JOHN H. BANKS et al.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in consolidated case numbers 99-CV-4451, 99-CV-4452, 99-CV-4453, 99-CV-4454, 99-CV-4455, 99-CV-4456, 99-CV-4457, 99-CV-4458, 99-CV-4459, 99-CV-44510, 99-CV-44511, 99-CV-44512, 99-CV-365, 99-CV-379, 99-CV-380, 99-CV-381, 99-CV-382, 00-CV-383, 00-CV-384, 00-CV-385, 00-CV-386, 00-CV-387, 00-CV-388, 00-CV-389, 00-CV-390, 00-C-391, 00-CV-392, 00-CV-393, 00-CV-394, 00-CV-395, 00-CV-396, 00-CV-398, 00-CV-399, 00-CV-400, 00-CV-401, 05-CV-1353, 05-CV-1381, and 06-CV-072, Chief Judge Emily C Hewitt.

## JOINT APPENDIX VOLUME I

John Ehret, Esq.
20860 Greenwood Drive
Olympia Fields, Illinois 60431

Eugene J. Frett, Esq.
Sperling & Slater, P.C.
55 West Monroe Street, Ste. 3200
Chicago, Illinois 60603

Mark E. Christensen, Esq.
Christensen & Ehret, LLP
135 South LaSalle, Suite 4200
Chicago, Illinois 60603
(312) 634-1014
(312) 634-1018 Fax

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

2012-5067

JOHN H. BANKS et al.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in consolidated case numbers 99-CV-4451, 99-CV-4452, 99-CV-4453, 99-CV-4454, 99-CV-4455, 99-CV-4456, 99-CV-4457, 99-CV-4458, 99-CV-4459, 99-CV-44510, 99-CV-44511, 99-CV-44512, 99-CV-365, 99-CV-379, 99-CV-380, 99-CV-381, 99-CV-382, 00-CV-383, 00-CV-384, 00-CV-385, 00-CV-386, 00-CV-387, 00-CV-388, 00-CV-389, 00-CV-390, 00-C-391, 00-CV-392, 00-CV-393, 00-CV-394, 00-CV-395, 00-CV-396, 00-CV-398, 00-CV-399, 00-CV-400, 00-CV-401, 05-CV-1353, 05-CV-1381, and 06-CV-072, Chief Judge Emily C Hewitt.

## APPENDIX VOLUME I

John Ehret, Esq.
20860 Greenwood Drive
Olympia Fields, Illinois 60431

Eugene J. Frett, Esq.
Sperling & Slater, P.C.
55 West Monroe Street, Ste. 3200
Chicago, Illinois 60603

Mark E. Christensen, Esq.
Christensen & Ehret, LLP
135 South LaSalle, Suite 4200
Chicago, Illinois 60603
(312) 634-1014
(312) 634-1018 Fax

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**BANKS v. U.S., 2012-5067**

## Appendix

## TABLE OF CONTENTS

Banks v. US, 78 Fed. Cl. 603 (Fed. Cl. 2007) .............................................. 1

Banks v. US, 101 Fed. Cl. 115 (Fed. Cl. 2011)............ .86

Civil Docket Sheet Case No. 99-cv-445 ....................................................... ..229

Civil Docket Sheet Case No. 99-cv-4451..... 238

Order Denying Motion to Strike Robert B. Nairn's Expert Report ............... .273

June 4, 2007 Trial Transcript (without cover)................................................ 288

June 5, 2007 Trial Transcript (without cover)................................................ 545

June 6, 2007 Trial Transcript (without cover) .............................................. ..842

June 7, 2007 Trial Transcript (without cover)................................................ 1083

June 8, 2007 Trial Transcript (without cover)................................................ 1305

Plaintiffs' Damage Trial Memorandum ....................................................... 1637

Opinion Treating Plaintiffs' Damage Trial Memorandum as Motion for Reconsideration and Permitting Introduction of Certain Additional Evidence ..................................................................................................... 1658

Stipulation to Certain Ownership (with Exhibit) ......................................... 1673

Plaintiffs' Motion for Declaration that as the Result of One Government Action, The Building of the Jetties, Which Ripened Into a Permanent Physical Taking by Erosion of January 2000, are Entitled to All Damages to That Property and Reasonably Foreseeable Future Damages and for Clarification of the Court's June 23, 2005 Order and Opinion (without Exhibits) 1681

Stipulation as to Certain Ownership (with Exhibit)........................................... 1706

Stipulation as to Certain Ownership (with Exhibit) ........................................... 1722

Opinion and Order Treating Motion for Declaratory Judgment as Pre-Trial Motion and Granting in Part and Denying in Part; Clarifying June 23, 2005 Opinion and Order, and Setting Forth Law Governing Damages Plaintiffs May Seek ......... 1747

Stipulation IV Regarding Certain Plaintiffs' Standing ..................................... 1778

Order Granting in Part and Mooting in Part Plaintiffs' Motion to Compel and Defendant's Motion to Compel ...................................................................... 1784

Plaintiffs' Motion to Strike Defendant's Expert, Dr. Jesse McNinch .............. 1791

Plaintiffs' Motion to Strike Defendant's Expert, Dr. Robert Nairn ................ .1811

Opinion Denying Motion to Strike Dr. Jess McNinch, Dr. Robert Nairn ........ .1839

Plaintiffs' Motion in Limine to Exclude Evidence of Nearshore Lakebed Composition .................................................................................................. 1859

Order Denying Motion in Limine to Exclude Evidence of Nearshore Lakebed Composition .................................................................................................. 1873

Trial Stipulations of Fact ............................................................................... 1884

April 18, 2011 Trial Transcript (without cover) ............................................... 1889

April 19, 2011 Trial Transcript (without cover) ............................................... 2189

April 20, 2011 Trial Transcript (without cover) ............................................... 2589

April 21, 2011 Trial Transcript (without cover) ............................................... 2989

April 25, 2011 Trial Transcript (without cover)                              .............. 3389

April 26, 2011 Trial Transcript (without cover) ............................................... 3789

April 27, 2011 Trial Transcript (without cover) ............................................... 4189

April 28, 2011 Trial Transcript (without cover) ............................................... 4589

Third Trial Stipulations of Fact ...................................................................... 4853

Order Directing Additional Briefmg on Jurisdiction ......................................... 4860

*Banks v. US,* Appeal No. 01-5150, Appendix                 ............................ 4866

Plaintiff Trial Exhibit No. 22: Mitigation of Shore Damage Attributed to Federal Navigation Structure at St. Joseph, Michigan (November 1974)........................ 5058

Plaintiff Trial Exhibit No. 23: Geological Effect on Behavior of Beach Fill and Shoreline Stability for Southeast Lake Michigan (June 1996) ............................ 5320

Plaintiff Trial Exhibit No. 24: Effectiveness of Beach Nourishment on Cohesive Shores, St. Joseph, Lake Michigan (July 1997).................................................... .5423

Plaintiff Trial Exhibit No. 32: Interim Monitoring Report for St. Joseph Harbor, Michigan for the period of 1975-1984 (June 1986)............................................... 5526

Plaintiff Trial Exhibit No. 33: Preliminary Results of a Pilot Study Conducted Between St. Joseph, Michigan and Michigan City, Indiana (May 1992)........... 5582

Plaintiff Trial Exhibit No. 41: Annual Report on the Section 111 Beach Nourishment Monitoring Program (January 2000)............................................... .5633

Plaintiff Trial Exhibit No. 57: Public Notice Regarding Proposed Mitigation Policy for Shore Protection Projects (July 2000)................................................ 5642

Plaintiff Trial Exhibit No. 58: Finding of Significant Impact Regarding Structural Repairs to Piers (January 1988)............................................................................ .5650

Plaintiff Trial Exhibit No. 68: 1834 Survey of the St. Joseph River Mouth .....5661

Plaintiff Trial Exhibit No. 74: Photographs of St. Joseph Harbor and Surrounding Area ..................................................................................................................... 5662

Plaintiff Trial Exhibit No. 86: Cohesive Shores (April 1997) ............................ 5707

Plaintiff Trial Exhibit No. 93: Section 111 Detailed Project Report on Shore Damage at St. Joseph Harbor, Michigan ............................................................... 5712

Plaintiff Trial Exhibit No. 101: Origin and Evolution of the Great Lakes (July 2001). ....................................................................................................... 5886

Plaintiff Trial Exhibit No. 126: Declaration of John Konik (August 4, 2005)... 5915

Plaintiff Trial Exhibit No. 132: Berrien County, Michigan Beach Erosion Control Study (1958) ................................................................................................ 5932

Plaintiff Trial Exhibit No. 135: Correspondence with Marcia Wineberg (February 9, 2007)....................................................................................................... 5967

Plaintiff Trial Exhibit No. 136: Sidescan Sonar Survey and Interpretation of St. Joseph, Michigan (October 2009).......................................................... 5968

Plaintiff Trial Exhibit No. 137: Response to Mickelson Review of Sidescan Sonar Survey and Interpretation (March 2010).............................................. 5997

Plaintiff Trial Exhibit No. 140: Response to Nairn Review of Sediment Contributions to the Littoral System by the St. Joseph River, Michigan and Sidescan Sonar Survey and Interpretation (May 2010) (Scudder Mackey). .... 6015

Plaintiff Trial Exhibit No. 141: Response to Nairn Review of Sediment Contributions to the Littoral System by the St. Joseph River, Michigan and Sidescan Sonar Survey and Interpretation (May 2010) (Patrick 0' Shires)........ 6046

Plaintiff Trial Exhibit No. 142: An Analysis of Incident Wave Conditions of St. Joseph, Michigan (March 2010)............................................................... 6083

Plaintiff Trial Exhibit No. 143: Evaluation of Nearshore Property Loss, South of St. Joseph, Michigan (January 2010) ..... 6090

Plaintiff Trial Exhibit No. 144: Response to Banks Damages Phase Report — Ordinary High Water Mark (June 2010)............................................... 6237

Plaintiff Trial Exhibit No. 145: Headland Beach Systems: The Most Effective and Sustainable Shore Protection for Residential Lakefront Properties Downdrift from the Jetties at St. Joseph (March 2010) ...... 6291

Plaintiff Trial Exhibit No. 146: Rebuttal to the Baird Banks Damages Phase Report (May 2010) ......................................................................6308

Plaintiff Trial Exhibit No. 147: Shoreline Erosion Protection, Berrien County Michigan (April 2010). ........................................................................ 6314

Plaintiff Trial Exhibit No. 149: Rebuttal Expert Report of Michael J. Moore...6352

Plaintiff Trial Exhibit No. 157: Surficial Geological Map of Berrien County, Michigan (2001)................................................................................................ 6398

Plaintiff Trial Exhibit No. 158: Regional Sediment Management, Sediment Budget for St. Joseph, MI to Michigan City, IN (July 2002)............................... 6399

Plaintiff Trial Exhibit No. 159: Standard Test Method for Particle Size Analysis of Soils ..................................................................................................... 6454

Plaintiff Trial Exhibit No. 172: Correspondence from Terry Petrie to Assata Peterson (April 16, 2010)...................................................................... 6471

Plaintiff Trial Exhibit No. 178: Coastal Engineering Manual, 2002, Chapter 5: Erosion Transport, and Deposition of Cohesive Sediments (April 2002)........... 6484

Plaintiff Trial Exhibit No. 182: Operation and Maintenance Manual for Chicago Shoreline Protection Project (December 2007).................................... 6551

Plaintiff Trial Exhibit No. 183: Coastal Engineering Manual, 2008, Engineering and Design (April 2008) ...................................................................... 6607

Plaintiff Trial Exhibit No. 184: Civil Works Construction Cost Index (March 2000)...................................................................................................... 6676

Plaintiff Trial Exhibit No. 194: Geographically arranged photographs of plaintiffs' shoreline protection from north to south                    .................................... 6721

Plaintiff Trial Exhibit No. 205: Google Earth Photograph of Fort Sheridan Beaches ............................................................................................................ 6805

Plaintiff Trial Exhibit No. 253: Bunker Shore Protection Supporting Documents ............................................................................................................ 6806

Plaintiff Trial Exhibit No. 257: Concklin shore Protection Supporting Documents ............................................................................................................ 6808

Plaintiff Trial Exhibit No. 259: Ehret Shore Protection Supporting Documents ……………………………………………………………………………6815

Plaintiff Trial Exhibit No. 261: Greenbrier Development Shore Protection Supporting Documents........................................................................ .6826

Plaintiff Trial Exhibit No. 265: Miller Shore Protection Supporting Documents ................................................................................................. 6834

Plaintiff Trial Exhibit No. 267: Pancoast Shore Protection Supporting Documents ......................................................................................................... 6884

Plaintiff Trial Exhibit No. 268: Ragins Shore Protection Supporting Documents ......................................................................................................... 6892

Plaintiff Trial Exhibit No. 270: Errant Shore Protection Supporting Documents ......................................................................................................... .6936

Plaintiff Trial Exhibit No. 273: Wineberg Shore Protection Supporting Documents ......................................................................................................6947

Plaintiff Trial Exhibit No. 275: Summary Exhibit of Burgoyne Appraisal Figures (Based on Burgoyne property appraisals) ........................................ 6953

Plaintiff Trial Exhibit No. 311: Letter to Todd Walton from Robert Nairn with enclosures (June 25, 1996) .................................... 6955

Plaintiff Trial Exhibit No. 316: Guide to Preparation of the Coastal Engineering Manual (February 1993). ................................................................... 6996

Plaintiff Trial Exhibit No. 324: Great Lakes Boundary Contract W911Xk-06-002. .................................... 7182

Plaintiff Trial Exhibit No. 326: Order for Supply of Services (August 2005) ............................................................................... 7200

Plaintiff Trial Exhibit No. 343: Photograph of Glenlord Beach .................... 7222

Plaintiff Trial Exhibit No. 344: Completion Report for Maintenance Dredging of St. Joseph Outer Harbor, Michigan (September 2004)..................................... 7224

Plaintiff Trial Exhibit No. 351: Completion Report for St. Joseph Outer and New Buffalo Harbors, Michigan (December 2010).................................... 7229

Plaintiff Trial Exhibit No. 364: Annual Report/Contract Dredging Report (July 2009) ........................................................................................ 7234

Plaintiff Trial Exhibit No. 365 Record of Construction/Maintenance Dredging St. Joseph Outer and Inner Harbor, Michigan. ......................................... 7237

Plaintiff Trial Exhibit No. 367: Dredging Information for Michigan .......... 7238

Plaintiff Trial Exhibit No. 370: Record of Construction/Maintenance Dredging St. Joseph Harbor, Michigan .............................................................. 7244

Plaintiff Trial Exhibit No. 371: Berrien county dredging documents including permits and testing information (February 2011) ............... 7247

Plaintiff Trial Exhibit No. 377: Proposal for Shoreline Erosion Protection Construction Delivery Order (April 1999)........................................................ 7350

Plaintiff Trial Exhibit No. 395: Permit Evaluation and Decision Document.....7374

Plaintiff Trial Exhibit No. 400: Permit to Construct Revetment and Breakwater/Beach System and Pier Along Lake Michigan at 77 Stonegate, Lake Forest, IL (March 1998) ............................................................. 7391

Plaintiff Trial Exhibit No. 401: Permit for Thomas Duckworth (April 1998)............................................................................................ 7405

Plaintiff Trial Exhibit No. 402: Permit Evaluation and Decision Review .... 7410

Plaintiff Trial Exhibit No. 403: Google Earth Pictures of Private Property Headland Shore Protection................................................................7429

Plaintiff Trial Exhibit No. 406: Letter from Colleen Reilly, BRAC Environmental Coordinator to Fort Sheridan RAB Members and Interested Citizens (dated December 19, 1997) ........................................................................ 7435

Plaintiff Trial Exhibit No. 409: Kane shore protection supporting documents...7457

Deposition of Joan Pope dated March 23, 2011 (subsequently admitted into evidence per docket entry 493 in Case No. 99-cv-4451)................................7474

Defendant Trial Exhibit No. 1: Assessment of the Causes of Erosion in the Vicinity of St. Joseph Harbor, MI ...........................................7575

Defendant Trial Exhibit No. 2: Supplemental Report on Review of Plaintiffs' Expert Reports ............................................................................ 8028

Defendant Trial Exhibit No. 3: Geology and Long-Term Lakeshore Erosion in the Vicinity of St. Joseph, MI ................................................................ 8053

Defendant Trial Exhibit No. 23: Figure 4.2 AARR Summary by Research (from Nairn Expert Report, p. 4-121) ....................................................... 8097

Defendant Trial Exhibit No. 32: Well Logs Used to Generate Cross Section in Figure 9 of Larson's Expert Report ................................................. 8098

Defendant Trial Exhibit No. 34a: Summary Exh: "St. Joseph Dredging" updated January 2011 ............................................................................ 8146

Defendant Trial Exhibit No. 40: Summary Exh: "St. Joseph Dredging" updated January 2011 ............................................................................ 8150

Defendant Trial Exhibit No. 155: Expert Report dated December 7, 2009: Banks Damages Phase Report 1 - Shore Composition and Revised ........ 8253

Defendant Trial Exhibit No. 156: Summary Table of Cohesive Shore Definition ............................................................................................ 8318

Defendant Trial Exhibit No. 157: Seminal Cohesive Shore Erosion Research Sites & Sand Content of Eroding Sediment .................................. 8319

Defendant Trial Exhibit No. 172: Expert Report Dated March 2, 2010: Banks Damages Phase Report 2 - Ordinary High Water Mark" .................. 8320

Defendant Trial Exhibit No. 180: Figure 3.5 Property Area Calculation: Two-Step Approach (see Nairn Report 2, DX-172 p. 18) ....................... 8451

Defendant Trial Exhibit No. 181: Table 4.1 Summary of OHWM Delineation for Plaintiff Properties (by year) (see Nairn Report 2, DX-172 p. 20) ... 8452

Defendant Trial Exhibit No. 184: Table 5.3 Plaintiff Property Areas for 2000 with Confidence (see Nairn Report 2, DX-172 p. 33) .......................... 8453

Defendant Trial Exhibit No. 188: Expert Report dated April 30, 2010: Banks Damages Phase Report 3 - Information on Comparable Sale ........... 8454

8

Defendant Trial Exhibit No. 293: Expert Report dated April 30, 2010: Banks Damages Phase Report 3 - Information on Comparable Sale ............................. 8507

Defendant Trial Exhibit No. 293A: Lake Michigan - Shoreham Mosiac (Revised Figure 7 on Page 23 of Mickelson) ...................................................................... 8563

Defendant Trial Exhibit No. 293B: Lake Michigan - Grand Mere Mosiac (Revised Figure 11 on Page 28 of the Mickelson Expert Report). ..................................... 8564

Defendant Trial Exhibit No. 295: Appraisal Report for Property Owned by Michael R. and Janice Anderson (dated May 2010).. ...................................... 8565

Defendant Trial Exhibit No. 296: Appraisal Report for property Owned by John H. and Mary E. Banks (dated May 2010) .......................... 8721

Defendant Trial Exhibit No. 336: Appraisal Parcel Summary with Identification and Estimated Market Values from Appraisal Reports. ....................................... 8879

Motion to Dismiss, filed February 9, 2001 (docket entry 447-1 in Case No. 99-cv-4451 ...................................................................................................................... 8881

Plaintiffs' Post-Trial Brief on Jurisdiction, filed September 7, 2011 (docket entry 501 in Case No. 99-cv-4451) ........................ 8991

APPEAL,CLOSED,ECF,LEAD,PROTO

# US Court of Federal Claims
## United States Court of Federal Claims (COFC)
## CIVIL DOCKET FOR CASE #: 1 :99-cv-04451-ECH

BANKS, et al v. USA
Assigned to: Chief Judge Emily C. Hewitt
Demand: $0
Case in other court: 12-05067
Cause: 28:1491 Tucker Act

Date Filed: 07/09/1999
Date Terminated: 12/22/2011
Nature of Suit: 512 Taking — Realty
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**JOHN H. BANKS**

represented by **John Broderick Ehret**
20860 Greenwood Drive
Olympia Fields, IL 60461
(708) 748-8975
Fax: (708) 748-3736
Email: johnbamailbug.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MARY BANKS**

represented by **John Broderick Ehret**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ELIZABETH S. ERRANT TRUST**

represented by **John Broderick Ehret**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**V.**

**Consolidated Plaintiff**

**ERROL L. STONE**
*TERMINATED: 06/13/2007*

represented by **Drew William Marrocco**
SNR Denton US, LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005
(202) 408-6400
Fax: (202) 408-6399
Email: cliew.marrocco@dentons.corn
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consolidated Plaintiff**

**SUSAN H. STONE**
*TERMINATED: 06/13/2007*

represented by **Drew William Marrocco**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consolidated Plaintiff**

**EUGENE J. FRETT**
*individually and as trustee of the Victor J.
Horvath and Frances B. Horvath Trust
dated November 1995*

represented by **Eugene J. Frett**
Sperling &Slater, P.C.
55 West Monroe Street
Suite 3200
Chicago, IL 60603

(312) 641-3200
Fax: (312) 641-6492
Email: gfrett@sperling—law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consolidated Plaintiff**

**EHRET MICHIGAN TRUST**                  represented by   **Mark Englund Christensen**
                                                           Christensen &Ehret LLP
                                                           135 South LaSalle Street
                                                           Suite 4200
                                                           Chicago, IL 60603
                                                           (312) 634-1014
                                                           Fax: (312) 634-1018
                                                           Email: mchristensenachristensenehret.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USA**                                   represented by   **Alan Brenner**
                                                           **U.** S. Department of Justice
                                                           Environment &Natural Resources Division
                                                           P.O. Box 663
                                                           Ben Franklin Station
                                                           Washington, DC 20044-0663
                                                           *TERMINATED: 02/17/2004*
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **David William Spohr**
                                                           **U.** S. Department of Justice.
                                                           Environment &Natural Resources Division
                                                           7600 Sand Point Way NE
                                                           c/o NOAA Damage Assessment
                                                           Seattle, WA 98115-0070
                                                           (206) 526-4603
                                                           Fax: (206) 526-6665
                                                           Email: david.spohr@usdoj.gov
                                                           *TERMINATED: 05/17/2005*
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Terry M. Petrie**
                                                           **U.S.** Department of Justice (CO)
                                                           Environment and Natural Resources
                                                           Division
                                                           Natural Resources Section
                                                           999 18th Street
                                                           South Terrace, Suite 370
                                                           Denver, CO 80202
                                                           (303) 844-1369
                                                           Fax: (303) 844-1350
                                                           Email: Terry.PetrieQusdoj.gov
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/09/1999 | 1 | COMPLAINT, FILING FEE $120, RECEIPT #049821. Answer due on 9/20/00. (FE) (Entered: 06/20/2000) |

| 07/09/1999 | 2 | Notice of assignment to Judge Emily C. Hewitt. Copy to parties. (FE) (Entered: 06/20/2000) |
|---|---|---|
| 08/09/1999 | | ***Attorney Alan Brenner for USA added. (dls) (Entered: 12/11/2003) |
| 07/31/2001 | 3 | Decision of Judge Emily C. Hewitt; Copy to parties. See 99-445E for published decision. (HW) (Entered: 07/31/2001) |
| 07/31/2001 | 4 | JUDGMENT entered, pursuant to Rule 58, in favor of defendant and the complaint is dismissed. Each party will bear its own costs. (signed by Clerk). Copy to parties. (LD) (Entered: 07/31/2001) |
| 07/31/2001 | | Case closed (LD) (Entered: 07/31/2001) |
| 09/05/2001 | 25 | ORDER re: Because judgment has been entered in the individual cases related to this matter, the court vacates the judgment entered in case no. 99-445L, and the case shall be closed except for record filing purposes. For purposes of appeal, documents contained in the file for case no. 99-445L shall appropriate, be deemed to be the records of case nos. 00-388L, 99-4451E, 00383E, 00381L, 00-387E, 00-380E, 00-384E, 00-391E, 00-392L, 99-4452E, 00-386E, 99-4453E, 00-385E, 99-4454E, 99-4455E, 00-394L, 00-399E, 00-400E, 99-4456L, 99--4457E, 99-4459E, 00-382E, 00-401L, 00-390E, 00-389E, 00-379E, 99-4458L, 99-44510L, 99-44511E, 00-393L, 99-44512L, 00-398L, 00-397L, 00-396L, 00-395L, and 00-365L. Signed by Judge Emily C. Hewitt. (hwl, ) (Entered: 02/27/2004) |
| 09/24/2001 | 5 | NOTICE OF APPEAL by JOHN H. BANKS, MARY E. BANKS. Copy to Defendant, Judge Emily C. Hewitt and to C.A.F.C. FILING FEE $105.00; RECEIPT # 052444. (HW) (Entered: 09/24/2001) |
| 09/27/2001 | | CAFC Case Number Re: [5-1] appeal by MARY E. BANKS, JOHN H. BANKS. CAFC NUMBER: 01-5150. (HW) (Entered: 10/02/2001) |
| 05/27/2003 | 6 | MANDATE of CAFC reversing 4 Judgment and remanding case for further proceedings. (hwl, ) (Entered: 05/29/2003) |
| 11/18/2003 | 7 | MOTION to Correct and Amend the Case Caption, by JOHN H. BANKS, MARY BANKS.Service: 11/17/03. Response due by 12/4/2003. (jcp, ) (Entered: 11/24/2003) |
| 12/16/2003 | 8 | SEPARATE PROPOSED FINDINGS of Uncontroverted Fact for Pigs' Motion for Summary Judgment on Liability by JOHN H. BANKS, MARY BANKS. Service: 12/15/03.(jcp, ) (Entered: 12/22/2003) |
| 12/16/2003 | 9 | MOTION for Summary Judgment on Liability by JOHN H. BANKS, MARY BANKS.Service: 12/15/03. Response due by 1/15/2004.(jcp, ) (Entered: 12/22/2003) |
| 12/19/2003 | 10 | ORDER: Before the court unfiled is Pltfs' Motion to Correct and Amend the Case Caption (Revised). By leave of court, the Clerk of the Court shall file the document. Signed by Judge Emily C. Hewitt. (jcp, ) (Entered: 12/24/2003) |
| 12/19/2003 | 11 | (REVISED) MOTION to Correct and Amend the Case Caption by JOHN H. BANKS, MARY BANKS. [FILED BY LEAVE OF THE JUDGE]Service: 12/9/03. Response due by 1/5/2004. (jcp, ) (Entered: 12/24/2003) |
| 12/30/2003 | 12 | MOTION to Hold Pltfs' Motion for Summary Judgment in Abeyance Until a Status Conference Can Be Held by USA.Service: 12/30/2003. Response due by 1/16/2004. (jcp, ) (Entered: 01/06/2004) |
| 01/06/2004 | 13 | STATUS CONFERENCE ORDER: A Telephone Status Conference will be held in this matter on Wednesday, 1/14/2004 10:00 AM before Judge Emily C. Hewitt. Signed by Judge Emily C. Hewitt. (jcp, ) (Entered: 01/12/2004) |
| 01/08/2004 | 14 | RESPONSE IN OPPOSITION to 12 Dft's MOTION to Hold Summary Judgment in Abeyance filed by JOHN H. BANKS, MARY BANKS. Reply due by 1/22/2004. Service: 1/7/2004.(jcp, ) (Entered: 01/12/2004) |
| 01/14/2004 | | Minute Entry for proceedings held before Judge Emily C. Hewitt : Telephonic Status Conference held on the record on 1/14/2004. (pcs, ) (Entered: 01/14/2004) |
| 01/14/2004 | | Set/Reset Transcript Deadlines: Transcript due by 1/20/2004. (vpl, ) (Entered: 01/14/2004) |
| 01/14/2004 | 15 | ORDER: Upon review of 7 Pltfs` Motion to Correct and Amend the Case Caption, and 11 Pltfs' Revised Motion to Correct and Amend the Case Caption and with the concurrence of |

dft, the court GRANTS pltfs' motions with respect to pltfs June Cunat, Yolanda Stevens, Gerard Cosgrove, Victoria Jackson and Robert Pancoast: 1) to substitute the successors in interest to the claims of deceased pltfs June M. Cunat, Yolanda P. Stevens and Gerard V. Cosgrove and 2) to correct the names of pltfs Victoria Jackson and Robert Pancoast. With respect to the proper party status, if any, of Mr. James W. Errant, pltfs are directed to file with the court on or before 2/4/2004, a further statement of justification for pltfs' position. 12 Dft's Motion to Hold Pltfs' Motion for Summary Judgment in Abeyance Until a Status Conference Can Be Held is now MOOT. On or before 2/18/2004, dft shall file its opposition to pltfs' motion for summary judgment on liability and, if necessary, seek any relief to which it may be entitled under Rule 56(f) of the CFC. Signed by Judge Emily C. Hewitt. (jcp, ) (Entered: 01/15/2004)

| | |
|---|---|
| 01/14/2004 | Set/Reset Deadlines: Response due by 3/18/2004. Notice of Compliance due by 2/4/2004. (jcp, ) (Entered: 01/15/2004) |
| 01/20/2004 16 | TRANSCRIPT of Proceedings in One Volume held on 1/14/2004 before Judge Emily C. Hewitt. (jcp, ) (Entered: 01/23/2004) |
| 01/22/2004 17 | MOTION to Correct the Case Caption (2nd Revision) by JOHN H. BANKS, MARY BANKS.Service: 1/22/2004. Response due by 2/9/2004. (jcp, ) (Entered: 01/28/2004) |
| 02/03/2004 18 | MOTION for Leave to File Additional Exhibits — Numbered 84 and 85 by JOHN H. BANKS, MARY BANKS.Service: 2/2/2004. Response due by 2/19/2004. (jcp, ) (Entered: 02/09/2004) |
| 02/09/2004 19 | ORDER: 17 Pltfs' Motion to Correct and Amend the Case Caption is GRANTED. The case caption in this matter is amended to substitute the Elizabeth S. Errant Trust as the proper party pltf in lieu of James W. Errant and Elizabeth S. Errant. Signed by Judge Emily C. Hewitt. (jcp, ) (Entered: 02/13/2004) |
| 02/09/2004 20 | ORDER granting 18 Pltfs Motion for Leave to File Additional Exhibits — Numbered 84 and 85. Signed by Judge Emily C. Hewitt. (jcp, ) (Entered: 02/13/2004) |
| 02/09/2004 21 | EXHIBITS 84 and 85 (Contained in Manila Envelope) by all plaintiffs. (jcp, ) (Entered: 02/13/2004) |
| 02/17/2004 24 | NOTICE of Appearance filed by David William Spohr for USA. Service: 2/13/04.(dls) (Entered: 02/27/2004) |
| 02/18/2004 22 | RESPONSE to 9 MOTION for Summary Judgment filed by USA. Reply due by 3/8/2004. Service: 2/18/04.(hwl, ) (Entered: 02/23/2004) |
| 02/20/2004 23 | MOTION for Leave to File Answers to Dft's Second Set of Interrogatories and Request for Production With Expanded Answers and Document Appendix by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST.Service: 2/19/2004. Response due by 3/8/2004. (jcp, ) (Entered: 02/27/2004) |
| 02/25/2004 27 | ORDER granting 23 Motion for Leave to File Answers to Defendant's Interrogatories and Requests for Production. Signed by Judge Emily C. Hewitt. (jat, ) (Entered: 03/01/2004) |
| 02/26/2004 26 | REPLY to Response to Motion re 9 MOTION for Summary Judgment filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. Service: 02/26/2004.(11d, ) (Entered: 02/29/2004) |
| 03/03/2004 28 | SCHEDULING ORDER: The court allows dft until 6/14/2004 to complete discovery process outlined in its RCFC 56(f) Responses to Pltfs' Motion for Summary Judgment. On or before 7/12/2004, dft shall file its opposition to pltfs' summary judgment motion. The responsive briefing thereto shall be filed within the time periods prescribed by the court's rules. Signed by Judge Emily C. Hewitt. (jcp, ) (Entered: 03/05/2004) |
| 07/12/2004 29 | RESPONSE to 9 MOTION for Summary Judgment filed by USA. Reply due by 7/26/2004. Service: 7/9/04.(dwl) Modified on 7/15/2004 to correct service date and reply due date (dwl). (Entered: 07/15/2004) |
| 07/12/2004 | Set Deadlines/Hearings: Reply due by 7/26/2004. (dwl) (Entered: 07/15/2004) |
| 07/12/2004 30 | RESPONSE to Statement of Uncontroverted Fact by USA filed by USA. Service: 7/9/04.(dwl) (Entered: 07/15/2004) |

| | | |
|---|---|---|
| 07/15/2004 | 31 | MOTION for Rule 6.1 Extension of Time to File Reply to 29 Dft's Response to Pltfs' Motion for Summary Judgment until Two Weeks From Such Time as Dr. Nairn's Deposition Transcript is Received by Pltfs or Alternatively until Such Time as the Court Deems Reasonable and Just, by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST.Service: 7/1/2004. Response due by 7/19/2004. (jcp, ) (Entered: 07/19/2004) |
| 07/19/2004 | 32 | ORDER granting 31 Pltfs' Motion for Rule 6.1 Extension of Time to File Reply to 29 Dft's Response to 9 Pltfs' MOTION for Summary Judgment.Pltfs shall file their Reply on or before 8/31/2004. Signed by Judge Emily C. Hewitt. (jcp, ) (Entered: 07/20/2004) |
| 08/02/2004 | 33 | MOTION for Clarification of Introductory Paragraph of Opposition to Plaintiffs' Motion for Summary Judgment and Footnote One of Response to Plaintiffs' Statement of Uncontroverted Fact by USA.Service: 7/30/04. Response due by 8/16/2004 (jat, ) (Entered: 08/05/2004) |
| 08/10/2004 | 34 | ORDER: Before the court is 33 Dft's Motion for Clarification of Introductory Paragraph of Opposition to Plaintiffs' Motion for Summary Judgment and Footnote One of Response to Plaintiffs' Statement of Uncontroverted Fact. As a motion, the filing requires no response and is therefore deemed MOOT. Signed by Judge Emily C. Hewitt. (jcp, ) (Entered: 08/12/2004) |
| 08/24/2004 | 35 | MOTION for Leave to File Deposition Transcript of DOJ Expert Robert B. Nairn, P.E. and Exhibits 5 (2004) 86 — 92, by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST.Service: 8/20/2004. Response due by 9/7/2004. (jcp, ) (Entered: 08/25/2004) |
| 08/26/2004 | 36 | ORDER granting 35 Pltfs' Motion for Leave to File Deposition Transcript of DOJ Expert Robert B. Nairn P.E. and Exhibits 5 (2004) 86-92. Signed by Judge Emily C. Hewitt. (jcp, ) (Entered: 08/27/2004) |
| 08/26/2004 | 37 | DEPOSITION TRANSCRIPT of DOJ Expert Robert B. Nairn P.E., by all plaintiffs. (jcp, ) (Entered: 08/27/2004) |
| 08/26/2004 | 38 | EXHIBITS 5 (2004) and 86 — 92 (in orange manila evelope), by all plaintiffs. (jcp, ) (Entered: 08/27/2004) |
| 08/30/2004 | 39 | REPLY to Dft's Opposition to 9 Pltfs' MOTION for Summary Judgment filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. Service: 8/28/2004.(jcp, ) (Entered: 09/01/2004) |
| 10/12/2004 | 40 | MOTION for Leave to File Exhibits 93, 94 and 95 by JOHN H. BANKS, MARY BANKS and ELIZABETH S. ERRANT TRUST.Service: 10/7/04. Response due by 10/25/2004. (dwl) (Entered: 10/18/2004) |
| 10/18/2004 | 41 | ORDER granting 40 Motion for Leave to File Exhibits 93-95. Defendant may file a memorandum by 10/29/2004 regarding the import of Exhibits 93-95 for the disposition of the pending motion. Signed by Judge Emily C. Hewitt. (jat, ) (Entered: 10/25/2004) |
| 10/29/2004 | 42 | COURT—ORDERED RESPONSE to Pltfs Exhibits 93, 94, and 95, filed by USA. Service: 10/29/2004.(jcp, ) (Entered: 11/03/2004) |
| 11/02/2004 | 43 | ORDER: Before the court unified is Pltfs' Memorandum of Import Regarding Exhibits 93, 94, and 95 as to Their Motion for Summary Judgment on Liability. The document appears to be in response to the court's Order of 10/18/2004 permitting dft to file, on or before Friday, 10/29/2004, a memorandum. The document should have been accompanied by a motion for leave to file. Notwithstanding this defect, the Clerk of the Court shall file the document. Signed by Judge Emily C. Hewitt. (jcp, ) (Entered: 11/04/2004) |
| 11/02/2004 | 44 | MEMORANDUM of Import Regarding Exhibits 93, 94 &95 as to Their Motion for Summary Judgment on Liability by all plaintiffs. [FILED BY LEAVE OF THE JUDGE] Service: 10/28/2004.(jcp, ) (Entered: 11/04/2004) |
| 11/02/2004 | 45 | PUBLISHED OPINION: 9 Pltfs' MOTION for Summary Judgment is DENIED. On or before 11/8/2005, the parties shall provide chambers with three mutually agreeable dates and times for the telephonic status conference. Signed by Judge Emily C. Hewitt. (jcp, ) (Entered: 11/05/2004) |
| 11/09/2004 | 46 | SCHEDULING ORDER: Telephonic Status Conference set for 11/17/2004 11:30 AM before Judge Emily C. Hewitt. Signed by Judge Emily C. Hewitt. (dwl) (Entered: 11/10/2004) |

| 11/09/2004 | 47 | ORDER RETURNING "Plaintiffs' Reply to Defendant's Response Re: Exhibits 93, 94 and 95 and Plaintiffs' Memorandum of Import" received November 5, 2004. No provision in the rules (or court order) for the filing of this item. Signed by Judge Emily C. Hewitt. (dwl) (Entered: 11/10/2004) |
|---|---|---|
| 11/16/2004 | 48 | MOTION to Take Judicial Notice of the Location of the Natural Ordinary Hight Water Mark (NOHWM) or Alternatively to Certify the Question to the Michigan Supreme Court, by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST.Service: 11/15/2004. Response due by 12/2/2004. (jcp, ) (Entered: 11/18/2004) |
| 11/17/2004 | 49 | SCHEDULING ORDER: Parties Joint Proposed Discovery due by 11/23/2004. Telephonic Status Conference set for 12/16/2004 03:30 PM before Judge Emily C. Hewitt. Signed by Judge Emily C. Hewitt. (dwl) (Entered: 11/19/2004) |
| 11/22/2004 | | Set/Reset Transcript Deadlines: Transcript due by 11/18/2004. (vpl, ) (Entered: 11/22/2004) |
| 11/23/2004 | 50 | COURT—ORDERED Proposed Schedule for Discovery by all parties. Service: 11/23/2004. (j cp, ) (Entered: 11/29/2004) |
| 11/30/2004 | 51 | DISCOVERY SCHEDULING ORDER: On or before Friday, 6/17/2005, all discovery (expert and fact) shall conclude. Signed by Judge Emily C. Hewitt. (jcp, ) (Entered: 12/06/2004) |
| 12/01/2004 | 52 | TRANSCRIPT of Proceedings in One Volume held on 11/17/2004 before Judge Emily C. Hewitt. (jcp,) (Entered: 12/09/2004) |
| 12/02/2004 | 53 | RESPONSE to 48 Pltfs' MOTION to Take Judicial Notice of the Location of the Natural Ordinary Hight Water Mark (NOHWM) or Alternatively to Certify the Question to the Michigan Supreme Court, filed by USA. Reply due by 12/16/2004. Service: 12/2/2004.(jcp, ) (Entered: 12/09/2004) |
| 12/10/2004 | 54 | NOTICE OF CORRECTION by all plaintiffs re 48 MOTION Service: 12/2/2004 [BY LEAVE OF THE JUDGE].(1g1, ) (Entered: 12/16/2004) |
| 12/14/2004 | 55 | REPLY to Response to Motion re 48 MOTION filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. Service: 12/13/04.(jat, ) (Entered: 12/21/2004) |
| 12/22/2004 | 56 | ORDER denying 48 Motion to Take Judicial Notice of the Location of the Natural Ordinary High Water Mark, etc. Signed by Judge Emily C. Hewitt. (hwl, ) (Entered: 12/29/2004) |
| 12/23/2004 | | Set/Reset Transcript Deadlines: Transcript due by 12/17/2004. (vpl, ) (Entered: 12/23/2004) |
| 02/25/2005 | 57 | MOTION for Partial Summary Judgment as to the Period of Claim Examination and the High Water Mark by USA.Service: 2/25/2005. Response due by 3/28/2005. (mb2, ) (Entered: 03/01/2005) |
| 03/03/2005 | 58 | MOTION for Extension of Time until 5/31/2005 to File a Report by an Expert Appraiser filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST.Service: 3/1/2005. Response due by 3/18/2005 (mb2, ) (Entered: 03/08/2005) |
| 03/04/2005 | 59 | MOTION for Clarification re: Bifurcation filed by USA.Service: 3/3/2005. Response due by 3/21/2005.(mb2, ) (ar). (Entered: 03/10/2005) |
| 03/09/2005 | 60 | ORDER Setting Hearing on Motion 58 MOTION for Extension of Time until 5/31/2005 to File a Report by an Expert Appraiser, 59 MOTION for Clarification: Motion Hearing set for 3/14/2005 at 04:00 PM before Judge Emily C. Hewitt. Signed by Judge Nancy B. Firestone for Judge Emily C. Hewitt. (mb2, ) (Entered: 03/11/2005) |
| 03/09/2005 | 61 | RESPONSE to 58 MOTION for Extension of Time until 5/31/2005 to File a Report by an Expert Appraiser filed by USA. Reply due by 3/21/2005. Service: 3/9/2005.(mb2, ) (Entered: 03/11/2005) |
| 03/11/2005 | 62 | REPLY to Response to Motion re 58 MOTION for Extension of Time until 5/31/2005 to File a Report by an Expert Appraiser filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. Service: 3/11/2005.(mb2, ) (Entered: 03/16/2005) |
| 03/15/2005 | 63 | DISCOVERY SCHEDULING ORDER: Plaintiffs shall identify and disclose their expert witnesses by 5/20/2005. Defendant shall identify and disclose their expert witnesses by 6/17/2005. Parties shall identify and disclose their rebuttal expert witnesses by 7/15/2005. Discovery shall close by 8/6/2005. Plaintiffs Motion for Enlargement of Time in Which to File a Report by Their Expert Appraiser is now MOOT.The Court CONSOLIDATES the |

related case 04-277 for the limited purpose of addressing the liability issue. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 03117/2005)

03/15/2005 63 ORDER finding as moot 58 Motion for Extension of Time, granting 59 Motion for Clarification. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 03/17/2005)

03/25/2005 64 MOTION for Leave to File Supplemental Missing Pages filed by USA.Service: 3/25/2005. Response due by 4/11/2005. (mb2, ) (Entered: 03/30/2005)

03/25/2005 69 Opposition to Defendant's Motion for Partial Summary Judgment and Cross—Motion for Partial Summary Judgment as to the period of claim examination and the highwater mark by ERROL L. STONE, SUSAN H. STONE. Response due: 4/25/2005Service: 3/25/05.(jat, ) (Entered: 04/11/2005)

03/25/2005 Set/Reset Deadlines: Response to Stone Plaintiffs' cross—motion due by 4/25/2005. (jat, ) (Entered: 04/11/2005)

03/30/2005 65 ORDER granting 64 Motion for Leave to File Supplemental Missing Pages. Signed by Judge Edward J. Damich for Judge Emily C. Hewitt. (mb2, ) (Entered: 04/04/2005)

03/30/2005 66 ORDER DIRECTING THE CLERK TO FILE: Plaintiffs' Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment and Plaintiffs' Memorandum in Support of Their Cross Motion for Summary Judgment.Plaintiffs' Proposed Findings of Uncontroverted Facts and their Responses to Defendant's Proposed Findings of Uncontroverted Facts due by 4/12/2005. Signed by Chief Judge Edward J. Damich for Judge Emily C. Hewitt. (mb2, ) (Entered: 04/04/2005)

03/30/2005 67 CROSS MOTION and RESPONSE to 57 Motion for Partial Summary Judgment filed by USA, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. [FILED BY LEAVE OF THE JUDGE]Service: 3/23/2005. Response due by 5/2/2005.(mb2, ) (Entered: 04/04/2005)

03/30/2005 68 MEMORANDUM in support of the Cross Motion for Summary Judgment as the the period of Claim Examination and the High Water Mark (HWM) by all plaintiffs. [FILED BY LEAVE OF THE JUDGE] Service: 3/23/2005.(mb2, ) Modified on 4/4/2005 (mb2, ). (Entered: 04/04/2005)

04/12/2005 70 PROPOSED FINDINGS of Uncontroverted Fact RE: 67 CROSS MOTION and RESPONSE to 57 Motion for Partial Summary Judgment filed by USA, by all plaintiffs. Service: 4/11/2005. (mb2, ) (Entered: 04/14/2005)

04/14/2005 71 MOTION for Extension of Time to File Response as to all Plaintiffs' Submissions in a consolidated pleading, until 5/6/2005, filed by USA. Service: 4/13/2005. Response due by 5/2/2005.(mb2, ) (Entered: 04/18/2005)

04/18/2005 72 ORDER granting 71 Motion for Extension of Time to File Response/Reply. Response due by 5/6/2005. Reply due by 5/20/2005. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 04/20/2005)

05/02/2005 73 MOTION to Amend Schedule re: 63 Discovery Scheduling Order, filed by USA. Service: 4/29/2005. Response due by 5/16/2005. (mb2, ) (Entered: 05/06/2005)

05/06/2005 74 MOTION for Extension of Time to File Response as to 67 CROSS MOTION and RESPONSE to 57 Motion for Partial Summary Judgment filed by USA, until 5/7/2005, filed by USA. Service: 5/6/2005. Response due by 5/23/2005. (mb2, ) (Entered: 05/11/2005)

05/09/2005 75 RESPONSE to 70 PROPOSED FINDINGS of Uncontroverted Fact, filed by USA. Service: 5/9/2005.(mb2,) (Entered: 05/11/2005)

05/09/2005 76 RESPONSE and reply to 67 CROSS MOTION and RESPONSE to 57 Motion for Partial Summary Judgment filed by USA, filed by USA. Reply due by 5/26/2005. Service: 5/9/2005.(mb2,) (Entered: 05/11/2005)

05/10/2005 77 ORDER granting 74 Motion for Extension of Time to File Response/Reply re 67 CROSS MOTION and RESPONSE to 57 Motion for Partial Summary Judgment filed by USA, Response due by 5/9/2005. Reply due by 5/23/2005. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 05/12/2005)

| | | |
|---|---|---|
| 05/11/2005 | 78 | ORDER granting 73 Motion to Amend Schedule. Plaintiffs shall identify and disclose their expert witnesses by 6/30/2005. Defendant shall identify and disclose its expert witnesses by 7/28/2005. Parties shall identify and disclose their rebuttal expert witnesses by 8/25/2005. Discovery due by 9/16/2005. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 05/13/2005) |
| 05/17/2005 | 79 | NOTICE of Appearance by Terry M. Petrie for USA. Service: 5/16/2005.(mb2, ) (Entered: 05/20/2005) |
| 05/19/2005 | 80 | REPLY to Response to Motion re 67 CROSS MOTION and RESPONSE to 57 Motion for Partial Summary Judgment filed by USA, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST . Service: 05/17/2005.(11d, ) Modified on 5/31/2005 to correct filers. (dls ). (Entered: 05/25/2005) |
| 05/23/2005 | 81 | MOTION for Extension of Time of three days to File Reply as to 69 Opposition to Defendant's Motion for Partial Summary Judgment and Cross—Motion for Partial Summary Judgment as to the period of claim examination and the highwater mark by ERROL L. STONE, SUSAN H. STONE, filed by ERROL L. STONE, SUSAN H. STONE.Service: 5/23/2005. Response due by 6/9/2005. (mb2, ) (Entered: 05/27/2005) |
| 05/26/2005 | 82 | Reply to defendant's Opposition to Cross—Motion for Partial Summary Judgment by ERROL L. STONE and SUSAN H. STONE. Service: 5/26/05.(dwl) (Entered: 06/01/2005) |
| 05/27/2005 | 83 | ORDER granting 81 Motion for Extension of Time to File Reply to Opposition to Motion for Partial Summary Judgment. Signed by Judge Nancy B. Firestone for Judge Emily C. Hewitt. (dwl) (Entered: 06/01/2005) |
| 05/31/2005 | 84 | Reply by JOHN H. BANKS, MARY BANKS and ELIZABETH S. ERRANT TRUST re 75 Response to Proposed Findings of Uncontroverted Fact, by leave of the Judge. Service: 5/21/05.(dwl) (Entered: 06/02/2005) |
| 06/20/2005 | 85 | MOTION to Amend Schedule re: 78 Order on Motion to Amend Schedule, filed by JOHN H. BANKS, MARY BANKS. Service: 6/17/2005. Response due by 7/5/2005. (mb2, ) (Entered: 06/21/2005) |
| 06/23/2005 | 86 | ORDER granting 85 Motion to Amend Schedule. Discovery due by 10/14/2005. Brief due by 7/22/2005. Response due by 8/5/2005. Reply due by 8/12/2005. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 06/27/2005) |
| 06/23/2005 | 87 | PUBLISHED OPINION on 57 MOTION for Partial Summary Judgment filed by USA, 67 CROSS MOTION and RESPONSE to 57 Motion for Partial Summary Judgment filed by USA, filed by JOHN H. BANKS. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 06/27/2005) |
| 07/11/2005 | 88 | MOTION to Amend Schedule re: 86 Order on Motion to Amend Schedule, filed by ALL PARTIES.Service: 7/11/2005. (mb2, ) (Entered: 07/14/2005) |
| 07/14/2005 | 89 | ORDER granting 88 Motion for Extension of Time. Briefs due by 7/29/2005. Responses due by 8/12/2005. Replies due by 8/19/2005. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 07/18/2005) |
| 07/26/2005 | 90 | MOTION for Extension of Time of One Week to File Briefs Due Under the Court's July 14, 2005 Order, filed by USA. Service: 7/26/2005. Response due by 8/12/2005. (mb2, ) (Entered: 07/28/2005) |
| 07/28/2005 | 91 | ORDER granting 90 Motion for Extension of Time. Briefs due by 8/5/2005. Responses due by 8/19/2005. Replies due by 8/26/2005. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 07/29/2005) |
| 07/29/2005 | 92 | Plaintiffs' Answer as to whether the corps is liable for any erosion caused by plaintiffs' own efforts to mitigate the damage from the corps' activities in St. Joseph Harbor by placing shore protection on their respective properties, filed by JOHN H. BANKS, MARY BANKS. Service: 7/28/2005.(mb2, ) (Entered: 07/29/2005) |
| 08/05/2005 | 93 | MOTION for Extension of Time until 8/10/2005 to File Briefs Due Under the Court's July 28, 2005 Order, filed by USA. Service: 8/5/2005. Response due by 8/22/2005. (mb2, ) (Entered: 08/08/2005) |

08/05/2005 94 ORDER granting 93 Motion for Extension of Time. Brief due by 8/10/2005. Response due by 8/24/2005. Reply due by 8/31/2005. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 08/08/2005)

08/10/2005 95 MOTION for Partial Summary Judgment filed by USA. Service: 8/10/05. Dispositive Motion Response due by 8/24/2005. (dwl) (Entered: 08/11/2005)

08/10/2005 96 PROPOSED FINDINGS of Uncontroverted Fact RE: 95 MOTION for Partial Summary Judgment by USA. Service: 8/10/05.(dwl) (Entered: 08/11/2005)

08/12/2005 97 SCHEDULING ORDER: Plaintiffs "Notice of Proof of Service" due by 8/19/2005. Signed by Judge Emily C. Hewitt. (dwl) (Entered: 08/15/2005)

08/12/2005 110 BRIEF on liability for alleged contributory erosion caused by protective structures installed by landowners south of St. Joseph Harbor filed by ERROL L. STONE, SUSAN H. STONE [by leave of the judge].Service: 8/10/05.(dls ) (Entered: 09/07/2005)

08/16/2005 98 MOTION to Take Judicial Notice of the Michigan Supreme Court Ruling on July 29, 2005 in Glass v. Goeckel Docket No. 126409, filed by JOHN H. BANKS, MARY BANKS. Service: 8/12/2005. Response due by 8/29/2005. (mb2, ) (Entered: 08/18/2005)

08/16/2005 99 Notice of Filing Proof of Service, filed by ERROL L. STONE, SUSAN H. STONE. Service: 8/16/2005.(mb2, ) (Entered: 08/18/2005)

08/16/2005 100 MOTION for Extension of Time until 8/24/2005 to Respond to Defendant's Fourth Set of Interrogatories, filed by ERROL L. STONE, SUSAN H. STONE. Service: 8/16/2005. Response due by 9/2/2005. (mb2, ) (Entered: 08/18/2005)

08/24/2005 101 RESPONSE to 92 Plaintiffs' Answer as to whether the corps is liable for any erosion caused by plaintiffs' own efforts to mitigate the damage from the corps' activities in St. Joseph Harbor by placing shore protection on their respective properties, filed by USA. Service: 8/24/2005.(mb2,) (Entered: 08/26/2005)

08/29/2005 102 RESPONSE to 98 MOTION to Take Judicial Notice of the Michigan Supreme Court Ruling on July 29, 2005 in Glass v. Goeckel Docket No. 126409, filed by USA. Reply due by 9/12/2005. Service: 8/29/2005.(mb2, ) (Entered: 08/30/2005)

08/30/2005 103 ORDER ALLOWING THE FILING: Stone Plaintiffs' Response and Opposition to Defendant's Motion for Partial Summary Judgment. Omitted Document due by 9/9/2005. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 08/31/2005)

08/30/2005 104 RESPONSE to 95 MOTION for Partial Summary Judgment, filed by ERROL L. STONE, SUSAN H. STONE. [FILED BY LEAVE OF THE JUDGE] Reply due by 8/31/2005. Service: 8/24/2005.(mb2,) (Entered: 08/31/2005)

08/30/2005 105 ORDER ALLOWING THE FILING: Response to MOTION for Partial Summary Judgment. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 08/31/2005)

08/30/2005 106 RESPONSE to 95 MOTION for Partial Summary Judgment, filed by JOHN H. BANKS, MARY BANKS. [FILED BY LEAVE OF THE JUDGE] Reply due by 8/31/2005. Service: 8/23/2005.(mb2,) (Entered: 08/31/2005)

08/30/2005 107 RESPONSE to 96 PROPOSED FINDINGS of Uncontroverted Fact, filed by JOHN H. BANKS, MARY BANKS. Service: 8/23/2005.(mb2,) (Entered: 08/31/2005)

08/31/2005 108 Reply to 101 Response, filed by ERROL L. STONE, SUSAN H. STONE. Service: 8/31/2005.(mb2, ) (Entered: 09/02/2005)

08/31/2005 109 REPLY to Response to Motion re 95 MOTION for Partial Summary Judgment, filed by USA. Service: 8/31/2005.(mb2, ) (Entered: 09/02/2005)

09/06/2005 111 Reply to 101 Response, filed by JOHN H. BANKS, MARY BANKS. [FILED BY LEAVE OF THE JUDGE] Service: 8/30/2005.(mb2, ) (Entered: 09/08/2005)

09/08/2005 112 RESPONSE to 96 PROPOSED FINDINGS of Uncontroverted Fact, filed by ERROL L. STONE, SUSAN H. STONE. Service: 9/8/2005.(mb2, ) (Entered: 09/13/2005)

09/09/2005 113 REPLY to Response to Motion re 98 MOTION to Take Judicial Notice of the Michigan Supreme Court Ruling on July 29, 2005 in Glass v. Goeckel Docket No. 126409, filed by JOHN H. BANKS, MARY BANKS. Service: 9/8/2005.(mb2,) (Entered: 09/13/2005)

| | | |
|---|---|---|
| 01/09/2006 | 114 | PUBLISHED OPINION denying 98 MOTION to Take Judicial Notice of the Michigan Supreme Court Ruling on July 29, 2005 in Glass v. Goeckel Docket No. 126409 and 95 MOTION For Partial Summary Judgment filed by USA. Signed by Judge Emily C. Hewitt. (mb2, ) Modified on 1/4/2007 to indicate action on 95 (11d, ). (Entered: 01/13/2006) |
| 01/17/2006 | 115 | MOTION to Amend Pleadings — Rule 15 1 Complaint , filed by ERROL L. STONE, SUSAN H. STONE. Service: 1/17/2006. Response due by 2/3/2006. (mb2, ) (Entered: 01/20/2006) |
| 01/30/2006 | 116 | MOTION for Extension of Time of 30 Days to Complete Discovery , filed by JOHN H. BANKS, MARY BANKS. Service: 1/27/2006. Response due by 2/13/2006. (mb2, ) (Entered: 01/31/2006) |
| 01/31/2006 | 117 | MOTION for Extension of Time until 2/10/2006 to File Response as to 115 MOTION to Amend Pleadings — Rule 15 1 Complaint , filed by USA. Service: 1/30/2006. Response due by 2/16/2006. (mb2, ) (Entered: 02/02/2006) |
| 02/02/2006 | 118 | MOTION for Clarification of High Water Mark or MOTION for Certification of the Question of the Michigan Supreme Court to Determine Property Rights Above the HWM , filed by JOHN H. BANKS, MARY BANKS. Service: 2/1/2006. Response due by 2/21/2006. Response due by 2/21/2006. (mb2, ) (Entered: 02/06/2006) |
| 02/07/2006 | 119 | ORDER granting 117 Motion for Extension of Time to File Response/Reply re 115 MOTION to Amend Pleadings — Rule 15 1 Complaint. Response due by 2/10/2006. Reply due by 2/17/2006. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 02/09/2006) |
| 02/09/2006 | 120 | RESPONSE to 115 MOTION to Amend Pleadings — Rule 15 1 Complaint , filed by USA. Reply due by 2/24/2006. Service: 2/9/2006.(mb2, ) (Entered: 02/13/2006) |
| 02/10/2006 | 121 | ORDER granting 116 Motion for Extension of Time to Complete Discovery. Discovery due by 5/17/2006. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 02/14/2006) |
| 02/13/2006 | 122 | ORDER granting 115 Motion to Amend Pleadings — Rule 15(b) Amended Pleadings due by 2/21/2006. Signed by Judge Emily C. Hewitt. (dwl) (Entered: 02/15/2006) |
| 02/15/2006 | 123 | STATUS CONFERENCE ORDER: Status Conference set for 5/18/2006 at 11:00 AM in Chambers (Telephonic) before Judge Emily C. Hewitt. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 02/21/2006) |
| 02/21/2006 | 124 | AMENDED COMPLAINT re 1 Complaint, filed by ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE. Service: 2/21/2006.(mb2, ) (Entered: 02/23/2006) |
| 02/21/2006 | 125 | RESPONSE to 118 MOTION for Clarification MOTION Certification of the Question of the Michigan Supreme Court to Determine Property Rights Above the HWM, filed by USA. Reply due by 3/6/2006. Service: 2/21/2006.(mb2,) (Entered: 02/23/2006) |
| 02/24/2006 | 126 | MOTION for Hearing , filed by USA. Service: 2/23/2006. Response due by 3/13/2006. (mb2, ) (Entered: 03/01/2006) |
| 02/28/2006 | 127 | RESPONSE to 118 MOTION for Clarification, filed by JOHN H. BANKS, MARY BANKS. Reply due by 3/13/2006. Service: 2/27/2006.(mb2, ) (Entered: 03/03/2006) |
| 03/07/2006 | 128 | MOTION for Delay in Expert Disclosures , filed by USA. Service: 3/7/2006. Response due by 3/24/2006. (mb2, ) (Entered: 03/09/2006) |
| 03/09/2006 | 129 | STATUS CONFERENCE ORDER: Status Conference set for 3/16/2006 at 12:00 PM in Chambers (Telephonic) before Judge Emily C. Hewitt. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 03/13/2006) |
| 03/09/2006 | 130 | ORDER granting 128 Motion for Delay in Expert Disclosures. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 03/13/2006) |
| 03/17/2006 | | SEE NO. 05-1353L FOR ORDER CONSOLIDATING CASES. Signed by Judge Emily C. Hewitt. (dls) (Entered: 03/17/2006) |
| 03/17/2006 | 131 | ORDER Striking 123 Status Conference Order and 121 Order on Motion for Extension of Time to Complete Discovery. Signed by Judge Emily C. Hewitt. (dwl) (Entered: 03/20/2006) |
| 03/17/2006 | | Set Deadlines/Hearings: Discovery due by 7/17/2006. Status Conference set for 7/26/2006 11:00 AM in Chambers (Telephonic) before Judge Emily C. Hewitt. (dwl) (Entered: 03/20/2006) |

03/21/2006 132 STIPULATION of Dismissal Regarding Michael S. Walsh, filed by all parties. Service: 3/18/2006.(mb2, ) (Entered: 03/22/2006)

03/23/2006 133 ORDER unconsolidating Walsh v. United States, No. 00-397L from this case. Signed by Judge Emily C. Hewitt. (dls ) (Entered: 03/23/2006)

04/14/2006 134 JOINT PRELIMINARY STATUS REPORT. Service: 4/13/2006.(mb2, ) (Entered: 04/19/2006)

04/20/2006 135 Motion for Leave of the Court to Change Parties Attorney, filed by CHERIE R. OKONSKI, CRAIG D. OKONSKI. [FILED BY LEAVE OF THE JUDGE] Service: 3/10/2006.(mb2, ) (Entered: 04/25/2006)

04/20/2006 136 ORDER Granting 135 Motion for Leave of the Court to Change Parties Attorney, filed by CRAIG D. OKONSKI, CHERIE R. OKONSKI, Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 04/25/2006)

04/20/2006 137 Motion for Leave of the Court to Change Parties Attorney, filed by ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR. [FILED BY LEAVE OF THE JUDGE] Service: 4/14/2006.(mb2, ) (Entered: 04/25/2006)

04/20/2006 138 ORDER granting 137 Motion for Leave of the Court to Change Parties Attorney, filed by ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 04/25/2006)

04/28/2006 139 NOTICE of Change of Address by Terry M. Petrie. Service: 4/27/2006.(mb2, ) (Entered: 05/03/2006)

05/15/2006 140 JOINT PRELIMINARY STATUS REPORT re: 06-72L. Service: 5/12/2006.(mb2, ) (Entered: 05/19/2006)

05/26/2006 141 PUBLISHED OPINION denying 118 MOTION for Clarification MOTION Certification of the Question of the Michigan Supreme Court to Determine Property Rights Above the HAWM. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 06/01/2006)

06/13/2006 142 MOTION to Amend/Correct Scheduling Order , filed by ERROL L. STONE, SUSAN H. STONE. Service: 6/13/2006.Response due by 6/30/2006.(mb2, ) (Entered: 06/15/2006)

06/15/2006 143 ORDER granting 142 Motion to Amend/Correct. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 06/16/2006)

06/30/2006 144 NOTICE of Change of Address by John Broderick Ehret. Service: 6/27/2006.(mb2, ) (Entered: 07/05/2006)

10/11/2006 145 STATUS CONFERENCE ORDER: Status Conference set for 10/16/2006 at 2:00 PM in Chambers (Telephonic) before Judge Emily C. Hewitt. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 10/11/2006)

10/17/2006 146 SCHEDULING ORDER:Joint Record due by 11/13/2006. Motion to Strike due by 11/20/2006. Response due by 12/12/2006. Reply due by 1/3/2007. Oral Argument set for 1/8/2007 at 2:00 PM before Judge Emily C. Hewitt. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 10/17/2006)

11/13/2006 147 JOINT RECORD (with IV Volume Appendix), filed by USA. Service: 11/9/2006.(mb2, ) (Entered: 11/14/2006)

11/20/2006 148 MOTION to Strike Dr. Robert B. Naim's (Naim) Expert Report, filed by JOHN H. BANKS, MARY BANKS. Service: 11/17/2006.Response due by 12/12/2006.(mb2, ) (Entered: 11/20/2006)

11/30/2006 149 NOTICE of Change of Address by John Broderick Ehret, Service: 11/28/2006.(mb2, ) (Entered: 11/30/2006)

12/11/2006 150 MOTION to Amend Schedule re: 146 Scheduling Order, filed by USA. Service: 12/9/2006.Response due by 12/26/2006.(mb2, ) (Entered: 12/11/2006)

12/11/2006 151 ORDER Setting Hearing on Motion 148 MOTION to Strike: Oral Argument set for 1/19/2007 at 2:00 PM in Chambers (Telephonic) before Judge Emily C. Hewitt. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 12/11/2006)

12/12/2006 152 ORDER granting in part and denying in part 150 Motion to Amend Schedule.Response due by 12/15/2006. Reply due by 1/8/2007. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 12/12/2006)

12/15/2006 153 MOTION for Leave to Exceed Page Limit of Response by 3 pages, filed by USA. Service: 12114/2006.Response due by 1/2/2007.(mb2, ) (Entered: 12/18/2006)

12/19/2006 154 ORDER granting 153 Motion for Leave to File Excess Pages. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 12/20/2006)

12/19/2006 155 RESPONSE to 148 MOTION to Strike, filed by USA.Reply due by 12/29/2006. Service: 12/14/2006.(mb2, ) (Entered: 12/20/2006)

12/26/2006 156 MOTION to combine docket reports (No. 99-445L with this case) , filed by JOHN H. BANKS. Service: 12/21/06.Response due by 1/8/2007.(d1s) (Entered: 12/26/2006)

01/04/2007 157 ORDER directing the Clerk to designate this case as an electronic (ECF) case. All future filings will be in electronic form. Signed by Judge Emily C. Hewitt. (mb2, ) (Entered: 01/04/2007)

01/04/2007 158 NOTICE of Designation of Electronic Case. (mb2, ) (Entered: 01/04/2007)

01/04/2007 il2 ORDER regarding exhibits at trial and proposing a pretrial schedule. Parties shall discuss the proposed schedule in advance of the oral argument to be held on 1/19/2007. Signed by Judge Emily C. Hewitt. (nag, ) (Entered: 01/04/2007)

01/04/2007 160 ORDER fmding as moot 156 Motion to consolidate related cases Signed by Judge Emily C. Hewitt. (nag, ) (Entered: 01/04/2007)

01/05/2007 161 REPLY to Response to Motion re 148 MOTION to Strike *Dr. Robert B. Nairn's Report,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR. (Attachments: # 1 Appendix pgs 1-17#2. Appendix pgs 18-41#a Appendix pgs 42-62#A Appendix pgs 63-65# 5 Appendix pgs 66-68#5 Appendix pgs 69-73#/, Appendix pgs 74-87)(Frett, Eugene) (Entered: 01/05/2007)

01/10/2007 162 ORDER Information due by 1/16/2007 and 1/18/2007. Signed by Judge Emily C. Hewitt. (nag, ) (Entered: 01/10/2007)

01/16/2007 163 REPLY to Response to Motion re 148 MOTION to Strike *Dr. Robert B. Nairn's Report (Pursuant to Court Order January 10, 2007),* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR. (Frett, Eugene) (Entered: 01/16/2007)

01/16/2007 164 RESPONSE to *Court Order filed January 10, 2007,* filed by USA. (Attachments: #1 Exhibit Exhibit 1)(Petrie, Terry) (Entered: 01/16/2007)

01/18/2007 165 RESPONSE to *Defendant's January 16, 2007 filing,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR. (Frett, Eugene) (Entered: 01/18/2007)

01/18/2007 166 RESPONSE to *Plaintiffs' Second Reply to Defendant's Opposition to Motion to Strike Dr. Nairn's Expert Report,* filed by USA. (Attachments: #1 # 2)(Petrie, Terry) (Entered: 01/18/2007)

01/19/2007 167 PRETRIAL ORDER Exhibit List due by 3/14/2007. Witness List due by 3/14/2007.Appendix A Filings due by 4/4/2007.Opposing Exhibit List due by 3/14/2007. Opposing Witness List due by 3/14/2007.Opposing Appendix A Filings due by 4/25/2007. Defendant shall file its responses to any motions made by plaintiffs on or before 4/18/2007. Plaintiffs shall file their responses to any motions filed by defendant on or before 5/9/2007. Pretrial Conference set for 5/16/2007 at the National Courts Building. Trial set for 6/4/2007 09:00 AM in Out of Town Location before Judge Emily C. Hewitt. Signed by Judge Emily C. Hewitt. (nag, ) (Entered: 01/19/2007)

01/23/2007 ***Attorney Eugene J. Frett for EUGENE J. FRETT added. (mb2, ) (Entered: 01/23/2007)

01/24/2007 168 TRANSCRIPT of Proceedings (pages 1-82) held on January 19,2007 before Judge Emily C. Hewitt. (dwl) (Entered: 01/25/2007)

02/08/2007 169 MOTION for Protective Order, filed by USA.Response due by 2/26/2007. (Attachments: # 1 Appendix)(Herrmann, Heide) (Entered: 02/08/2007)

02/12/2007 170 ORDER denying 148 Motion to Strike Signed by Judge Emily C. Hewitt. (nag, ) (Entered: 02/12/2007)

02/20/2007 171 RESPONSE to 169 MOTION for Protective Order, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, CHRISTINE M. ZAHL—BODNAR.Reply due by 3/6/2007. (Frett, Eugene) (Entered: 02/20/2007)

02/26/2007 172 MOTION to Dismiss pursuant to Rule 12(b)(1), filed by USA.Response due by 3/29/2007. (Attachments: # 1 Exhibit Exh. 1# 2 Exhibit Exh. 2# 3 Exhibit Exh. 3# 4 Exhibit Exh. 4# 5 Exhibit Exh. 5# 6 Exhibit Exh. 6# 7 Exhibit Exh. 6# 8 Exhibit Exh. 7# 9 Exhibit Exh. 8# 10 Exhibit Exh. 9# 11 Exhibit Exh. 10# 12 Exhibit Exh. 11# 13 Exhibit Exh. 12# 14 Exhibit Exh. 13# 15 Exhibit Exh. 14# 16 Exhibit Exh. 151112 Exhibit Exh. 16# 18 Exhibit Exh. 17# 19 Exhibit Exh. 18)(Petrie, Terry) (Entered: 02/26/2007)

02/28/2007 173 ORDER for a courtesy copy of defendant's motion to partially dismiss Signed by Judge Emily C. Hewitt. (nag, ) (Entered: 02/28/2007)

03/06/2007 174 REPLY to Response to Motion re1.6_2 MOTION for Protective Order, filed by USA. (Attachments: # 1 Appendix)(Hemnaun, Heide) (Entered: 03/06/2007)

03/16/2007 175 ORDER granting 169 Motion for Protective Order to the extent consistent with the form of Protective Order filed just after this order. Signed by Judge Emily C. Hewitt. (nag) (Entered: 03/16/2007)

03/16/2007 176 PROTECTIVE ORDER (related to 175 Order on Motion for Protective Order ). Signed by Judge Emily C. Hewitt. (Attachments: # 1 Exhibit A)(nag) (Entered: 03/16/2007)

03/16/2007 177 ORDER regarding excerpts of documents and a potential site visit. Signed by Judge Emily C. Hewitt. (nag) (Entered: 03/16/2007)

03/21/2007 ː2 RESPONSE to 172 MOTION to Dismiss pursuant to Rule 12(b)(1) MOTION to Dismiss pursuant to Rule 12(b)(1) MOTION to Dismiss pursuant to Rule 12(b)(1), filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR.Reply due by 4/9/2007. (Attachments: # 1 Exhibit Exhibits 1-9 7# 2 Exhibit exhs. 10 to 12_2#1 Exhibit exhs. 13_1 and 13_2# 4 Exhibit exh. 133# 5 Exhibit exh. 14)(Frett, Eugene) Modified on 3/22/2007 to correct reply deadline (mb2, ). (Entered: 03/21/2007)

03/21/2007 179 NOTICE, filed by all parties *Joint Certification of Meeting of all Counsel (Appendix A, Paragraph* 13) (Petrie, Terry) (Entered: 03/21/2007)

04/03/2007 180 MEMORANDUM re: 167 Pretrial Order,,, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR. (Attachments: # 1 Exhibits 1-6 3# 2 Exhibits 7-13)(Frett, Eugene) (Entered: 04/03/2007)

04/04/2007 181 SUPPLEMENTAL BRIEF re: 180 Memorandum, *of Contentions Of Fact And Law Pursuant to Court Dated: 1-19-07 Docket 167, Supplementary Filing To Add Plaintiffs' Witness and Exhibit Lists,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR. (Frett, Eugene) (Entered: 04/04/2007)

04/04/2007 182 Memorandum of Contentions of Fact and Law, filed by ERROL L. STONE, SUSAN H. STONE. (Attachments: # 1 Exhibit A)(Marrocco, Drew) (Entered: 04/04/2007)

04/06/2007 183 JOINT STATUS REPORT *Regarding Site Visit,* filed by all parties. (Ilennaann, Heide) (Entered: 04/06/2007)

| | | |
|---|---|---|
| 04/09/2007 | 14 | REPLY to Response to Motion re 172 MOTION to Dismiss pursuant to Rule 12(b)(1) MOTION to Dismiss pursuant to Rule 12(b)(1) MOTION to Dismiss pursuant to Rule 12(b)(1), filed by USA. (Petrie, Terry) (Entered: 04/09/2007) |
| 04/12/2007 | 185 | ORDER regarding the court's site visit Signed by Judge Emily C. Hewitt. (nag) (Entered: 04/12/2007) |
| 04/17/2007 | | ORDER regarding courthouse location for trial Signed by Judge Emily C. Hewitt. (nag) (Entered: 04/17/2007) |
| 04/19/2007 | 187 | PRETRIAL ORDER setting the agenda for the pretrial conference Signed by Judge Emily C. Hewitt. (nag) (Entered: 04/19/2007) |
| 04/20/2007 | 188 | ORDER Notice of Compliance due by 4/27/2007. Signed by Judge Emily C. Hewitt. (ef2) (Entered: 04/20/2007) |
| 04/24/2007 | 189 | MOTION for Authorization of Service 100+ Miles, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR.Response due by 5/11/2007.(Frett, Eugene) (Entered: 04/24/2007) |
| 04/25/2007 | 2 | STATUS CONFERENCE ORDER:Status Conference set for when parties call the court, beginning from today, 4/25/2007 before 06:00 PM in Chambers (Telephonic) before Judge Emily C. Hewitt. Signed by Judge Emily C. Hewitt. (nag) (Entered: 04/25/2007) |
| 04/25/2007 | 191 | Memorandum of Contentions of Fact and Law, filed by USA. (Attachments: # 1 Exhibit Exh 1# 2 Exhibit Exh 2)(Petrie, Terry) (Entered: 04/25/2007) |
| 04/25/2007 | 192 | Exhibit List *Defendant's Exhibits,* filed by USA. (Attachments: # 1 Exhibit List of Defendant's Exhibits)(Petrie, Terry) (Entered: 04/25/2007) |
| 04/25/2007 | 12a | Witness List, filed by USA. (Petrie, Terry) (Entered: 04/25/2007) |
| 04/25/2007 | 2 | MOTION for Leave to File Designated Deposition Testimony, filed by USA.Response due by 5/14/2007. (Attachments: # 1 Exhibit Exh A)(Petrie, Terry) (Entered: 04/25/2007) |
| 04/25/2007 | | MOTION in Limine *to Exclude the Testimony of Twenty—three of Plaintiffs' Forty—nine Witnesses and Memorandum in Support,* filed by USA.Response due by 5/14/2007. (Attachments: # 1 Exhibit Exh 1# 2 Exhibit Exh 2# 3 Exhibit Exh 3# 4 Exhibit Exh 4# 5 Exhibit Exh 5#1 Exhibit Exh 6)(Petrie, Terry) (Entered: 04/25/2007) |
| 04/25/2007 | 196 | Objection to Exhibit List, filed by USA. Related document: 167 Pretrial Order,,. (Attachments: #1 Exhibit Exh 1# 2 Exhibit Exh 2#2 Exhibit Exh 3# 4 Exhibit Exh 4#1 Exhibit Exh 5)(Petrie, Terry) (Entered: 04/25/2007) |
| 04/27/2007 | | RESPONSE to *Joint Response to Court Order April 20, 2007 Re: Date of 1999 Report,* filed by USA. (Attachments: # 1 Exhibit Declaration of James P. Selegean)(Petrie, Terry) (Entered: 04/27/2007) |
| 04/27/2007 | 198 | ORDERS re Telephonic Status Conference held on April 26, 2007 Signed by Judge Emily C. Hewitt. (Attachments: # 1 Schaetzl# 2 Foster# 3 Morang# 4 Larson# 5 Parson)(nag) (Entered: 04/27/2007) |
| 04/27/2007 | 199 | ORDERS grantingJ32 Motion for Authorization of Service 100+ Signed by Judge Emily C. Hewitt. (Attachments: # 1 Mannesta 2 Ross# 3 Schloop# 4 Schweiger# 5 Segrest# 6 Selegean# 7 Thieme# 8 Thompsont2 Jannereth) (nag) (Entered: 04/27/2007) |
| 05/03/2007 | 200 | Denying—in—part17/ Motion to Dismiss — Rule 12(b)(1); PUBLISHED OPINION. Telephonic Status Conference on 5/7/2007, 4:00 p.m. ET. Signed by Judge Emily C. Hewitt. (ef2) (Entered: 05/03/2007) |
| 05/07/2007 | 201 | RESPONSE to *defendant's memorandum of contentions offact and law (docket 191 4/25/07),* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR. (Frett, Eugene) (Entered: 05/07/2007) |
| 05/07/2007 | 202 | NOTICE, filed by JOHN H. BANKS, MARY BANKS, USA, CHERIE R. OKONSKI, CRAIG D. OKONSKI *Notice -- Joint Submission Regarding Date of 1999 Report* (Petrie, |

Terry) (Entered: 05/07/2007)

| | | |
|---|---|---|
| 05/07/2007 | 203 | SCHEDULING ORDER:Brief due by 5/10/2007, Reply due by 5/14/2007. Response to motions in limine due by 5/14/2007. Signed by Judge Emily C. Hewitt. (ef2) (Entered: 05/07/2007) |
| 05/08/2007 | 2 | MEMORANDUM, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR. (Frett, Eugene) (Entered: 05/08/2007) |
| 05/09/2007 | 205 | RESPONSE to 194 MOTION for Leave to File Designated Deposition Testimony, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR.Reply due by 5/21/2007. (Frett, Eugene) (Entered: 05/09/2007) |
| 05/10/2007 | | ORDER Notice of Compliance due by 5/11/2007. Signed by Judge Emily C. Hewitt. (e12) (Entered: 05/10/2007) |
| 05/10/2007 | 202, | RESPONSE to 195 MOTION in Limine *to Exclude the Testimony of Twenty—three of Plaintiffs' Forty—nine Witnesses and Memorandum in Support,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR.Reply due by 5/24/2007. (Frett, Eugene) (Entered: 05/10/2007) |
| 05/11/2007 | 208 | RESPONSE to *Court Order Filed May 10, 2007,* filed by USA. (Attachments: # 1 Exhibit Defendant's Letter to Plaintiffs dated March 12, 2007)(Petrie, Terry) (Entered: 05/11/2007) |
| 05/11/2007 | 21.2 | Exhibit List *and witnesses pursuant to Court Order (Docket 206 — 5/10/07),* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, Witness List, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR. (Frett, Eugene) (Entered: 05/11/2007) |
| 05/11/2007 | 21.0. | MOTION for Leave to File Response to Court Order of May 10, 2007, filed by USA.Response due by 5/29/2007. (Attachments: # 1 Exhibit Def Resp to Court Order filed May 10, 2007# 2 Exhibit Exh 1)(Petrie, Terry) (Entered: 05/11/2007) |
| 05/11/2007 | 211 | MOTION to Strike 207 Response to Motion,, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR.Response due by 5/29/2007.(Frett, Eugene) (Entered: 05/11/2007) |
| 05/11/2007 | 212 | RESPONSE to 195 MOTION in Limine *to Exclude the Testimony of Twenty—three of Plaintiffs' Forty--nine Witnesses and Memorandum in Support,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR.Reply due by 5/25/2007. (Frett, Eugene) (Entered: 05/11/2007) |
| 05/11/2007 | 213 | ORDER granting1th Motion for Leave to File. Signed by Judge Emily C. Hewitt. (ef2) (Entered: 05/11/2007) |
| 05/14/2007 | 11A | NOTICE of Change of Address by Eugene J. Frett (Frett, Eugene) (Entered: 05/14/2007) |
| 05/14/2007 | 215 | RESPONSE to_2a4 Memorandum *Defendant's Response to Plaintiffs' Submission Regarding Date of the 1999 Report,* filed by USA. (Attachments: # 1 Exhibit 1# 2 Exhibit 2)(Pritchard, G.) (Entered: 05/14/2007) |
| 05/15/2007 | | Set/Reset Transcript Deadlines: Transcript due by 5/17/2007. (vpl, ) (Entered: 05/15/2007) |

05/15/2007 216 OPINION AND ORDER denying—in—part defendant's 172 motion to dismiss. Signed by Judge Emily C. Hewitt. (ef2) Modified on 5/17/2007 (mb2, ). (Entered: 05/15/2007)

05/17/2007 217 ORDER summarizing the Pre—Trial Conference and in re 195 MOTION in Limine *to Exclude the Testimony of Twenty—three of Plaintiffs' Forty—nine Witnesses and Memorandum in Support* filed by USA Signed by Judge Emily C. Hewitt. (nag) (Entered: 05/17/2007)

05/17/2007 218 ORDER removing subpoena authorization for witnesses that the court has ruled will be excluded from testifying at trial. Signed by Judge Emily C. Hewitt. (nag) (Entered: 05/17/2007)

05/17/2007 219 TRANSCRIPT of Proceedings (pages 1-194) held on May 16,2007 before Judge Emily C. Hewitt. (dwl) (Entered: 05/18/2007)

05/18/2007 220 SUPPLEMENTAL BRIEF re: 217 Order, *Defendant's Submission in Response to Order of May 17, 2007,* filed by USA. (Pritchard, G.) (Entered: 05/18/2007)

05/22/2007 221 RESPONSE to217 Order,, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR. (Frett, Eugene) (Entered: 05/22/2007)

05/23/2007 222 Unopposed MOTION for Extension of Time until August 29,2007 to To File Post—Trial Briefs, filed by USA.Response due by 6/11/2007.(Herrmarm, Heide) (Entered: 05/23/2007)

05/23/2007 223 NOTICE, filed by USA *Joint Preliminary Trial Schedule* (Attachments: *#1.* Exhibit Preliminary Trial Schedule)(Petrie, Terry) (Entered: 05/23/2007)

05/24/2007 224 ORDER denying 222 Motion for Extension of Time Signed by Judge Emily C. Hewitt. (nag) (Entered: 05/24/2007)

05/24/2007    ORDER regarding Dr. Larson's and Mr. Thieme's appearances in court Signed by Judge Emily C. Hewitt. (nag) (Entered: 05/24/2007)

05/29/2007 226 RESPONSE to *Defendant's Response to Order Filed May 24, 2007,* filed by USA. (Petrie, Terry) (Entered: 05/29/2007)

05/30/2007 227 RESPONSE to 224 Order on Motion for Extension of Time to File, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR. (Frett, Eugene) (Entered: 05/30/2007)

05/31/2007 228 RESPONSE to 224 Order on Motion for Extension of Time to File, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, ERROL L. STONE, SUSAN H. STONE, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR. (Frett, Eugene) (Entered: 05/31/2007)

06/01/2007 229 STIPULATION of Dismissal with prejudice, filed by ERROL L. STONE, SUSAN H. STONE.. (Marrocco, Drew) (Entered: 06/01/2007)

06/04/2007    Set/Reset Transcript Deadlines: Transcript due by 6/12/2007. (vpl, ) (Entered: 06/04/2007)

06/11/2007 230 TRANSCRIPT of Proceedings (pages 1-257) held on June 4,2007 before Judge Emily C. Hewitt. (dwl) (Entered: 06/11/2007)

06/12/2007    Set/Reset Transcript Deadlines: Transcript due by 6/12/2007. (vpl, ) (Entered: 06/12/2007)

06/12/2007 231 MOTION Notice of Compliance, filed by USA.Response due by 6/29/2007.(Petrie, Terry) (Entered: 06/12/2007)

06/13/2007 232 ORDER directing the Clerk to dismiss case no. 04-277 (Stone plaintiffs). Signed by Judge Emily C. Hewitt. (nag) (Entered: 06/13/2007)

06/13/2007 233 ORDER entered 231 Motion that defendant has complied with court's directive to submit to the court and plaintiffs copies of its demonstrative exhibits. Signed by Judge Emily C. Hewitt. (nag) (Entered: 06/13/2007)

06/13/2007 234 JUDGMENT entered, as provided in Rule 54(b), that in Case No. 04-277L judgment is entered in favor of defendants and against the Stone plaintiffs. (11d) (Entered: 06/13/2007)

| | | |
|---|---|---|
| 06/15/2007 | 2.31 | TRANSCRIPT of Proceedings (pages 851-1073) held on June 7, 2007 before Judge Emily C. Hewitt. (dwl) (Entered: 06/15/2007) |
| 06/15/2007 | 236 | TRANSCRIPT of Proceedings (pages 258-554) held on June 5, 2007 before Judge Emily C. Hewitt. (dwl) (Entered: 06/19/2007) |
| 06/18/2007 | 237 | TRANSCRIPT of Proceedings (pages 555-795/850) held on June 6, 2007 before Judge Emily C. Hewitt. (dwl) (Entered: 06/19/2007) |
| 06/19/2007 | 238 | SCHEDULING ORDER:Post Trial Briefs due 7/6/2007.,Post Trial Response Briefs due 7/18/2007. Signed by Judge Emily C. Hewitt. (nag) (Entered: 06/19/2007) |
| 06/19/2007 | 239 | TRANSCRIPT of Proceedings (pages 1074-1349) held on June 8, 2007 before Judge Emily C. Hewitt. (dwl) (Entered: 06/20/2007) |
| 06/29/2007 | 240 | Cumulative Index for TRANSCRIPT of Proceedings held on June 4, 2007 through June 8, 2007. Filed with defendant exhibits: 1-3,6-9,11,13-15,17,19,20,22,23,25,27¯32,34,129,131,140. Plaintiff exhibits: 22-24,28,31-34,40,41,46,61,68,74AA,74Y,74Z,75,90,93,94,96,101,102,102A,107,113¯117, 119,121,123,124,130,132,133,136,137. (Entered: 07/03/2007) |
| 07/06/2007 | 241 | POST TRIAL BRIEF, filed by MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR. (Frett, Eugene) (Entered: 07/06/2007) |
| 07/06/2007 | 242 | POST TRIAL BRIEF, filed by USA. (Petrie, Terry) (Entered: 07/06/2007) |
| 07/18/2007 | 243 | RESPONSE to 242 Post Trial Brief, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR. (Frett, Eugene) (Entered: 07/18/2007) |
| 07/18/2007 | 244 | RESPONSE to *Defendant's Response to Plaintiffs' Post—Trial Brief,* filed by USA. (Petrie, Terry) (Entered: 07/18/2007) |
| 09/28/2007 | 245 | PUBLISHED OPINION determining extent of liability for erosion damage to plaintiffs' properties. Signed by Judge Emily C. Hewitt. (jh4) (Entered: 09/28/2007) |
| 10/01/2007 | 2 | ORDER fmding as moot 194 Motion for Leave to File ; finding as moot 195 Motion in Limine; finding as moot 211 Motion to Strike ; finding as moot 231 Motion for Notice of Compliance Signed by Judge Emily C. Hewitt. (jh4) (Entered: 10/01/2007) |
| 11/01/2007 | 247 | MOTION to Amend/Correct *The Case Caption,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR.Response due by 11/19/2007.(Frett, Eugene) (Entered: 11/01/2007) |
| 11/06/2007 | 248 | NOTICE of Change of Address by Eugene J. Frett (Frett, Eugene) (Entered: 11/06/2007) |
| 11/14/2007 | 242 | ORDER granting 42 Motion to Amend/Correct the Case Caption Signed by Judge Emily C. Hewitt. (jh4) (Entered: 11/14/2007) |
| 12/14/2007 | 250 | STATUS REPORT ORDERStatus Report due by 12/20/2007 Signed by Judge Emily C. Hewitt. (jh4) (Entered: 12/14/2007) |
| 12/19/2007 | 251 | STATUS REPORT, filed by all plaintiffs. (Frett, Eugene) (Entered: 12/19/2007) |
| 12/20/2007 | 252 | STATUS REPORT *Defendant's Status Report,* filed by USA. (Attachments: # 1 Exhibit Redacted Letter of November 8, 2007)(Petrie, Terry) (Entered: 12/20/2007) |
| 01/04/2008 | 253 | MOTION for Leave to File Supplement Status Report , filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR.Response due by 1/22/2008.(Frett, Eugene) (Entered: 01/04/2008) |
| 01/09/2008 | 254 | STATUS CONFERENCE ORDER:Status Conference set for 1/22/2008 11:00 AM EST in Chambers (Telephonic) before Judge Emily C. Hewitt. Signed by Judge Emily C. Hewitt. (jh4) (Entered: 01/09/2008) |
| 01/15/2008 | 255 | MOTION to Appoint Counsel *Mark Christensen,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, |

CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M.
ZAHL—BODNAR.Response due by 2/1/2008.(Frett, Eugene) (Entered: 01/15/2008)

| | | |
|---|---|---|
| 01/17/2008 | 256 | RESPONSE to 253 MOTION for Leave to File Supplement Status Report, filed by USA.Reply due by 2/1/2008. (Attachments: # 1 Exhibit)(Petrie, Terry) (Entered: 01/17/2008) |
| 01/18/2008 | 257 | ORDER responding to motion 255 Motion to Appoint Counsel Signed by Judge Emily C. Hewitt. (jh4) (Entered: 01/18/2008) |
| 01/22/2008 | a | STATUS CONFERENCE ORDER:Status Conference set for 2/19/2008 11:00 AM EST in Chambers (Telephonic) before Judge Emily C. Hewitt. Signed by Judge Emily C. Hewitt. (jh4) (Entered: 01/22/2008) |
| 02/01/2008 | 22 | TRANSCRIPT of Proceedings (pages 1-17) held on January 22, 2008 before Judge Emily C. Hewitt. (dwl) (Entered: 02/04/2008) |
| 02/19/2008 | 260 | SCHEDULING ORDER: Plaintiffs' Brief due by 5/20/2008., Defendant's Response due by 7/8/2008., Plaintiffs' Reply due by 8/5/2008 Signed by Judge Emily C. Hewitt. (jh4) (Entered: 02/19/2008) |
| 02/25/2008 | 2AL | TRANSCRIPT of Proceedings (pages 1-32) held on February 19, 2008 before Judge Emily C. Hewitt. (dwl) (Entered: 02/26/2008) |
| 05/20/2008 | 2.62 | MEMORANDUM, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT. (Christensen, Mark) (Entered: 05/20/2008) |
| 05/21/2008 | 263 | ORDER to correct filing Corrected Memorandum due by 5/28/2008. Signed by Judge Emily C. Hewitt. (jh4) (Entered: 05/21/2008) |
| 05/28/2008 | 264 | MEMORANDUM, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT. (Christensen, Mark) (Entered: 05/28/2008) |
| 06/13/2008 | 265 | NOTICE of Change of Address by Mark Englund Christensen (Christensen, Mark) (Entered: 06/13/2008) |
| 07/01/2008 | 266 | Unopposed MOTION to Amend Schedule re: 260 Scheduling Order, filed by USA.Response due by 7/18/2008.(Petrie, Terry) (Entered: 07/01/2008) |
| 07/02/2008 | 267 | ORDER granting 266 Motion for Extension of Time Defendant's Response due by 7/15/2008. Plaintiffs' Reply due by 8/12/2008. Signed by Judge Emily C. Hewitt. (jh4) (Entered: 07/02/2008) |
| 07/15/2008 | 268 | RESPONSE to *Defendant's Response to Plaintiffs' Damages Trial Memorandum,* filed by USA. (Attachments: # 1 Exhibit Exh. 1, # 2 Exhibit Exh. 2, # 3 Exhibit Exh. 3, # 4 Exhibit Exh. 4, # 5 Exhibit Exh. 5, # 6 Exhibit Exh. 6, #1 Exhibit Exh. 7)(Petrie, Terry) (Entered: 07/15/2008) |
| 08/05/2008 | 269 | Unopposed MOTION for Extension of Time until August 22, 2008 to to reply to Defendant's Response to Plaintiffs' Damages Trial Memorandum *currently due August 12, 2008 under the Court's Order dated July 2, 2008,* filed by MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR.Response due by 8/22/2008.(Frett, Eugene) (Entered: 08/05/2008) |
| 08/05/2008 | 270 | ORDER granting 269 Motion for Extension of TimePlaintiffs' Reply due by 8/22/2008 Signed by Judge Emily C. Hewitt. (jh4) (Entered: 08/05/2008) |
| 08/22/2008 | 271 | *Reply in Support of Plaintiffs' Damages Trial Memorandum,* filed by MARY BANKS, EUGENE J. FRETT, ANDREW C. BODNAR. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Christensen, Mark) Modified on 8/23/2008 (dls). (Entered: 08/22/2008) |
| 08/22/2008 | 22Z. | MOTION to Strike *Declaration of David Wolfe and James Selegean,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT.Response due by 9/8/2008.(Christensen, Mark) (Entered: 08/22/2008) |
| 09/04/2008 | 273 | ORDER ON FORM OF FILING Signed by Judge Emily C. Hewitt. (ae) (Entered: 09/04/2008) |
| 09/05/2008 | 17A | RESPONSE to 272 MOTION to Strike *Declaration of David Wolfe and James Selegean,* filed by USA.Reply due by 9/19/2008. (Petrie, Terry) (Entered: 09/05/2008) |

| | | |
|---|---|---|
| 09/19/2008 | 275 | REPLY to Response to Motion re 272 MOTION to Strike *Declaration of David Wolfe and James Selegean*, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR. (Frett, Eugene) (Entered: 09/19/2008) |
| 10/15/2008 | 276 | PUBLISHED OPINION ( Status Report due by 10/29/2008) finding as moot 272 Motion to Strike. Treating 24 Plaintiffs' Damages Trial Memorandum as a Motion for Reconsideration and Permitting Introduction of Certain Additional Evidence. Signed by Judge Emily C. Hewitt. (ae) (Entered: 10/15/2008) |
| 10/17/2008 | 277 | Consented MOTION to Substitute Attorney Mark E. Christensen in place of John B. Ehret, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT. (Attachments:     Exhibit A, # 2 Exhibit B)(Christensen, Mark) (Entered: 10/17/2008) |
| 10/27/2008 | 278 | Joint MOTION for Extension of Time until November 7, 2008 to To provide a Joint Status Report, filed by USA.Response due by 11/1312008.(Petrie, Terry) (Entered: 10/27/2008) |
| 10/28/2008 | 279 | ORDER granting 278 Motion for Extension of Time Status Report due by 11/7/2008 Signed by Judge Emily C. Hewitt. (ae) (Entered: 10/28/2008) |
| 11/07/2008 | 280 | STATUS REPORT *Plaintiffs'*, filed by JOHN H. BANKS, MARY BANKS, EUGENE J. FRETT, EHRET MICHIGAN TRUST. Status Report due by 11/7/2008 (Christensen, Mark) (Entered: 11/07/2008) |
| 11/07/2008 | 281 | STATUS REPORT *Defendant's Status Report on Further Proceedings*, filed by USA. (Petrie, Terry) (Entered: 11/07/2008) |
| 11/12/2008 | 282 | SCHEDULING ORDER following Parties' Status Reports filed in Response to Published Opinion/Order of October 15; 2008 Signed by Judge Emily C. Hewitt. (ae) (Entered: 11/12/2008) |
| 11/12/2008 | | Set/Reset Deadlines: Motion(s) due by 3/31/2009; Response due by 4/21/2009; and Reply due by 5/5/2009. (jtl) (Entered: 11/14/2008) |
| 11/13/2008 | 181 | NOTICE of Change of Address by Eugene J. Frett (Frett, Eugene) (Entered: 11/13/2008) |
| 02/17/2009 | 284 | MOTION for Extension of Time until March 3, 2009 to file motions regarding ownership, filed by EHRET MICHIGAN TRUST.Response due by 3/6/2009. (Attachments: # 1 Exhibit A)(Christensen, Mark) (Entered: 02/17/2009) |
| 02/17/2009 | 285 | ORDER granting 284 Motion for Extension of Time Signed by Judge Emily C. Hewitt. (ae) (Entered: 02/17/2009) |
| 02/17/2009 | | Set/Reset Deadlines: Motion(s) due by 3/3/2009. Response due by 3/24/2009. Reply due by 4/7/2009. (jtl) (Entered: 02/17/2009) |
| 03/03/2009 | 286 | Second MOTION for Extension of Time until March 10, 2009 to to allow parties to file Motions Related to Ownwership issues, filed by EUGENE J. FRETT, EHRET MICHIGAN TRUST.Response due by 3/20/2009. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Christensen, Mark) (Entered: 03/03/2009) |
| 03/03/2009 | 287 | MOTION to Amend/Correct 286 Second MOTION for Extension of Time until March 10, 2009 to to allow parties to file Motions Related to Ownwership issues, filed by EUGENE J. FRETT, EHRET MICHIGAN TRUST.Response due by 3/20/2009. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Christensen, Mark) (Entered: 03/03/2009) |
| 03/03/2009 | 181 | ORDER granting 287 Plaintiffs Amended Second Motion for an Extension of Time to File Motions Regarding Ownership; This Scheduling Order to SUPERSEDE Orders of Nov 12, 2008 and Feb 17, 2009 Signed by Judge Emily C. Hewitt. (ae) (Entered: 03/03/2009) |
| 03/10/2009 | 289 | STIPULATION, filed by USA, EUGENE J. FRETT, EHRET MICHIGAN TRUST. (Attachments: # 1 Exhibit A)(Christensen, Mark) (Entered: 03/10/2009) |
| 03/10/2009 | 290 | MOTION for Declaratory Judgment (Response due by 3/27/2009.), MOTION for Clarification, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Christensen, Mark) (Entered: 03/10/2009) |

| | | |
|---|---|---|
| 03/10/2009 | 291 | MOTION for Summary Judgment *Plaintiffs' Omnibus Motion* , MOTION for Leave to File Leave to Supplement Omnibus Motion , filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST.<font style=color:AF3636;font—weightbold;> (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Christensen, Mark) RULING DEFERRED — NO RESPONSE DUE (Entered: 03/10/2009) |
| 03/11/2009 | 292, | STIPULATION II, filed by all parties. (Attachments: # 1 Exhibit Exhibit A)(Christensen, Mark) (Entered: 03/11/2009) |
| 03/11/2009 | 22.3. | MOTION for Extension of Time until March 24, 2009 to to allow the parties to file Motions Related to Ownership issues for Greenbriar Development, filed by EUGENE J. FRETT, EHRET MICHIGAN TRUST.Response due by 3/30/2009. (Attachments: #1 Exhibit A, #1 Exhibit B, # 3 Exhibit C)(Christensen, Mark) (Entered: 03/11/2009) |
| 03/11/2009 | 294 | MOTION for Leave to File *an Amended Complaint,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST. (Attachments: # 1 Supplement Memorandum in Support of Plaintiffs' Motion for Leave to File an Amended Complaint, # 2 Exhibit Exhibit A)(Christensen, Mark) RULING DEFERRED — NO RESPONSE DUE Modified on 11/9/2009 (jtl). (Entered: 03/11/2009) |
| 03/18/2009 | 295 | ORDER deferring ruling on 291 Motion for Summary Judgment; deferring ruling on 291 Motion for Leave to File ; granting 293 Motion for Extension of Time for Greenbriar Development Briefing Only, Ownership Motion Briefing Schedule Otherwise Unchanged; deferring ruling on 294 Motion for Leave to File Signed by Chief Judge Emily C. Hewitt (ae) (Entered: 03/18/2009) |
| 03/20/2009 | 296 | Unopposed MOTION for Extension of Time until 04/15/2009 to Respond to Plaintiffs' Request for Production of Documents, filed by USA.Response due by 4/6/2009.(Petrie, Terry) (Entered: 03/20/2009) |
| 03/23/2009 | 221 | ORDER granting 296 Motion for Extension of Time Signed by Chief Judge Emily C. Hewitt. (ae) (Entered: 03/23/2009) |
| 03/24/2009 | 22a | Second MOTION for Extension of Time until 03/31/2009 to File Motions Regarding Ownership for Plaintiff Greenbriar Development, Inc., filed by JOHN H. BANKS, MARY BANKS.Response due by 4/10/2009. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Christensen, Mark) (Entered: 03/24/2009) |
| 03/24/2009 | 222 | ORDER granting 2Q$ Motion for Extension of Time for Greenbriar Development Only; Remainder of Briefing Schedule in Paragraphs I.B.2 and I.B.3, H, and III, of March 3, 2009 Order (Dkt. No. 288) Shall Not Be Altered Signed by Chief Judge Emily C. Hewitt. (ae) (Entered: 03/24/2009) |
| 03/27/2009 | 300 | First MOTION for Extension of Time until 04/10/2009 to File Response or Reply as to 294 MOTION for Leave to File *an Amended Complaint,* filed by USA.Response due by 4/13/2009.(Petrie, Terry) (Entered: 03/27/2009) |
| 03/30/2009 | 301 | ORDER finding as moot 300 Motion for Extension of Time to File Response/Reply Signed by Chief Judge Emily C. Hewitt. (ae) (Entered: 03/30/2009) |
| 03/31/2009 | 302 | RESPONSE to 291 MOTION for Summary Judgment *Plaints' Omnibus Motion* MOTION for Leave to File Leave to Supplement Omnibus Motion, 290 MOTION for Declaratory Judgment MOTION for Clarification, filed by USA.Reply due by 4/14/2009. (Petrie, Terry) Modified on 4/1/2009 to correct reply deadline (jtl). (Entered: 03/31/2009) |
| 03/31/2009 | 101 | STIPULATION *III — Greenbriar Development, Inc.,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST. (Attachments: # 1 Exhibit Exhibit A)(Christensen, Mark) (Entered: 03/31/2009) |
| 03/31/2009 | | Set/Reset Deadlines: Reply due by 4/14/2009. (41) (Entered: 04/01/2009) |

| | | |
|---|---|---|
| 04/14/2009 | 304 | Unopposed MOTION for Extension of Time until April 17, 2009 to File Response or Reply as to 302 Response to Motion,, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST.Response due by 5/1/2009. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C)(Christensen, Mark) (Entered: 04/14/2009) |
| 04/14/2009 | 305 | ORDER granting 304 Motion for Extension of Time to File Response/Reply; Plaintiffs' Reply due 4/17/09; Defendant's Request DENIED as MOOT; Briefing on Plaintiffs' Omnibus Motion Premature Signed by Chief Judge Emily C. Hewitt. (ae) (Entered: 04/14/2009) |
| 04/14/2009 | | Set/Reset Deadlines: Reply due by 4/17/2009. OM (Entered: 04/15/2009) |
| 04/17/2009 | 306 | REPLY to Response to Motion re 290 MOTION for Declaratory Judgment MOTION for Clarification, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST. (Christensen, Mark) (Entered: 04/17/2009) |
| 04/28/2009 | 307 | First MOTION for Extension of Time until 5/07/09 to file opening motions for reasonably foreseeable future loss, filed by USA.Response due by 5/15/2009.(Petrie, Terry) (Entered: 04/28/2009) |
| 04/29/2009 | 308 | ORDER granting3Q2 Motion for Extension of Time on "All Reasonably Foreseeable Future Loss;" Motions 5/7/09; Responses 5/28/09; Replies 6/11/09 Signed by Chief Judge Emily C. Hewitt. (ae) (Entered: 04/29/2009) |
| 04/29/2009 | | Set/Reset Deadlines: Motion(s) due by 5/7/2009. Response due by 5/28/2009. Reply due by 6/11/2009. (0) (Entered: 04/29/2009) |
| 05/07/2009 | 309 | MOTION Finding of the Legal Interpretation of "All Reasonably Foreseeable Future Loss" re 282 Scheduling Order, 288 Order on Motion to Amend/Correct,, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST.Response due by 5/26/2009.(Christensen, Mark) (Entered: 05/07/2009) |
| 05/07/2009 | 310 | First MOTION *Defendant's Memorandum on the Legally Correct Interpretation of the Phase !!All Reasonably Foreseeable Future Loss,* filed by USA.Response due by 5/26/2009.(Petrie, Terry) (Entered: 05/07/2009) |
| 05/26/2009 | 311 | MOTION for Extension of Time until 06/15/2009 to File Response, filed by USA.Response due by 6/12/2009.(Petrie, Terry) (Entered: 05/26/2009) |
| 05/27/2009 | 312 | ORDER granting 311 Motion for Extension of Time to File Response Response due by 6/15/2009. Reply due by 6/29/2009. Signed by Chief Judge Emily C. Hewitt. (ae) (Entered: 05/27/2009) |
| 06/01/2009 | 313 | NOTICE of Change of Address by Mark Englund Christensen (Christensen, Mark) (Entered: 06/01/2009) |
| 06/08/2009 | 314 | MOTION for Extension of Time,until Stay the Deadlines in the March 3, 2009 Order Until 30 Days After Ruling on Pending Motions, to Complete Discovery *Pertaining to Experts,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST.Response due by 6/25/2009.(Christensen, Mark) (Entered: 06/08/2009) |
| 06/09/2009 | 315 | RESPONSE to Motion re 314 MOTION for Extension of Time,until Stay the Deadlines in the March 3, 2009 Order Until 30 Days After Ruling on Pending Motions, to Complete Discovery *Pertaining to Experts,* filed by USA.Reply due by 6/22/2009. (Petrie, Terry) (Entered: 06/09/2009) |
| 06/10/2009 | | Minute Entry for proceeding held in Washington, DC on 6/10/2009 before Chief Judge Emily C. Hewitt: Status Conference. [Total number of MINUTES of proceeding: 10]. Official Record of proceeding taken via electronic digital recording (EDR). (Click HERE for link to Court of Federal Claims web site forms page for information on ordering: certified transcript from reporter or certified transcript of proceeding from official digital recording.)(ae) (Entered: 06/10/2009) |

| | | |
|---|---|---|
| 06/10/2009 | 31A | ORDER granting 314 Plaintiffs' Motion to Stay Current Scheduling Order; March 3, 2009 Order STAYED until further order of the court Signed by Chief Judge Emily C. Hewitt. (ae) (Entered: 06/10/2009) |
| 06/15/2009 | 317 | RESPONSE to 310 First MOTION *Defendant's Memorandum on the Legally Correct Interpretation of the Phase "All Reasonably Foreseeable Future Loss,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST.Reply due by 6/29/2009. (Christensen, Mark) (Entered: 06/15/2009) |
| 06/15/2009 | 318 | RESPONSE to 309 Motion for Miscellaneous Relief, *Defendant's Response to Plaintiffs' Brief Setting Forth the Legally Correct Interpretation of the Phrase "All Reasonably Foreseeable Future Loss",* filed by USA. (Petrie, Terry) (Entered: 06/15/2009) |
| 06/29/2009 | 319 | REPLY to Response to Motion re 309 MOTION Finding of the Legal Interpretation of "All Reasonably Foreseeable Future Loss" re 282 Scheduling Order, 288 Order on Motion to Amend/Correct, MOTION Finding of the Legal Interpretation of "All Reasonably Foreseeable Future Loss" re 282 Scheduling Order, 288 Order on Motion to Amend/Correct,, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST. (Christensen, Mark) (Entered: 06/29/2009) |
| 06/29/2009 | 320 | MOTION for Extension of Time until 7/22/2009 to File Answer re 282 Scheduling Order *Answer Defendant's First Set of Interrogatories and Request for Production of Documents to Plaintiffs,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST.Response due by 7/16/2009.(Christensen, Mark) (Entered: 06/29/2009) |
| 06/29/2009 | 321 | REPLY to Response to Motion re 310 First MOTION *Defendant's Memorandum on the Legally Correct Interpretation of the Phase "All Reasonably Foreseeable Future Loss,* filed by USA. (Petrie, Terry) (Entered: 06/29/2009) |
| 06/30/2009 | 322 | RESPONSE to 320 MOTION for Extension of Time until 7/22/2009 to File Answer re 282 Scheduling Order *Answer Defendant's First Set of Interrogatories and Request for Production of Documents to Plaintiffs* MOTION for Extension of Time until 7/22/2009 to File Answer re 282 Scheduling Order *Answer Defendant's First Set of Interrogatories and Request for Production of Documents to Plaintiffs,* filed by USA.Reply due by 7/13/2009. (Petrie, Terry) (Entered: 06/30/2009) |
| 06/30/2009 | 31 a | ORDER granting in part and denying in part32Q Motion for Extension of Time to Answer; Plaintiff Shall Respond to Defendant's Discovery Request On or Before Wednesday, July 15, 2009. Signed by Chief Judge Emily C. Hewitt. (ae) (Entered: 06/30/2009) |
| 08/11/2009 | 324 | OPINION AND ORDER Treating Plaintiffs' 290 Motion for Declaratory Judgment As Pre—Trial Motion and Granting Pre—Trial Motion To the Extent Set Out in This Opinion and Order and Otherwise Denying Pre—Trial Motion; Clarifying June 23, 2005 Opinion and Order As Requested by Plaintiffs in 290 Motion for Clarification; Setting Forth the Law Which Governs the Types of Damages Plaintiffs May Seek, Based Upon Plaintiffs' Brief filed May 7, 2009 309 and Defendant's Memorandum filed May 7, 2009 310 Signed by Chief Judge Emily C. Hewitt. (ae) (Entered: 08/11/2009) |
| 08/11/2009 | | Set Deadlines/Hearings: re: 324 Order — Status Report due by 8/26/2009. (jtl) (Entered: 08/12/2009) |
| 08/24/2009 | 325 | Unopposed MOTION for Extension of Time until 09/02/2009 to to file Joint Status Report, filed by USA.Response due by 9/10/2009.(Petrie, Terry) (Entered: 08/24/2009) |
| 08/24/2009 | 326 | ORDER granting 32 Motion for Extension of Time Status Report due by 5 pm EDT on 9/2/2009 Signed by Chief Judge Emily C. Hewitt. (ae) (Entered: 08/24/2009) |
| 09/02/2009 | 327 | JOINT STATUS REPORT, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST. (Christensen, Mark) (Entered: 09/02/2009) |

| 09/14/2009 | E2$ | ORDER Responding to Parties' Joint Status Report of 9/02/09 and Setting Joint Status Conference. Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 09/14/2009) |
| 09/14/2009 | | Set Deadlines/Hearings: re: 328 Order Status Conference set for 9/18/2009 11:00 AM in Chambers (Telephonic) before Chief Judge Emily C. Hewitt. (jtl) (Entered: 09/15/2009) |
| 09/16/2009 | 329 | MOTION to Compel *Defendant to Produce Certain Discovery Information,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST.Response due by 10/5/2009. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, #1 Exhibit H, #.2 Exhibit I)(Christensen, Mark) (Entered: 09/16/2009) |
| 09/16/2009 | 330 | STATUS REPORT *as to Remaining Issues Regarding Certain Plaintiffs,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST. (Christensen, Mark) (Entered: 09/16/2009) |
| 09/16/2009 | 331 | STIPULATION *IV: As To Certain Plaintiffs' Standing,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST. (Christensen, Mark) (Entered: 09/16/2009) |
| 09/16/2009 | 332 | MOTION to Compel, filed by USA.<font style=color:AF3636;font—weight:bold;>Response due by 10/5/2009. (Attachments: # 1 Exhibit Exh 1, # 2 Exhibit Exh 2, #_a Exhibit Exh 3, #*j* Exhibit Exh 4, # 5 Exhibit Exh 5, # 6 Exhibit Exh. 6, # 7 Exhibit Exh 7, # 8 Exhibit Exh 8)(Petrie, Terry) (Entered: 09/16/2009) |
| 09/17/2009 | 333 | STATUS REPORT *Defendant's Status Report as to Remaining Issues Regarding Certain Parties,* filed by USA. (Petrie, Terry) (Entered: 09/17/2009) |
| 09/18/2009 | | Minute Entry for proceedings held before Judge Emily C. Hewitt : Telephonic Status Conference held on the record on 9/18/2009. (jas ) (Entered: 09/18/2009) (Click HERE for link to Court of Federal Claims web site forms page for information on ordering: certified transcript from reporter or certified transcript of proceeding from official digital recording . )(js8) (Entered: 09/18/2009) |
| 09/18/2009 | 334 | ORDER regarding issues discussed during Telephonic Status Conference on 9/18/09. Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 09/18/2009) |
| 09/18/2009 | | Set/Reset Deadlines: Amended Motion(s) due by 9/30/2009; Response(s) to motions to compel due by 9/25/2009; Reply(s) to motions to compel due by 10/2/2009;and Status Report due by 9/25/2009 (jtl) (Entered: 09/21/2009) |
| 09/21/2009 | 335 | MOTION for Extension of Time until 10/02/2009 to to Respond to Plaintiffs' Motion to Compel, filed by USA.Response due by 10/8/2009.(Petrie, Terry) (Entered: 09/21/2009) |
| 09/22/2009 | 336 | ORDER grantinald Motion for Extension of Time. Responses to Motion to Compel due on or before 10/02/09 and replies due on before 10/09/09. Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 09/22/2009) |
| 09/22/2009 | 337 | RESPONSE to 335 MOTION for Extension of Time until 10/02/2009 to to Respond to Plaintiffs' Motion to Compel, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST.Reply due by 10/5/2009. (Christensen, Mark) (Entered: 09/22/2009) |
| 09/22/2009 | | Set/Reset Deadlines: Responses due by 10/2/2009. Replies due by 10/9/2009. (jtl) (Entered: 09/22/2009) |
| 09/25/2009 | 338 | Proposed Pretrial Order *Amending this Court's 9/14/2009 Order (Doc. 328),* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST. (Christensen, Mark) (Entered: 09/25/2009) |
| 09/28/2009 | 339 | STATUS REPORT *Defendant's Response to Plaintiffs' Proposed Amendment to the Court's September 14, 2009 Order,* filed by USA. (Attachments: # 1 Exhibit Attachment 1, # 2 Exhibit Attachment 2)(Petrie, Terry) (Entered: 09/28/2009) |

09/30/2009  340  MOTION to Amend Pleadings — Rule 15 *P's Motion for Leave to File Amended Complaints and Supporting Memorandum of Law,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST.Response due by 10/19/2009. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, *ff* 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Christensen, Mark) Modified on 11/9/2009 (X). (Entered: 09/30/2009)

10/02/2009  341  RESPONSE to 332 MOTION to Compel, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST.Reply due by 10/9/2009 (per court order). (Attachments: #1 Exhibit A, #2 Exhibit B, # 3 Exhibit C)(Christensen, Mark) Modified on 10/4/2009 to edit reply due date. (dls) (Entered: 10/02/2009)

10/02/2009  342  MOTION for Leave to File Attached Defendant's Response to Plaintiffs Motion to Compel Out of Time, filed by USA.<font style=colorAF3636;font—weight:bold;>Response due by 10/19/2009. (Attachments: # 1 Exhibit Defendant's Response to Plaintiffs Motion to Compel Defendant to Produce Certain Discovery Information and Defendant's Motion for a Protective Order, # 2 Exhibit list and Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, &a Exhibit 7, # 9 Exhibit 8, tua Exhibit 9, # 11 Exhibit 10, #12 Exhibit 11, # la Exhibit 12, # 14 Exhibit 13, &LI Exhibit 14, # 16 Exhibit 15, #±2 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, #2( Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23)(Petrie, Terry) (Entered: 10/02/2009)

10/09/2009 343  NOTICE, filed by USA re 341 Response to Motion, *Defendant's Reply in Support of Defendant's Motion to Compel* (Petrie, Terry) (Entered: 10/09/2009)

10/09/2009  344  REPLY to Response to Motion re 342 MOTION for Leave to File Attached Defendant's Response to Plaintiffs Motion to Compel Out of Time, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST. (Attachments: fij Exhibit A, part 1, # 2 Exhibit A, part 2, #_a Exhibit B)(Christensen, Mark) (Entered: 10/09/2009)

10/19/2009 345  RESPONSE to 340 MOTION to Amend Pleadings — Rule 15 *P's Motion for Leave to File Amended Complaints and Supporting Memorandum of Law,* filed by USA.Reply due by 11/2/2009. (Petrie, Terry) (Entered: 10/19/2009)

10/20/2009 346  NOTICE, filed by USA re 342 MOTION for Leave to File Attached Defendant's Response to Plaintiffs Motion to Compel Out of Time *Defendant's Notice of Errata* (Attachments: # 1 Exhibit Exhibit 17, # 2 Exhibit Exhibit 18)(Petrie, Terry) (Entered: 10/20/2009)

10/21/2009 347  Notice Of Filing Of Certified Transcript for proceedings held on September 18, 2009 in Washington, DC. (dwl) (Entered: 10/21/2009)

10/21/2009 348  TRANSCRIPT of Proceedings (pages 1-51) held on September 18, 2009 before Chief Judge Emily C. Hewitt. Procedures Re: Electronic Transcripts and Redactions. For copy, contact Heritage Court Reporting, (202) 628-4888. Forms to Request Transcripts. Notice of Intent to Redact due 10/28/2009. Redacted Transcript Deadline set for 11/23/2009. Release of Transcript Restriction set for 1/19/2010. (dwl) (Entered: 10/21/2009)

10/27/2009 349  STATUS CONFERENCE ORDER: Status Conference set for 11/2/2009 10:00 AM in Chambers (Telephonic) before Chief Judge Emily C. Hewitt. Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 10/27/2009)

10/30/2009 350  NOTICE, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, CHRISTINE M. ZAHL—BODNAR, EHRET MICHIGAN TRUST re 349 Status Conference Order (Christensen, Mark) (Entered: 10/30/2009)

11/05/2009  Minute Entry for proceeding held in Washington, DC on 11/2/2009 before Chief Judge Emily C. Hewitt: Telephone Conference. [Total number of days of proceeding: 1]. Official Record of proceeding taken via electronic digital recording (EDR). (Click HERE for link to Court of Federal Claims web site forms page for information on ordering: certified transcript from reporter or certified transcript of proceeding from official digital recording.)(js8) (Entered: 11/05/2009)

| | | |
|---|---|---|
| 11/05/2009 | 311 | SCHEDULING ORDER:Notice of Compliance due by 11/6/2009. Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 11/05/2009) |
| 11/06/2009 | 352 | Joint MOTION for Extension of Time until 11/16/2009 to to file joint revision of Plaintiffs Notice of Outstanding Discovery Issues, filed by USA.Response due by 11/23/2009.(Petrie, Terry) (Entered: 11/06/2009) |
| 11/06/2009 | 353 | STIPULATION of Dismissal Without prejudice as to certain plaintiffs, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, EHRET MICHIGAN TRUST.. (Christensen, Mark) (Entered: 11/06/2009) |
| 11/06/2009 | 354 | NOTICE, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, EHRET MICHIGAN TRUST *Notice of Revised Case Caption* (Christensen, Mark) (Entered: 11/06/2009) |
| 11/06/2009 | 355 | NOTICE, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, EHRET MICHIGAN TRUST *Notice of Plaintiffs' Answers to the Court's Discovery Inquiry* (Christensen, Mark) (Entered: 11/06/2009) |
| 11/06/2009 | 356 | NOTICE of Change of Address by Mark Englund Christensen (Christensen, Mark) (Entered: 11/06/2009) |
| 11/06/2009 | 357 | ORDER re: Notice of Revised Caption and Joint Stipulation Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 11/06/2009) |
| 11/06/2009 | 358 | ORDER granting 352 Motion for Extension of Time to 11/16/09 Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 11/06/2009) |
| 11/06/2009 | | Set/Reset Deadlines: Notice of Compliance due by 11/16/2009. (jll) (Entered: 11/09/2009) |
| 11/10/2009 | 312 | MOTION for Extension of Time until 12/02/2009 to Defendant to provide RCFC 26(a)(2) disclosures, filed by USA.Response due by 11/30/2009. (Attachments: # 1 Exhibit Exh. 1)(Petrie, Terry) (Entered: 11/10/2009) |
| 11/10/2009 | 360 | RESPONSE to 359 Motion for Extension of Time until 12/02/2009 to Defendant to provide RCFC 26(a)(2) disclosures, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, EHRET MICHIGAN TRUST.Reply due by 11/23/2009. (Attachments: # 1 Exhibit A)(Christensen, Mark) (Entered: 11/10/2009) |
| 11/12/2009 | 361 | REPLY to Response to Motion re 359 MOTION for Extension of Time until 12/02/2009 to Defendant to provide RCFC 26(a)(2) disclosures, filed by USA. (Attachments: # 1 Exhibit Reply Ex. 1, # 2 Exhibit Reply Ex. 2, # 3 Exhibit Reply Ex. 3)(Petrie, Terry) (Entered: 11/12/2009) |
| 11/12/2009 | 362 | ORDER re 359 MOTION for Extension of Time Notice of Compliance due by 11/16/2009. Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 11/12/2009) |
| 11/16/2009 | 363 | Joint MOTION for Extension of Time until 11/20/2006 to for Parties to file joint revision of outstanding Discovery Issues, filed by USA.Response due by 12/3/2009.(Petrie, Terry) (Entered: 11/16/2009) |
| 11/16/2009 | 364 | ORDER re 363 Joint MOTION for Extension of Time until 11/20/2009 for Parties to file joint revision of outstanding Discovery Issues filed by USA Notice of Compliance due by 11/20/2009. Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 11/16/2009) |
| 11/16/2009 | 365 | ORDER granting in part and mooting in part 329 Plaintiffs' Motion to Compel and 332 Defendant's Motion to Compel Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 11/16/2009) |
| 11/17/2009 | 366 | Unopposed MOTION for Extension of Time until January 4, 2009 to Disclose OHWM Expert, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, EHRET MICHIGAN TRUST.Response due by 12/4/2009. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, #_€ Exhibit F)(Christensen, Mark) (Entered: 11/17/2009) |

| | | |
|---|---|---|
| 11/17/2009 | 16.2 | JOINT STATUS REPORT *as to Expert Disclosures,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, EHRET MICHIGAN TRUST. (Christensen, Mark) (Entered: 11/17/2009) |
| 11/20/2009 | 368 | ORDER granting 366 Motion for Extension of Time to Disclose Their OHWM Expert Witnesses Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 11/20/2009) |
| 11/20/2009 | 369 | JOINT STATUS REPORT *of the Parties' Revised Notice of Outstanding Discovery,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ANDREW C. BODNAR, EHRET MICHIGAN TRUST. (Christensen, Mark) (Entered: 11/20/2009) |
| 11/25/2009 | | MOTION for Extension of Time until 12/11/2009 to Make Expert Disclosures Related to Shoreline Composition, filed by **USA.Response due by 12/1412009.** (Attachments: # 1 Exhibit Naim Declaration, # 2 Exhibit Mickelson Declaration, # 3 Exhibit McNinch Declaration)(Barron, Mark) (Entered: 11/25/2009) |
| 11/30/2009 | 371 | ORDER granting 370 Motion for Extension of Time **Defendant's Expert Disclosures due by 12/11/2009.** Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 11/30/2009) |
| 12/03/2009 | 22 | NOTICE, filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE *Notice ofIntent to Issue Subpoena* (Attachments: # 1 Exhibit)(Christensen, Mark) (Entered: 12/03/2009) |
| 12/07/2009 | 373 | Notice Of Filing Of Certified Transcript for proceedings held on November 2, 2009 in Washington, DC. (dwl) (Entered: 12/07/2009) |
| 12/07/2009 | 374 | TRANSCRIPT of Proceedings (pages 1-127) held on November 2, 2009 before Chief Judge Emily C. Hewitt. Procedures Re: Electronic Transcripts and Redactions. For copy, contact Heritage Court Reporting, (202) 628-4888. Forms to Request Transcripts. Notice of Intent to Redact due 12/14/2009. Redacted Transcript Deadline set for 1/7/2010. Release of Transcript Restriction set for 3/8/2010. (dwl) (Entered: 12/07/2009) |
| 12/07/2009 | 375 | ORDER re 369 Parties Joint Revision of Plaintiffs Notice of Outstanding Discovery Issues. Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 12/07/2009) |
| 12/08/2009 | 376 | STATUS CONFERENCE ORDER: **Status Conference set for 12/10/2009 02:00 PM in Chambers (Telephonic) before Chief Judge Emily C. Hewitt.** Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 12/08/2009) |
| 12/11/2009 | | Minute Entry for proceeding held in Washington, DC on 12/10/2009 before Chief Judge Emily C. Hewitt: Telephone Conference (js8) (Entered: 12/11/2009) |
| 12/15/2009 | | ORDER denying        Motion to Compel Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 12/15/2009) |
| 12/30/2009 | 378 | Unopposed MOTION for Extension of Time,until 02/03/2010, to Complete Discovery *Expert Discovery,* filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. **ZAHL—BODNAR.Response due by 1/1912010.** (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, #5 Exhibit F)(Christensen, Mark) (Entered: 12/30/2009) |
| 12/30/2009 | 379 | ORDER granting 378 Motion for Extension of Time to Complete Discovery. Signed by Chief Judge Emily C. Hewitt. (md3) (Entered: 12/30/2009) |
| 12/31/2009 | 380 | Proof of Service of Subpoena on City of Lake Forest, Illinois. Proof of Service filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. ZAHL—BODNAR. (Attachments: # 1 Exhibit A)(Christensen, Mark) (Entered: 12/31/2009) |
| 01/12/2010 | 381 | MOTION to Strike *Defendant's Expert, Dr. Jesse McNinch,* filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. **ZAHL—BODNAR.Response due** |

**by 1/29/2010.** (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C-1, # 4 Exhibit C-2, # 5 Exhibit D-1, # 6 Exhibit D-2)(Christensen, Mark) (Entered: 01/12/2010)

| | | |
|---|---|---|
| 01/13/2010 | 382 | Unopposed MOTION for Extension of Time until 02/09/2010 to to Repond to Plaintiffs' Motion to Strike Expert Report of Dr. Jesse McNinch, filed by **USA.Response due by 2/1/2010.(Petrie,** Terry) (Entered: 01/1312010) |
| 01/20/2010 | 383 | ORDER granting 382 Motion for Extension of Time. **Response due on or before 2/9/2010.** Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 01/20/2010) |
| 01/22/2010 | 384 | MOTION to Strike *Defendant's Expert, Dr. Robert Nairn,* filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. ZAHL—BODNAR.Response **due by 2/8/2010. (Attachments: #** 1 Exhibit A, # 2 Exhibit B-1, # 3 Exhibit 8-2)(Christensen, Mark) (Entered: 01/22/2010) |
| 01/25/2010 | 385 | Unopposed MOTION to Stay Further Expert Discovery on the Shoreline Composition, filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. **ZAHL—BODNAR.Response due by 2/11/2010.(Christensen,** Mark) (Entered: 01/25/2010) |
| 01/26/2010 | 386 | NOTICE, filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. ZAHL—BODNAR *Notice of Intent to Issue Two Subpoenas* (Attachments: #1 Exhibit A)(Christensen, Mark) (Entered: 01/26/2010) |
| 01/27/2010 | 1E7 | ORDER granting 385 Motion to Stay Expert Discovery on Shoreline Composition Signed by Judge Nancy B. Firestone. (js8) (Entered: 01/27/2010) |
| 01/28/2010 | 1aa | Unopposed MOTION for Extension of Time until Feb. 16, 2010 to File Response as to 331 MOTION to Strike *Defendant's Expert, Dr. Robert Nairn,* filed by **USA.Response due by 2/16/2010.(Petrie,** Terry) (Entered: 01/28/2010) |
| 01/28/2010 | 312 | NOTICE, filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. ZAHL—BODNAR re 386 Notice (Other), Notice (Other) *Notice of Proof of Services of Subpoenas* (Christensen, Mark) (Entered: 01/28/2010) |
| 01/29/2010 | 2Q | ORDER granting 388 Motion for Extension of Time to File Response as to 384 MOTION to Strike *Defendant's Expert, Dr. Robert Nairn* **Response due by 2/16/2010.** Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 01/29/2010) |
| 02/09/2010 | 391 | RESPONSE to 381 MOTION to Strike *Defendant's Expert, Dr. Jesse McNinch,* filed by **USA.Reply due by 2/19/2010.** (Attachments: # 1 Exhibit Ex. 1 Mackey Rpt. Part 1, # 2 Exhibit Ex. 1 Mackey Rpt. Part 2)(Barron, Mark) (Entered: 02/09/2010) |
| 02/16/2010 | 392 | RESPONSE to 384 MOTION to Strike *Defendant's Expert, Dr. Robert Nairn,* filed by **USA.Reply due by 2/26/2010.** (Attachments: # 1 Exhibit Ex. 1, Part 1, # 2 Exhibit Ex. 1, Part 2)(Barron, Mark) (Entered: 02/16/2010) |
| 02/19/2010 | 393 | REPLY to Response to Motion re 381 MOTION to Strike *Defendant's Expert, Dr. Jesse McNinch,* filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. ZAHL—BODNAR. (Attachments: # 1 Exhibit A)(Christensen, Mark) (Entered: 02/19/2010) |
| 02/26/2010 | 394 | REPLY to Response to Motion re 384 MOTION to Strike *Defendant's Expert, Dr. Robert Nairn,* filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. ZAHL—BODNAR. (Christensen, Mark) (Entered: 02/26/2010) |

| | | |
|---|---|---|
| 03/01/2010 | | Unopposed MOTION for Extension of Time,until April 5, 2010, to Complete Discovery *(Third Round of Expert Discovery)*, filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. ZAHL—BODNAR.Response due by 3/18/2010.(Christensen, Mark) (Entered: 03/01/2010) |
| 03/05/2010 | 396 | ORDER granting 395 Motion for Extension of Time to Complete Discovery. Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 03/05/2010) |
| 04/02/2010 | 397 | MOTION to Strike *Defendant's OHWM Expert*, filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, USA, CHRISTINE M. ZAHL—BODNAR.Response due by 4/19/2010. (Attachments: # 1 Exhibit A, # 2 Exhibit B, part 1 of 5, # 3 Exhibit B, part 2 of 5, # 4 Exhibit B, part 3 of 5, # 5 Exhibit B, part 4 of 5, # 6 Exhibit B, part 5 of 5, # 7 Exhibit C, # 8 Exhibit D, # 9 Exhibit E, part 1 of 2, # 10 Exhibit E, part 2 of 2, # 11 Exhibit F, part 1 of 8, # 12 Exhibit F, part 2 of 8, #13 Exhibit F, part 3 of 8, # 14 Exhibit F, part 4 of 8, # 15 Exhibit F, part 5 of 8, #16 Exhibit F, part 6 of 8, # 17 Exhibit F, part 7 of 8, # 18 Exhibit F, part 8 of 8)(Christensen, Mark) (Entered: 04/02/2010) |
| 04/02/2010 | 221 | Unopposed MOTION to Stay Further OHWM Expert Discovery, filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. ZAHL—BODNAR.Response due by 4/19/2010.(Christensen, Mark) (Entered: 04/02/2010) |
| 04/05/2010 | 292 | Unopposed MOTION for Extension of Time until 04/26/2010 to File Response as to 397 MOTION to Strike *Defendant's OHWM Expert*, filed by USA.Response due by 4/22/2010.(Petrie, Terry) (Entered: 04/05/2010) |
| 04/06/2010 | .4.91 | ORDER granting 398 Motion to Stay OHWM Discovery. Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 04/06/2010) |
| 04/06/2010 | 401 | ORDER granting 399 Motion for Extension of Time to File Response as to 397 MOTION to Strike *Defendant's OHWM Expert* **Response due by 4/26/2010. Reply due by 5/10/2010.** Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 04/06/2010) |
| 04/26/2010 | 402 | RESPONSE to32/ MOTION to Strike *Defendant's OHWM Expert*, filed by **USA.Reply due by 5/10/2010.** (Attachments: # 1 Exhibit Ex. 1, Meadows Rpt., Part 1, # 2 Exhibit Ex. 1, Meadows Rpt., Part 2, # 3 Exhibit Ex. 1, Meadows Rpt., Part 3)(Barron, Mark) Modified on 4/28/2010 to correct reply deadline(jtl). (Entered: 04/26/2010) |
| 05/04/2010 | 403 | PUBLISHED OPINION denyingIL MOTION to Strike *Defendant's Expert, Dr. Jesse McNinch*, 384 MOTION to Strike *Defendant's Expert, Dr. Robert Nairn*. Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 05/04/2010) |
| 05/10/2010 | 404 | REPLY to Response to Motion re══ MOTION to Strike *Defendant's OHWM Expert*, filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. ZAHL—BODNAR. (Attachments: # 1 Exhibit A, #2 Exhibit B)(Christensen, Mark) (Entered: 05/10/2010) |
| 05/11/2010 | 101 | MOTION for Extension of Time until June 4, 2010 to to Disclose Supplemental Shoreline Composition Experts, filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. ZAHL—BODNAR.Response **due by** 5/28/2010.(Christensen, Mark) (Entered: 05/11/2010) |
| 05/12/2010 | LlQ¢ | RESPONSE toIad MOTION for Extension of Time until June 4, 2010 to to Disclose Supplemental Shoreline Composition Experts, filed by **USA.Reply due by 5/24/2010.** (Attachments: # 1 Exhibit Plaintiffs' Disclosure Letter, # 2 Exhibit Plaintiffs' rule 26 Disclosures)(Barron, Mark) (Entered: 05/12/2010) |
| 05/13/2010 | | Minute Entry for proceeding held in Washington, DC on 5/13/2010 before Chief Judge Emily C. Hewitt: Telephone Conference. [Total number of days of proceeding: 1]. Proceeding was |

not officially recorded. (js8) (Entered: 05/13/2010)

| | | |
|---|---|---|
| 05/13/2010 | 407 | ORDER granting 405 Motion for Extension of Time. **Notice of Compliance due by 6/4/2010.** Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 05/13/2010) |
| 05/28/2010 | 408 | NOTICE of Change of Address by Mark Englund Christensen (Christensen, Mark) (Entered: 05/28/2010) |
| 06/02/2010 | 409 | Unopposed MOTION for Extension of Time until 06/25/2010 to Disclose A Rebuttal Appraisal Expert Witness, filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. **ZAHL—BODNAR.Response due by 6/21/2010.** (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Christensen, Mark) (Entered: 06/02/2010) |
| 06/04/2010 | 410 | MOTION for Extension of Time until July 15, 2010 to Disclose Plaintiffs' Expert Patrick Shires, filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. **ZAHL—BODNAR.Response due by 6/21/2010.** (Attachments: # 1 Exhibit A)(Christensen, Mark) (Entered: 06/04/2010) |
| 06/04/2010 | 411 | ORDER granting 409 Motion for Extension of Time. **Notice of Compliance due by 6/25/2010.** Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 06/04/2010) |
| 06/08/2010 | 412 | RESPONSE to 410 MOTION for Extension of Time until July 15, 2010 to Disclose Plaintiffs' Expert Patrick Shires, filed by USA.Reply **due by 6/18/2010.** (Attachments: #1 Exhibit 1, Ehret Permit Application, # 2 Exhibit 2, Permit, # 3 Exhibit 3, Mackey Sed. Budg. Rpt.)(Barron, Mark) (Entered: 06/08/2010) |
| 06/08/2010 | 413 | REPLY to Response to 410 MOTION for Extension of Time until July 15, 2010 to Disclose Plaintiffs' Expert Patrick Shires, filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. ZAHL—BODNAR. (Attachments: # 1 Exhibit A, 1 of 2, # 2 Exhibit A, 2 of 2)(Christensen, Mark) (Entered: 06/08/2010) |
| 06/15/2010 | 414 | ORDER granting 410 Motion for Extension of Time. Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 06/15/2010) |
| 07/08/2010 | 415 | MOTION to Amend Schedule*for Remaining Discovery,* filed by **USA.Response due by 7/26/2010.** (Attachments: # 1 Exhibit Def.'s Ex. 1, July 2 Letter, # 2 Exhibit Def.'s Ex. 2, May 18 Email, # 3 Exhibit Def's Ex. 3, May 26 Letter, # 4 Exhibit Def.'s Ex. 4, July 6 Email)(Barron, Mark) (Entered: 07/08/2010) |
| 07/09/2010 | 416 | RESPONSE to 415 MOTION to Amend Schedule*for Remaining Discovery,* filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. ZAHL—BODNAR.Reply **due by 7/20/2010.** (Christensen, Mark) Modified on 7/12/2010 to reset reply deadline pursuant to Order of 7/9/2010(41). (Entered: 07/09/2010) |
| 07/09/2010 | 417 | ORDER re Dkt. No. 415 Signed by Chief Judge Emily C. Hewitt. (ss5) (Entered: 07/09/2010) |
| 07/09/2010 | | Set/Reset Deadlines: Reply due by 7/20/2010. (jtl) (Entered: 07/12/2010) |
| 07/15/2010 | 418 | REPLY to Response to Motion re 415 MOTION to Amend Schedule*for Remaining Discovery,* filed by USA. (Barron, Mark) (Entered: 07/15/2010) |
| 07/21/2010 | 419 | PUBLISHED OPINION denying 397 Motion to Strike. Signed by Chief Judge Emily C. Hewitt. (ss5) (Entered: 07/21/2010) |
| 07/23/2010 | 420 | ORDER granting J1_5 Motion to Amend Operative Discovery Order. **Status Report due by 7/30/2010. Status Conference set for 8/2/2010 04:00 PM in Chambers (Telephonic) before Chief Judge Emily C. Hewitt.** Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 07/23/2010) |

| | | |
|---|---|---|
| 07/30/2010 | 421 | JOINT STATUS REPORT, filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. ZAHL—BODNAR. (Christensen, Mark) (Entered: 07/30/2010) |
| 08/02/2010 | | Minute Entry for proceeding held in Washington, DC on 8/2/2010 before Chief Judge Emily C. Hewitt: Telephone Conference. [Total number of days of proceeding: 1]. Official Record of proceeding taken via electronic digital recording (EDR). (Click HERE for link to Court of Federal Claims web site forms page for information on ordering: certified transcript from reporter or certified transcript of proceeding from official digital recording.)(js8) (Entered: 08/02/2010) |
| 08/05/2010 | 422 | DISCOVERY SCHEDULING ORDER: **Pre Trial Conference set for 3111/201102:00 PM in Chambers before Chief Judge Emily C. Hewitt.** Signed by Chief Judge Emily C. Hewitt. (js8) Modified on 8/6/2010 — corrected pdf(jt1). (Entered: 08/05/2010) |
| 08/06/2010 | 423 | CORRECTED DISCOVERY SCHEDULING ORDER: Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 08/06/2010) |
| 08/18/2010 | 424 | NOTICE, filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE, CHRISTINE M. ZAHL—BODNAR *Notice of Coordination of Trial Location* (Christensen, Mark) (Entered: 08/18/2010) |
| 08/26/2010 | 425 | ORDER re: Trial Location and Dates. Signed by Chief Judge Emily C. Hewitt. (js8) (Entered: 08/26/2010) |
| 09/28/2010 | 426 | NOTICE of Change of Address by Terry M. Petrie (Petrie, Terry) (Entered: 09/28/2010) |
| 12/01/2010 | 42.1 | NOTICE of Change of Address by Mark Englund Christensen (Christensen, Mark) (Entered: 12/01/2010) |
| 12/20/2010 | 428 | NOTICE, filed by JOHN H. BANKS, MARY BANKS, EUGENE J. FRETT, USA *Joint Certification— Meeting of Counsel* (Christensen, Mark) (Entered: 12/20/2010) |
| 01/14/2011 | 429 | Consent MOTION for Extension of Time until 01/28/2011 to Plaintiffs Contentions of Fact and Law, Witness Lists, and Exhibit List, filed by JOHN H. BANKS, MARY BANKS, EUGENE J. FRETT.Response due by 1/31/2011.(Christensen, Mark) (Entered: 01/14/2011) |
| 01/14/2011 | 430 | ORDER granting    2 Motion for Extension of Time. **Memorandum due by 3/4/2011. Notice of Compliance due by 3/8/2011. Witness List due by 1/28/2011. Opposing Witness List due by 2/25/2011.** Signed by Chief Judge Emily C. Hewitt. (mm3) (Entered: 01/14/2011) |
| 01/28/2011 | 431 | Memorandum of Contentions of Fact and Law, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. (Christensen, Mark) (Entered: 01/28/2011) |
| 01/28/2011 | 432 | Witness List, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. (Christensen, Mark) (Entered: 01/28/2011) |
| 01/28/2011 | 433 | Exhibit List, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. (Christensen, Mark) (Entered: 01/28/2011) |
| 02/22/2011 | 434 | MOTION in Limine *to Exclude Evidence of Nearshore Lakebed Composition,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT **TRUST.Response due by 3/11/2011.(Christensen,** Mark) (Entered: 02/22/2011) |
| 02/25/2011 | 13 | Exhibit List *United States' List of Exhibits,* filed by USA. (Attachments: # 1 Exhibit Attachment 1)(Petrie, Terry) (Entered: 02/25/2011) |
| 02/25/2011 | 42..6 | Witness List, filed by USA. (Petrie, Terry) (Entered: 02/25/2011) |
| 02/25/2011 | 437 | Memorandum of Contentions of Fact and Law, filed by USA. (Barron, Mark) (Entered: 02/25/2011) |
| 03/02/2011 | 438 | ORDER directing defendant to address in its upcoming response an issue raised by plaintiffs in their brief. SCHEDULING ORDER regarding briefing of plaintiffs' motion in limine (Response due by 3/7/2011. Reply due by 3/9/2011.) Signed by Chief Judge Emily C. Hewitt. (mm3) (Entered: 03/02/2011) |

| | | |
|---|---|---|
| 03/02/2011 | 432 | PRETRIAL ORDER directing parties to bring to pretrial conference their joint or separate preliminary trial schedules (using the attached form) and any exhibits as to which an objection remains outstanding. Signed by Chief Judge Emily C. Hewitt. (mm3) (Entered: 03/02/2011) |
| 03/04/2011 | 440 | RESPONSE to *United States Contentions of Fact and Law,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. (Christensen, Mark) (Entered: 03/04/2011) |
| 03/04/2011 | 441 | Memorandum of Contentions of Fact and Law, filed by USA. (Barron, Mark) (Entered: 03/04/2011) |
| 03/05/2011 | 442 | RESPONSE to 434 MOTION in Limine *to Exclude Evidence of Nearshore Lakebed Composition,* filed by USA.Reply due by 3/15/2011. (Barron, Mark) (Entered: 03/05/2011) |
| 03/07/2011 | 443 | Joint MOTION for Extension of Time until March 15, 2011 to To file Trial Stipulations, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, USA.Response due by 3/24/2011. (Attachments: # 1 Exhibit A)(Christensen, Mark) (Entered: 03/07/2011) |
| 03/08/2011 | 444 | ORDER denying 443 Motion for Extension of Time. Signed by Chief Judge Emily C. Hewitt. (mm3) Copy to parties. (Entered: 03/08/2011) |
| 03/08/2011 | 445 | Exhibit List *Joint,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, USA. (Christensen, Mark) (Entered: 03/08/2011) |
| 03/08/2011 | 446 | STIPULATION *of Fact,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, USA. (Christensen, Mark) (Entered: 03/08/2011) |
| 03/09/2011 | 447 | REPLY to Response to Motion re 434 MOTION in Limine *to Exclude Evidence of Nearshore Lakebed Composition,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. (Attachments: # 1 Exhibit A (1), #2 Exhibit A (2), # 3 Exhibit A (3), # 4 Exhibit A (4),    Exhibit A (5), # 6 Exhibit A (6), #_2 Exhibit A (7))(Christensen, Mark) (Entered: 03/09/2011) |
| 03/14/2011 | 448 | Joint MOTION for Extension of Time until March 15, 2011 to Revised Trial Stipulations, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST.Response due by 3/31/2011.(Christensen, Mark) (Entered: 03/14/2011) |
| 03/15/2011 | 442 | ORDER granting 448 Motion for Extension of Time. Notice of Compliance due by 3115/2011. Signed by Chief Judge Emily C. Hewitt. (mm3) Copy to parties. (Entered: 03/15/2011) |
| 03/17/2011 | 450 | POST—PRETRIAL CONFERENCE ORDER. Signed by Chief Judge Emily C. Hewitt. (mm3) Copy to parties. (Entered: 03/17/2011) |
| 03/23/2011 | | Minute Entry for proceeding held in Washington, DC on 3/11/2011 before Chief Judge Emily C. Hewitt: Pretrial Conference. [Total number of days of proceeding: 1]. Official Record of proceeding taken via electronic digital recording (EDR). (Click HERE for link to Court of Federal Claims web site forms page for information on ordering: certified transcript from reporter or certified transcript of proceeding from official digital recording.) (mm3) (Entered: 03/23/2011) |
| 03/23/2011 | 451 | Objection to Witness List, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. Related document: 433 Witness List filed by USA.(Christensen, Mark) (Entered: 03/23/2011) |
| 03/30/2011 | 452 | ORDER denying 434 Motion in Limine. Signed by Chief Judge Emily C. Hewitt. (mm3) Copy to parties. (Entered: 03/30/2011) |
| 03/30/2011 | 452 | RESPONSE to 451 Objection to Witness List, filed by USA. (Petrie, Terry) (Entered: 03/30/2011) |
| 03/31/2011 | 454 | Notice Of Filing Of Certified Transcript for proceedings held on March 11, 2011 in Washington, DC. (dwl) (Entered: 03/31/2011) |
| 03/31/2011 | 455 | TRANSCRIPT of Proceedings held on March 11, 2011 before Judge Emily C. Hewitt. Total No. of Pages: 130. Procedures Re: Electronic Transcripts and Redactions. For copy, contact Heritage Court Reporting, (202) 628-4888. Forms to Request Transcripts. Notice of Intent to Redact due 4/7/2011. Redacted Transcript Deadline set for 5/2/2011. Release of Transcript Restriction set for 6/29/2011. (dwl) (Entered: 03/31/2011) |

04/01/2011 456 STIPULATION *of Fact,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, USA. (Christensen, Mark) (Entered: 04/01/2011)

04/08/2011 457 Witness List, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. (Christensen, Mark) (Entered: 04/08/2011)

04/08/2011 458 JOINT STATUS REPORT *Trial Schedule,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, USA. (Christensen, Mark) (Entered: 04/08/2011)

04/08/2011 459 Exhibit List *Plaintiffs' Amended,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. (Christensen, Mark) (Entered: 04/08/2011)

04/11/2011 460 ORDER regarding amended witness and exhibit lists. Notice of **Compliance due by 4/12/2011.** Signed by Chief Judge Emily C. Hewitt. (mm3) Copy to parties. (Entered: 04/11/2011)

04/12/2011 461 Unopposed MOTION for Extension of Time to Amend *and file an Amended Witness List and an Amended Exhibit List,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT **TRUST.Response due by 4/29/2011.** (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Christensen, Mark) (Entered: 04/12/2011)

04/12/2011 462 ORDER granting 461 Motion for Extension of Time to Amend. Signed by Chief Judge Emily C. Hewitt. (nun3) Copy to parties. (Entered: 04/12/2011)

04/13/2011 463 Unopposed MOTION for Leave to File Second Set of Trial Stipulations, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST.Response **due by 5/2/2011.** (Attachments: # 1 Exhibit A)(Christensen, Mark) (Entered: 04/13/2011)

04/14/2011 464 ORDER granting 463 Motion for Leave to File Additional Stipulations of Fact. Signed by Chief Judge Emily C. Hewitt. (mm3) Copy to parties. (Entered: 04/14/2011)

04/21/2011 465 STIPULATION *Second Set of Trial Stipulations of Fact,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, USA. (Christensen, Mark) (Entered: 04/21/2011)

04/28/2011 466 STIPULATION *Fourth Trial Stipulation of Fact,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, USA. (Christensen, Mark) (Entered: 04/28/2011)

04/28/2011 467 STIPULATION *Third Trial Stipulations of Fact,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, USA. (Christensen, Mark) (Entered: 04/28/2011)

05/03/2011 468 ORDER regarding filing of appendix to trial exhibit. Signed by Chief Judge Emily C. Hewitt. (mm3) Copy to parties. (Entered: 05/03/2011)

05/06/2011 469 NOTICE, filed by USA *United States Notice of Service* (Petrie, Terry) (Entered: 05/06/2011)

05/09/2011 470 ORDER opening record for the sole purpose of admitting the DVD provided to plaintiffs' counsel, the court and the court reporter. Signed by Chief Judge Emily C. Hewitt (mm3) Copy to parties and to court reporter. (Entered: 05/09/2011)

05/18/2011 Minute Entry for proceeding held in Niles, MI before Chief Judge Emily C. Hewitt: Trial. Trial began on 4/18/2011 and ended on 4/28/2011. [Total number of days of proceeding: 8]. Official record of proceeding taken by court reporter. (Click HERE for link to Court of Federal Claims web site forms page for information on ordering certified transcript from reporter or certified transcript of proceeding from official digital recording.) (mm3) Modified on 5/18/2011 — corrected text(jtl). (Entered: 05/18/2011)

05/18/2011 471 MOTION for Extension of Time until June 30, 2011 to File Post—Trial Briefs, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST, **USA.Response due by 6/6/2011.** (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Christensen, Mark) (Entered: 05/18/2011)

05/19/2011 472 Notice Of Filing Of Certified Transcript for proceedings held on April 19, 2011 in Niles, Michigan. (dwl) (Entered: 05/19/2011)

05/19/2011 473 TRANSCRIPT of Proceedings held on April 19, 2011 before Chief Judge Emily C. Hewitt. Total No. of Pages: 301-618/701. Procedures Re: Electronic Transcripts and Redactions. For copy, contact Heritage Court Reporting, (202) 628-4888. Forms to Request Transcripts.

| | | |
|---|---|---|
| | | Notice of Intent to Redact due 5/26/2011. Redacted Transcript Deadline set for 6/20/2011. Release of Transcript Restriction set for 8/17/2011. (dwl) Modified on 5/19/2011 (dwl). (Entered: 05/19/2011) |
| 05/19/2011 | 474 | Notice Of Filing Of Certified Transcript for proceedings held on April 21, 2011 in Niles, Michigan. (dwl) (Entered: 05/19/2011) |
| 05/19/2011 | 475 | TRANSCRIPT of Proceedings held on April 21, 2011 before Chief Judge Emily C. Hewitt. Total No. of Pages: 1101-1319/1500..Prseedures Re: Electronic Transcripts and Redactions. For copy, contact Heritage Court Reporting, (202) 628-4888. Forms to Request Transcripts. Notice of Intent to Redact due 5/26/2011. Redacted Transcript Deadline set for 6/20/2011. Release of Transcript Restriction set for 8/17/2011. (dwl) (Entered: 05/19/2011) |
| 05/19/2011 | 476 | Notice Of Filing Of Certified Transcript for proceedings held on April 25, 2011 in Niles, Michigan. (dwl) (Entered: 05/19/2011) |
| 05/19/2011 | 4.12 | TRANSCRIPT of Proceedings held on April 25, 2011 before Chief Judge Emily C. Hewitt. Total No. of Pages: 1501-1837/1900. Procedures Re: Electronic Transcripts and Redactions. For copy, contact Heritage Court Reporting, (202) 628-4888. Forms to Request Transcripts. Notice of Intent to Redact due 5/26/2011. Redacted Transcript Deadline set for 6/20/2011. Release of Transcript Restriction set for 8/17/2011. (dwl) (Entered: 05/19/2011) |
| 05/19/2011 | EI₃ | Notice Of Filing Of Certified Transcript for proceedings held on April 27, 2011 in Niles, Michigan. (dwl) (Entered: 05/19/2011) |
| 05/19/2011 | 422 | TRANSCRIPT of Proceedings held on April 27, 2011 before Chief Judge Emily C. Hewitt. Total No. of Pages: 2301-2633/2700. Procedures Re: Electronic Transcripts and Redactions. For copy, contact Heritage Court Reporting, (202) 628-4888. Forms to Request Transcripts. Notice of Intent to Redact due 5/26/2011. Redacted Transcript Deadline set for 6/20/2011. Release of Transcript Restriction set for 8/17/2011. (dwl) (Entered: 05/19/2011) |
| 05/19/2011 | 480 | ORDER granting 471 Motion for Extension of Time. Signed by Chief Judge Emily C. Hewitt. (mm3) Copy to parties. (Entered: 05/19/2011) |
| 05/19/2011 | 481 | Notice Of Filing Of Certified Transcript for proceedings held on April 18, 2011 in Niles, Michigan. (dwl) (Entered: 05/20/2011) |
| 05/19/2011 | 482 | TRANSCRIPT of Proceedings held on April 18, 2011 before Chief Judge Emily C. Hewitt. Total No. of Pages: 1-268/300. Procedures Re: Electronic Transcripts and Redactions  For copy, contact Heritage Court Reporting, (202) 628-4888. Forms to Request Transcripts. Notice of Intent to Redact due 5/26/2011. Redacted Transcript Deadline set for 6/20/2011. Release of Transcript Restriction set for 8/17/2011. (dwl) (Entered: 05/20/2011) |
| 05/25/2011 | Liaa | Notice Of Filing Of Certified Transcript for proceedings held on April 26, 2011 in Niles, Michigan. (dwl) (Entered: 05/25/2011) |
| 05/25/2011 | 431 | TRANSCRIPT of Proceedings held on April 26, 2011 before Chief Judge Emily C. Hewitt. Total No. of Pages: 1901-2217/2300. Procedures Re: Electronic Transcripts and Redactions. For copy, contact Heritage Court Reporting, (202) 628-4888. Forms to Request Transcripts. Notice of Intent to Redact due 6/1/2011. Redacted Transcript Deadline set for 6/27/2011. Release of Transcript Restriction set for 8/23/2011. (dwl) (Entered: 05/25/2011) |
| 05/25/2011 | 485 | Notice Of Filing Of Certified Transcript for proceedings held on April 28, 2011 in Niles, Michigan. (dwl) (Entered: 05/25/2011) |
| 05/25/2011 | 486 | TRANSCRIPT of Proceedings held on April 28, 2011 before Chief Judge Emily C. Hewitt. Total No. of Pages: 2701-2965. Procedures Re: Electronic Transcripts and Redactions. For copy, contact Heritage Court Reporting, (202) 628-4888. Forms to Request Transcripts. Notice of Intent to Redact due 6/1/2011. Redacted Transcript Deadline set for 6/27/2011. Release of Transcript Restriction set for 8/23/2011. (dwl) (Entered: 05/25/2011) |
| 05/25/2011 | 421 | Notice Of Filing Of Certified Transcript for proceedings held on April 20, 2011 in Niles, Michigan. (dwl) (Entered: 05/25/2011) |
| 05/25/2011 | 488 | TRANSCRIPT of Proceedings held on April 20, 2011 before Chief Judge Emily C. Hewitt. Total No. of Pages: 702-1008/1100. Procedures Re: Electronic Transcripts and Redactions. For copy, contact Heritage Court Reporting, (202) 628-4888. Forms to Request Transcripts. Notice of Intent to Redact due 6/1/2011. Redacted Transcript Deadline set for 6/27/2011. Release of Transcript Restriction set for 8/23/2011. (dwl) (Entered: 05/25/2011) |

| | | |
|---|---|---|
| 05/26/2011 | **182** | ORDER: Opening post—trial briefs to be filed by June 21,2011. Response briefs to be filed by July 12,2011. Signed by Chief Judge Emily C. Hewitt. (mm3) Copy to parties. (Entered: 05/26/2011) |
| 05/31/2011 | | Cumulative Index for TRANSCRIPT of Proceedings held on April 18,2011 through April 28, 2011. Filed with plaintiff, defendant, and joint exhibits. (dwl) (dwl). (Entered: 05/31/2011) |
| 05/31/2011 | 491 | STATUS CONFERENCE ORDER: **Status conference set for 2:00 p.m. EDT on 5/31/2011 in chambers (telephonic) before Chief Judge Emily C. Hewitt.** Signed by Chief Judge Emily C. Hewitt. (mm3) Copy to parties. (Entered: 05/31/2011) |
| 05/31/2011 | | Minute Entry for proceeding held in Washington, DC on 5/31/2011 before Chief Judge Emily C. Hewitt: Status Conference. [Total number of days of proceeding: 1]. Official Record of proceeding taken via electronic digital recording (EDR). (Click HERE for link to Court of Federal Claims web site forms page for information on ordering: certified transcript from reporter or certified transcript of proceeding from official digital recording.)(mm3) (Entered: 05/31/2011) |
| 05/31/2011 | 492 | ORDER with regard to trial transcripts. Signed by Chief Judge Emily C. Hewitt (mm3) Copy to parties. (Entered: 05/31/2011) |
| 06/01/2011 | 493 | NOTICE, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST *Deposition Transcript of Joan Pope* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Christensen, Mark) (Entered: 06/01/2011) |
| 06/03/2011 | 494 | NOTICE, filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST *Deposition Transcript of Donald Mangialardo* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Christensen, Mark) (Entered: 06/03/2011) |
| 06/21/2011 | 495 | POST TRIAL BRIEF *Plaintiffs',* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. (Christensen, Mark) (Entered: 06/21/2011) |
| 06/21/2011 | 496 | POST TRIAL BRIEF, filed by USA. (Barron, Mark) (Entered: 06/21/2011) |
| 07/12/2011 | 497 | POST TRIAL BRIEF *Plaintiffs Response to the United States Post—Trial Brief* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. (Christensen, Mark) (Entered: 07/12/2011) |
| 07/12/2011 | 498 | POST TRIAL BRIEF *United States' Post—Trial Response Memorandum,* filed by USA. (Barron, Mark) (Entered: 07/12/2011) |
| 08/09/2011 | 1-22 | ORDER directing additional briefing on jurisdiction. Opening briefs due 9/7/11. Responsive briefs due 9/21/11. Signed by Chief Judge Emily C. Hewitt. (mm3) Copy to parties. (Entered: 08/09/2011) |
| 08/15/2011 | 500 | NOTICE of Change of Address by Mark Englund Christensen (Christensen, Mark) (Entered: 08/15/2011) |
| 09/07/2011 | 501 | POST TRIAL BRIEF *on Jurisdiction,* filed by JOHN H. BANKS, MARY BANKS, ELIZABETH S. ERRANT TRUST. (Attachments: # 1 Exhibit A)(Christensen, Mark) (Entered: 09/07/2011) |
| 09/07/2011 | 502 | SUPPLEMENTAL BRIEF, filed by USA. (Attachments: # 1 Exhibit 2/9/01 Mem.)(Barron, Mark) (Entered: 09/07/2011) |
| 09/21/2011 | 503 | SUPPLEMENTAL BRIEF re: 499 Order, filed by USA. (Barron, Mark) (Entered: 09/21/2011) |
| 09/21/2011 | 50 | RESPONSE to 502 Supplemental Brief, filed by JOHN H. BANKS, MARY BANKS, ANDREW C. BODNAR, EHRET MICHIGAN TRUST, ELIZABETH S. ERRANT TRUST, EUGENE J. FRETT, CHERIE R. OKONSKI, CRAIG D. OKONSKI, ERROL L. STONE, SUSAN H. STONE. (Frett, Eugene) (Entered: 09/21/2011) |
| 12/22/2011 | 505 | PUBLISHED OPINION. The Clerk of Court shall ENTER JUDGMENT for defendant DISMISSING plaintiffs' complaints in each case included in the case caption. Signed by Chief Judge Emily C. Hewitt. (mm3) Copy to parties. (Entered: 12/22/2011) |
| 12/22/2011 | 506 | JUDGMENT entered, pursuant to Rule 58, dismissing the complaints (in this, 99-4452L, 99-4453L, 99-4454L, 99-4455L, 99-4456L, 99-4457L, 99-4458L, 99-4459L, 99-44510L, 99-44511L, 99-44512L, 00-365L, 00-379L, 00-380L, 00-381L, 00-382L, 00-383L, |

| | | |
|---|---|---|
| | | 00-384L, 00-385L, 00-386L, 00-387L, 00-388L, 00-389L, 00-390L, 00-391L, 00-392L, 00-393L, 00-394L, 00-395L, 00-396L, 00-398L, 00-399L, 00-400L, 00-401L, 05-1353L, 05-1381L and 06-7214 (Copy to parties) (dis) (Entered: 12/22/2011) |
| 02/17/2012 | 507 | NOTICE OF APPEAL, filed by All Plaintiffs. Filing fee $ 450, receipt number 073392 [additional $5.00 due]. Copies to judge, opposing party and CAFC. (hwl) (Entered: 02/17/2012) |
| 02/22/2012 | | CAFC Case Number 2012-5067 for 507 Notice of Appeal filed by MARY BANKS, ELIZABETH S. ERRANT TRUST, JOHN H. BANKS. (hwl) (Entered: 02/23/2012) |

mitigation efforts and collectively concluded that the erosion was permanent and irreversible." Def.'s Mot. 6; Banks (accrual) II, 314 F.3d at 1307.

Plaintiffs are the owners of property along approximately four and a half miles of the eastern shore of Lake Michigan south of St. Joseph Harbor. Def.'s Mot. 6; Banks (accrual) II, 314 F.3d at 1306. In July of 1999, sixteen of the current plaintiffs filed suit claiming that the Corps' construction and maintenance of the jetties from 1950 to 1989 caused erosion of their shoreline property. Def.'s Mot. 2, 6; see also Original Complaint of July 9, 1999, 2 ("Plaintiffs are riparian landowners who are uniformly suffering loss of property without just compensation arising out of the Defendant's construction and maintenance of fifteen jetties along the east coast of Lake Michigan."). By February 2000, the number of plaintiffs had increased to thirty-seven. Def.'s Mot. 2; Banks v. United States (Banks (accrual) I), 49 Fed. Cl. 806, 808 (2001).[4]

The United States moved to dismiss in February 2001, claiming that plaintiffs' actions were time-barred under 28 U.S.C. § 2501, which states that claims of which the Court of Federal Claims has jurisdiction must be filed within six years of accrual. Def.'s Mot. 2. The court granted the motion and dismissed plaintiffs' claims in July 2001. Banks (accrual) I, 49 Fed. Cl. at 826. The court reasoned that plaintiffs' takings claims were barred by the six-year statute of limitations no later than 1989 because the "gradual process of shoreline erosion set into motion by the government had resulted in a permanent taking and the extent of the damage had become reasonably foreseeable." Id. at 825.

The United States Court of Appeals for the Federal Circuit (Federal Circuit) reversed and remanded. Banks (accrual) II, 314 F.3d at 1305-06. Because a claim cannot accrue while the damages remain justifiably uncertain, the Federal Circuit stated that "the question is whether the 'predictability [and permanence] of the extent of damage to the [plaintiffs'] land' was made justifiably uncertain by the Corps' mitigation efforts." Id. at 1309 (citing Applegate v. United States (Applegate I), 25 F.3d 1579, 1583 (Fed. Cir. 1994)). The Federal Circuit held that "[w]ith the mitigation efforts underway, the accrual of plaintiffs' claims remained uncertain until the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that erosion was permanent and irreversible." Id. at 1310. These Reports "brought to an end plaintiffs' justifiable uncertainty' which had been created by the Corps's mitigation efforts about the permanency of erosion." Def.'s Mot. 4 (quoting Banks (accrual) II, 314 F.3d at 1310). The statute of limitations began to

---

'The Stone plaintiffs filed a Joint Stipulation of Dismissal with Prejudice on June 1, 2007; judgment was entered against the Stone plaintiffs as provided in Rule 54(b) of the Rules of the Court of Federal Claims (RCFC) on June 13, 2007, in case number 04-277 L.

run only after these Reports had been issued, and "[b]ecause the [R]eports were issued less than six years before plaintiffs filed their complaints, the Federal Circuit viewed each complaint as timely." Def.'s Mot. 4_[5]

After remand, the court consolidated the claims of all plaintiffs for the limited purpose of a trial of liability. See Order of Jan. 4, 2007; Order of Mar. 15, 2005; Order of Mar. 17, 2006 (consolidating Frett Y. United States, No. 05-1353 (Fed. Cl. filed Dec. 22, 2005) into Banks et al. v. United States).

Defendant filed its Motion on February 26, 2007, Def.'s Mot. 1, arguing that the Federal Circuit's decision did not apply to fifteen of the plaintiffs (Banks (accrual) II plaintiffs) because these plaintiffs "had no justifiable uncertainty regarding the erosion to their property," Def.'s Mat. 12. In the time since the Banks (accrual) II decision, defendant alleged, new evidence had come to light: (1) "Some plaintiffs had no knowledge whatsoever of the Corps' efforts" to mitigate the loss, id., that is, they had no reason to believe that the clearly visible "permanent taking," Banks (accrual) I, 49 Fed_ Cl. at 825, was not permanent, see Banks (accrual) II, 314 F.3d at 1310; and (2) "Others, while aware of the Corps' efforts, did not believe it would benefit their property," Def.'s Mot. 12, that is, they were not uncertain at all as to the permanency of the damage_ Defendant further alleged that plaintiffs Bodnar and Okonski, who filed their complaints after the Banks (accrual) II decision, were barred by the statute of limitations because they were "on inquiry notice" of their claims and failed to file within the six-year limit. Id. at 19-22.

The court held, in its May 3, 2007, Opinion, that the accrual of a takings claim pursuant to 28 U.S.C. § 2501 was governed by an objective standard.  Banks v. United States (Banks (accrual) III), 76 Fed. Cl. 686, 694-95 (2007). Therefore, plaintiffs' subjective knowledge and interpretations were irrelevant to the question of accrual, and the Federal Circuit's decision that these plaintiffs' claims did not accrue until the issuance of the Reports — and thus, are not barred by the six-year statute of limitations — still applied to the fifteen Banks (accrual) II plaintiffs_ Id. at 696. The court further held that "[a]s landowners when the Reports were issued, the Okonski [and the Bodnar] plaintiffs are in the same position with respect to ownership of their property as the other plaintiffs who are subject to this Motion, that is, they purchased their property when the extent of the damage remained 'justifiably uncertain.'" Id. (citing Banks (accrual) II, 314 F.3d. at 1309). The Bodnar plaintiffs were not barred by the statute of limitations because, having filed on December 28, 2005, they clearly fell within the six-year period of accrual that

---

For additional background, see Banks v. United States (Banks (accrual) I), 49 Fed. Cl. 806, 807-08 (2001).

_____

Wit. 28. She graduated from the University of Michigan in 1953 with a bachelor of arts degree in English literature. Tr. 737:11-12. She was raised in St. Joseph and lives there currently, See id. at 738:15-739:1.

Mr. James Mitchell Ellison III, Chief Boatswain Mate in the United States Coast Guard, Tr. at 315:18-316:2, is a fact witness for plaintiffs, Pls.' Wit. 21. He has been in that position since 1994. Tr. 315:23-24, He was stationed in St. Joseph from 1997 to 2000. Id. at 316:8-9.

Mr. Martin Richard Jannereth, Chief of the Lake, Streams, and Shoreland Section of the Land and Water Management Division of the Michigan Department of Environmental Quality (MDEQ), Tr. at 920:6-16, is a fact witness for plaintiffs, Pls.' Wit. 22. He has worked for MDEQ and its predecessor, the Depai.Intent of Natural Resources, for over thirty-three years. Tr. 920:10-13. He holds a bachelor's degree in forestry and a master's degree in forest ecology with an emphasis on soil science from Michigan State University. Id. at 920:3-5.

Mr. Dean King, a resident of Holland, Michigan and employed in The King Company, a dredging and pile driving business, Tr. at 329:14-330:7, is a fact witness for plaintiffs, Pls.' Wit. 22. The King Company contracts with the United States Amy Corps of Engineers (Corps), and it has done hundreds of jobs for that entity. Tr. 330:10; 330:23-24. The King Company has performed maintenance dredging in St. Joseph Harbor for the government. Id. at 331:1-5.

Mn John Konik, employed as Chief of the Regulatory Office of the Corps, Detroit District, Tr. 1345:2-8, is a fact witness for defendant. He has worked for the Corps' regulatory division for twenty-seven years. Id, at 1345:4-16. In his current position, he manages the regulatory program for the Detroit District. Id. at 1345:19.

Dr. Grahame J. Larson is an expert witness for defendant who was also called as a fact witness for plaintiffs. See id. at 860:3-20; 972:16-976:17. He is a professor of hydrogeology, glacial geology, and introductory geology at Michigan State University. Tr. at 855:1-4. He holds bachelor's and master's degrees in geology from Ohio Wesleyan University and a Ph.D. in geology from Ohio State. Id. at 855:9-12. He has taught at Michigan State University for about thirty years. Id. at 855:13-15. The court qualified Dr. Larson as an expert in glacial geology, glaciology, and hydrology. Id. at 976:22-25.

Mr. Lloyd Richard Marzke, one of the plaintiffs in this case, is a fact witness for plaintiffs. Pls.' Wit 28. He bought property along the St. Joseph River in 1969. Tr. 886:3-4.

Dr. Guy Allen Meadows, professor of Physical Oceanography in the Department of Naval Architecture and Marine Engineering and the Department of Atmospheric, Oceanic and Space Sciences at the University of Michigan, Tr. 28:12-16, is an expert witness for plaintiffs, id. at 32:12-33:22. He holds two degrees in mechanical engineering and a Ph.D. from Purdue University_ Id at 28:20-23. His major area of focus is "coastal hydrodynamics with an emphasis

the motion of water." Ti. 1099:8-9 (Nairn). This term could be used interchangeably with "littoral drift." Tr. 1039:3 (Larson) ("Littoral drift is transport,"); Pls.' Br. 26; see, e.g., Tr. 39:16-40:8 (Meadows). Sediment transport occurs along the nearshore profile, which is "from the shoreline lakeward to the extent of wave influence on changes on the bottom." Tr. 190:6-10 (Chrzastowski). The littoral zone or littoral system is the area along the shoreline where sediment transport occurs.  See, e.g., Tr. 34:12-20 (Meadows); Tr. 1161:8-10, 1330:8-11 (Nairn), The depth of closure is a point from the shore beyond which "there is never enough energy to move [sediment particles] again," Tr. 40:22-25 (Meadows), that is, a point beyond the littoral zone. Experts have opined that the depth of closure is at different locations: Dr. Guy Allen Meadows estimated it to be between 18 and 21 feet of depth for most of the Lake Michigan coast, Tr. 41:1-2, 43:3-14 (Meadows); Dr. James Patrick Selegean testified that he believes the depth of closure to be "closer to the 30-foot range, although [he has not] done any calculations to support that," Tr, 610:15-20 (Selegean); and Dr. Robert 13. Nairn testified that it was at a "depth greater than 10 or 15 or 20 meters [10.9 or 16.35 or 21.8 yards][13]," Tr. 1214:23-24 (Nairn). The zone beyond the depth of closure is known as "deep water." See Tr. 610:11-13 (S elegean).

A sediment source is what provides sediment into the littoral zone for transport.  See, e.g., Tr. 34:18-20 (Meadows). A sediment sink, on the other hand, is a place that traps sediment, removing it from sediment transport and thus from the littoral system. See Tr. 191:1-7 (Chrzastowski). Sinks are usually depressions on the lake bed deep enough that wave action can no longer influence sediment movement, which results in the sediment trap. Id.

It is undisputed in this case that the long-term net littoral drift in the area of St. Joseph Harbor moves from north to south. Plaintiffs' Exhibit (PX) 93 (Section 111 Detailed Project Report on Shore Damage at St. Joseph Harbor, Michigan (1973 Report)) 11; PX 22 (Mitigation of Shore Damage Attributed to the Federal Navigation Structures at St Joseph Harbor, Michigan (1974 Report)) 231; PX 24 (Effectiveness of Beach Nourishment on Cohesive Shores, St. Joseph, Lake Michigan (1997 Report)) 3; PX 23 (Geologic Effects on Behavior of Beach Fill and Shoreline Stability for Southeast Lake Michigan (1996 Report)) 9; Tr. 1277:4-13 (Nairn); Pls.' Br. 20; PX 33 (Preliminary Results of a Pilot Study Conducted Between St. Joseph, Michigan and Michigan City,

_____

("sediment . . is lifted and moved"). Further technical specificity is supplied by the context in which the word is used especially by testifying experts.

'The conversion from meters to yards was calculated by multiplying each metric measurement by 1.09.  American Heritage Dictionary 1088 (4th ed.. 2000).

Indiana (1992 Pilot Study)) 10; Tr. 39:2-15 (Meadows); Tr. 172:6-9, 173:8 (Chrzastowski); see Def.'s Br. passim. It is also undisputed that the disruption of littoral drift by St. Joseph Harbor depletes sediment supply in the littoral zone and causes erosion. PX 93 (1973 Report) 29; PX 101 (REVIEW Origin and Evolution of the Great Lakes) 537; Tr. 1039:9-1041:18 (Larson); Pls.' Br. 26-27; PX 33 (1992 Pilot Study) 10 ("The harbor jetties . . . have effectively trapped some of the southerly littoral drift which has resulted in the sediment starved nearshore area to the south; sand cover, therefore, is not sufficient to protect the till from erosion."); Tr. 415:18-416:1 (Thompson); Def.'s Br. 6. The process by which the blockage of littoral drift causes erosion is explained generally in a review co-authored by Dr. Grahame J. Larson, one of defendant's experts:

> The [sediment] in the shorezone is . . . moved along the shore by waves and offshore currents in longshore transport (Lawrence 1994).
>
> However, two recent types of human intervention have seriously reduced the supply of [sediment] to the shore zone and facilitated the loss of [sediment] to deeper water: (1) dams on rivers that are tributary to the Great Lakes, and most importantly (2) jetties and other engineering structures at river mouths. The effects of damming tributaries is obvious — sediment settles out in the relatively still water of inland reservoirs and is not allowed to be transported to the Great Lakes shore_ Jetties function differently. They are engineering structures erected at river mouths, resembling two long walls that border both sides of the river and extend from the river banks and mouth, just inland of a harbor, to relatively deep waters in the lake proper. Jetties affect beach replenishment by diverting sand and other sediments that move along the shore by lake processes, into deep water" . . [T]hese sediments can no longer be transported to the beach by waves and are therefore permanently lost from the beach system. For this reason, coastal erosion is often most severe near harbor structures, rather than at more "open" coasts. Dredging of river mouths for shipping and boating purposes can facilitate further transport of . . . sediment into deep water.

---

"The emphasized words in Plaintiffs' Exhibit (PX) 101 (REVIEW Origin and Evolution of the Great Lakes) 537 are in dispute. Compare Tr, 1039:9-1041:18 (Larson) with Pls.' Br. 26-27. It is not disputed by either party that jetties divert sediment moving along the shore such that the sediment is removed from the littoral zone. See Pls.' Br. 26-27; Defendant's Post-Trial Brief (Defendant's Brief or Def.'s Br.) 6. Both parties also agree that at least some of that sediment is trapped against the jetties, but it is disputed whether some sediment moves to deep water. See Pls.' Br. iv; Plaintiffs' Response to Defendant's Post Trial Brief (Plaintiffs' Response or Pls.' Resp.) 12; Tr. 1171:8-11 (Nairn); see Part W.C.2.c.

The 1973 Report describes the remediation program, which comprises the creation of "feeder beaches" south of the harbor. PX 93 (1973 Report) 46. Material dredged from the harbor entrance and brought in from outside of the littoral system is placed on the feeder beaches in order to be dispersed into the littoral zone. See PX 93 (1973 Report) 49-50; Tr. 180:5-13 (Chrzastowki). This is to provide "annual nourishment equal to the amount of material [that] is interrupted or diverted into deep water." PX 93 (1973 Report) 46. The feeder beach located at Lions Park, immediately south of the harbor, Tr. 348:6-7 (Selegean), appears to be the main effort by the Corps at mitigation, see Defendant's Exhibit (DX) 34 (St. Joseph Dredging) 2 (indicating that most of the material placed in the littoral zone is placed at Lions Park), but there have been other temporary projects, see, e.g. Tr. 246:12-247:7 (Wineberg) (describing the Corps' 1976 feeder beach located on one of plaintiffs' properties); PX Summary Tab 4, 61; Pls.' Br. 14; Tr. 347:24-348 (Selegean) (testifying that "the initial quantities were to be split between three different nourishment sites"); PX 93 (1973 Report) 46.

In order to understand the the processes of sediment removal from the littoral system, to quantify the amount removed by the jetties, and to quantify the amount of sediment that needs to be replaced, scientists calculate a sediment budget, "raln accounting procedure to keep track along the shoreline of sediment inputs and sediment losses." Tr. 112:25-113:3 (Meadows). Therefore, an important step to implementing the mitigation program was to calculate the sediment removed yearly from the littoral system by the jetties. See Tr. 668:18-669:1 (Selegean). Because the net littoral drift was to the south, the authors of the 1973 Report calculated the longshore sediment transport rate by adding the amount of sediment trapped against the north jetty' to the amount of sediment that traveled around the north jetty and became trapped in the outer harbor,[16] which was ultimately dredged. See id.

In a study dated May, 2006, Dr. Nairn of W.F. Baird & Associates Limited provided his "Assessment of the Causes of Erosion in the Vicinity of St. Joseph Harbor, Michigan" (Nairn Report). DX 1 (Nairn Report). The Nairn Report is the basis of defendant's case and attempts to demonstrate that key features of the previous Corps Reports, particularly the 1973 Report, are in error.  See generally DX 1 (Nairn Report);

---

'⁵The area next to a jetty that accumulates sediment is known as a "fillet." Tr. 44:10-14 (Meadows); Tr. 1250:15-17 (Nairn).

'The outer harbor is a flared area, Tr. 1250:22-24 (Nairn), just beyond the end of the jetties, see Tr. 331:4-19 (King); PX 116 (Record of Construction FY05 Maintenance Dredging St. Joseph Harbor, Michigan (2005 Record of Construction)); Tr. 334:1-11 (King).

16

level of a taking.  See, e.g., Boling, 220 F.3d at 1373; Applegate II, 35 Fed. Cl. at 414.

For reasons of efficiency, the court has left the questions of specific property ownership and damages to be determined after trial of causation. Banks Pretrial Transcript (Pretrial Tr.) 174:5-176:2." The parties do not dispute that St. Joseph Harbor causes erosion and that erosion has occurred in the area of plaintiffs' zone. Pls.' Br. 26-27; Def.'s Br. 6. The disputed issue in this case, therefore, is whether the government's actions effectively offset the effects of St. Joseph Harbor on plaintiffs' zone such that the erosion in plaintiffs' zone is not attributable to the government.

B.      Burden of Proof

Defendant is correct in stating that Ipjlaintiffs bear the burden of proof in civil proceedings." Def.'s Br. 5. Plaintiffs meet that burden only if they establish by a preponderance of the evidence the cause of action for which they have sued. The United States Court of Appeals for the Federal Circuit has "defined preponderance of the evidence in civil actions to mean 'the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it.'" Jazz Photo Corp. V. United States, 439 F.3d 1344, 1350 (Fed. Cir. 2006) (citing Hale v. Dep't of Iran sp., Fed. Aviation Admin., 772 F.2d 882, 885 (Fed. Cir. 1985); see also St. Paul Fire & Marine Ins. Co. v. United States, 6 F.3d 763, 769 (Fed. Cir. 1993) (same).

C.      Admissions and Expert Testimony

The Federal Rules of Evidence (FRE) make admissible for the truth of the matter asserted admissions made by party-opponents. See Fed_ R_ Evid. 801(d)(2). Admissions by a party-opponent are an exception to the general prohibition on hearsay, defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Id. at 801(c). Specifically, the statement must be offered against a party and must fall into one of the following categories: 1) the statement is the party's own statement in either an individual or representative capacity; 2) the statement is one of which the party has manifested an adoption or belief in its truth; 3) the statement was made by a person authorized by the party to make a statement concerning the subject; or 4) the statement is one by the party's agent or servant concerning a matter within the scope of the agency or employment, made

_____

'Arguments from plaintiffs about the scope of damages, therefore, are inapposite.  See, e.g., Pls.' Br. 36-37.

during the existence of the relationship. Id. at 801(d)(2)_[20] Therefore, an out-of-court statement of a party-opponent offered for its truth is admissible at trial providing that it conforms with Federal Rule of Evidence 801(d)(2).

The following exhibits, consisting in the main of the Corps Reports that form the basis of plaintiffs' arguments, constitute admissions under FRE 801(d)(2) because they meet the requirements of that rule: PX 132 (1958 Study); PX 93 (1973 Report); PX 22 (1974 Report); PX 94 (1983 Report); PX 32 (Interim Report 1975-1984); PX 33 (1992 Pilot Study); PX 114 (1992 Note); PX 23 (1996 Report); PX 24 (1997 Report); PX 41(1999 Report); PX 96[21] (Corps Finding of No Significant Impact); and PX 113, titled "Great Lakes Coastal Geology and Coastal Engineering, Southeastern Lake Michigan 30 April 1994" (1994 Site Visit)." First, the exhibits were offered by plaintiffs in evidence to prove the truth of the matter asserted, that is, to prove the truth of the statements that the reports themselves contain. Second, plaintiffs offered those documents against its party-opponent, defendant. Finally, the statements contained in these documents qualify as defendant's own statements because they arc reports issued by the United States. The studies not issued directly by an agency of the United States and instead issued by a-

_____

[20] "A fifth category relating to statements of co-conspirators has been omitted from this discussion as irrelevant. See Fed. R. Evid. 801(d)(2).

[21] 'Plaintiffs' Exhibit 96 consists of two documents, a title page to a Corps document titled "Finding of No Significant Impact" and a document titled "Glacial Tills Under Lake Michigan" by the Illinois State Geological Survey in 1974. See PX 96. Although Dr. Nairn did not seem to be familiar with the document, in examining PX 96, Dr. Nairn appeared to distinguish the two documents by describing the section entitled "Glacial Tills Under Lake Michigan," which was "{a]side from the cover page." Tr. 1267:9-15 (Nairn). This cover page is the Corps document, "Finding of No Significant Impact." PX 96. The court has not found a connection between those two documents on their face or in the testimony, see id.; Tr. 1267:9-15 (Nairn), and therefore distinguishes them in its citations as follows: PX 96 (Corps Finding of No Significant Impact) and PX 96 (Illinois State Geological Survey). This distinction is relevant in that the former could constitute, if relevant to the case, an admission by defendant, whereas the latter cannot be ascribed to defendant.

'Plaintiffs' Exhibit 113 is divided into two sections, "Itinerary - Day 1" and "Itinerary - Day 2," both numbered independently. See PX 113 (Great Lakes Coastal Geology and Coastal Engineering, Southeastern Lake Michigan 30 April 1994 (1994 Site Visit)). When relevant, this Opinion will specify which section it is referring to.

Plaintiffs' Exhibit 113 is a guide to a site visit in 1994. Tr. 451:14-16 (Thompson) (citing PX 113 (1994 Site Visit)). The Corps sponsored the site visit, Id. at 457:2-4 (Thompson) (citing PX 113 (1994 Site Visit)).

private entity hired by the government for the purpose of studying and submitting a report on the erosion at St. Joseph qualify as statements made "by a person authorized by the party to make a statement concerning the subject." Fed. R. Evid. S0l(d)(2)(C). Evidence that qualifies as a statement by an authorized person but does not qualify as an admission (because it is not offered by a party-opponent) includes the backbone of defendant's arguments, the Nairn Report, DX I (Nairn Report), and the supporting report by Dr_ Larson, DX 3 (Larson Report). See Fed. R. Evid. 801.

Both the Nairn Report and the Larson Report were admitted into evidence as expert reports. Tr. 1151:9-14, 1020:15-17; see also Banks v. United States (Banks (expert report) ), 75 Fed. Cl. 294, 304 (2007) (refusing to strike Nairn Report). The court did so under the authority of FRE 702, which enables the trier of fact to rely upon the testimony of an expert with scientific, technical, or other specialized knowledge. Fed. R. Evid. 702. Specifically, FRE 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Id. The Supreme Court has held that the trial court acts as a "gatekeeper" under FRE 702 to "`ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' Kumho Tire Co, v, Carmichael, 526 U.S. 137, 141 (1999) (Kumho Tire) (quoting Daubert v. Merrell Dow Pharms. Inc., 509 U.S. 579, 597 (1993)). The trial court's gatekeeping duty extends to all expert testimony, whether it be scientific, technical, or another type of specialized knowledge. Kumho Tire, 526 U.S. at 147. The rationale underlying the gatekeeping requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 152.

Plaintiffs moved in November 2006 to exclude the Nairn Report and the expected testimony at trial of Dr_ Nairn, see Plaintiffs' Motion to Strike Dr. Nairn's Expert Report of Nov. 20, 2006, but, after responsive briefing by defendant and subsequent oral argument, the court denied the motion, Banks (expert report), 75 Fed. Cl. at 304. Further, during trial, the court qualified Dr. Nairn as an expert in a variety of areas related to the

central issues of the case. Tr. 1107:22-24 (Nairn).'

During trial and in briefing, plaintiffs attack the credibility of the Nairn Report because it is the work. of Dr. Nairn and does not reflect the thinking of others involved, as Dr. Nairn was, in the preparation of the Corps Reports. When discussing the extent of the zone of influence of the jetties, for example, plaintiffs note that "kill three of the authors of . . . PX 113 • . . attended the PX 33" workshop and that Mr. Larry Parson, co-author of PX 113, also co-authored the 1996 Report and the 1997 Report. Pls.' Br. 2; PX 113 (1994 Site Visit); PX 23 (1996 Report); PX 24 (1997 Report). Plaintiffs also state that the organizations associated with the creation of the Corps Reports, as well as some of their authors, "are not shown to have joined with Dr. Nairn in his May 2006 litigation report." Pls.' Br. 2-3; PX 113 (1994 Site Visit); PX 23 (1996 Report); PX 24 (1997 Report). Plaintiffs point to the $1,000,000 in expert fees paid to Dr. Nairn by defendant. Pls.' Br. 3 (citing Tr. 1327:1-18 (Nairn)). Plaintiffs' reference to Dr. Nairn's fee and the fact that he conducted his research on the Nairn Report without the collaboration of other authors of the Corps Report appear intended to suggest that Dr. Nairn's expert report is an about-face by a lone scientist whose opinion has been bought and paid for.

Dr. Nairn's report and testimony have been admitted into evidence by the court as an expert report and expert testimony. Tr. 1107:22-24 (Nairn); see also Banks (expert report), 75 Fed. Cl. at 304. The fact that previous Corps Reports, some co-authored by Dr. Nairn, see, e.g., PX 23 (1996 Report); PX 24 (1997 Report), are admissions by defendant is also not in dispute and defendant's counsel acknowledged this as to the 1973 Report specifically. Tr. 74:23-75:25 (Petrie, defendant's counsel). What is at issue, therefore, is the credibility of an expert's report and testimony when compared with prior admissions by a defendant.

The court does not view the admissions as ipso facto more credible than the Nairn Report because they are prior statements by defendant. Neither does the court hold the Nairn Report in higher regard than the admissions because Dr. Nairn is a qualified expert witness. The court instead reviews the evidence that both parties put before it and determines, based on the substance of the evidence and any surrounding facts and

---

'As noted above in footnote 11 of Part I, both parties qualified several witnesses as experts. Defendant submitted the expert reports of these witnesses into evidence, See, e.g., Defendant's Exhibit (DX) 3 (Geology and Long-Term Lakeshore Erosion in the Vicinity of St. Joseph, Michigan (Larson Report)). The court explicitly inquired, with respect to plaintiffs' first expert witness to testify, Dr. Meadows, as to whether plaintiffs would like to move for the admission of his expert report. Tr. 163:6-11. Plaintiffs did not submit any of their experts' reports into evidence. See Tr. passim.

experts, however, provided evidence that lowering of a cohesive shore can have a very "different ultimate effect" because it is unclear whether mitigation is ever possible. Pls.' Br. 30. There no longer is a direct correlation between replacing material and effective mitigation because nourishment can act as an abrasive agent that exacerbates erosion, Tr, 1215:22-25 (Nairn); 176;15-178:14 (Chrzastowski), and the erosion of the lake bottom is considered permanent, Tr. 178:12-14 (Chrzastowki); PX 23 (1996 Report) 10; PX 24 (1997 Report) 8; PX 41 (1999 Report) 3. Parts IV.B.2 and V, below, address whether defendant provided the proper kind of material and the proper amount of material for effective mitigation at plaintiffs' properties.

Defendant acknowledges that the Corps considered the zone of plaintiffs' properties cohesive in its earlier Corps Reports, but it argues that this was an erroneous conclusion because that assumption was based on studies that did not focus on plaintiffs' zone. Def.'s Resp. 9. "Dr. Nairn testified that the scope of the area studied in the earlier [Corps] Reports did not in one instance include the plaintiffs' zone and, in another instance, only included a small stretch of the shoreline where the northern-most plaintiffs' properties are located." Def.'s Br. 23 (citing Tr. 1108:3-1111:11, 1342:1-11(Nairn)). Dr. Nairn stated during his testimony that the purpose of the 1996 Report and 1997 Report was to study the shoreline and the Corps' nourishment program, and that the 1996 Report studied the area from St. Joseph Harbor to 3.7 miles south, while the 1997 Report study area extended from St. Joseph Harbor to 5.6 miles south. Tr. 1109:24-1111:8 (Nairn). He then qualified the scope of the 1997 Report, stating that it "really relied [on] all the information collected on the first [1996 Report', so . going the extra three [miles] really weren't based on a lot of data." Id. at 1111:8-11 (Nairn).

Defendant's expert witness in geology, Dr. Larson, is the support for the conclusion in. Dr. Nairit's expert opinion that the properties belonging to a majority of the plaintiffs are located on a sandy, not a cohesive, shoreline. See generally Tr. 972:16-1020:23 (Larson); Tr. 1213:20-1214:5 (Nairn) ("Dr. Larson provided the stratigraphy and being a person with expertise in erosion processes, then I interpret that as to whether it's cohesive or is a sandy shore.") (footnote added). Dr. Larson found that the shoreline for some of the northern-most plaintiffs' properties "is a cohesive shore that then transitions to a sandy shore for the remaining larger group of plaintiffs' properties." Def.'s Br. 23 (citing DX 3 (Larson Report) 34; DX 28 (Glacial Geologic Map of Berrien County); DX 31 (Geologic Cross Section of Lake Bluffs North and South of St. Joseph); Tr. 1008:18-20 (Larson); Tr. 1212:21-1214:9, 1342:12-18 (Nairn)). In anticipation of this trial, Dr. Larson prepared a stratigraphy of the areas along the Lake Michigan shoreline encompassing plaintiffs' properties. Tr. 972:16-1020:23 (Larson). Dr. Larson testified

_____

[3]"'The stratigraphy means the layering of the sediments." Tr. 1003:9-10 (Larson).

34

that, in order to create the geologic map presented at trial, he drove through every path through the area and noted any exposure of geologic materials, such as sand and gravel. Id. at 981:4-9 (Larson) (citing DX 28 (Glacial Geologic Map of Berrien County)). He also testified that he used soil maps and published borings. Id. at 981:10-13 (Larson) (citing DX 28 (Glacial Geologic Map of Berrien County). Dr. Larson testified that he relied upon well logs that are on file with the Michigan geological survey in order to obtain information about the geology of the surface that lies below lake level. Id. at 1004:5-9 (Larson). He explained that well logs are the reports that well drillers must submit to the Michigan Department of Public Health, and that he uses the well logs in the same way that "petroleum people do:" he looks at the logs and tries to characterize the geology based on the information recorded in those logs. Id. at 1004:11-23 (Larson). Dr. Larson testified that he has used well logs extensively over the years for a variety of projects, and that he has found about 30% of them to be unreliable. Id. at 1006:7-11 (Larson). He testified that he deals with that variability by eliminating the logs that he finds unreliable, id. at 1006:19-20 (Larson), for example, logs containing obvious mistakes in the characterization of materials found and logs of uncertain location, id. at 1006:7-16 (Larson).

At trial, Dr. Larson reviewed the geological history of the area, describing the creation of Lake Michigan by a receding glacier that left behind a lake bed of alternating levels of till and sand, id. at 981:22-984:24 (Larson), and presented his stratigraphy of St. Joseph Harbor and the adjoining bluffs contained in DX 31, Tr. 1001:19-1003:16 (Larson). Dr. Larson explained that, south of the harbor, a layer of till exists above a layer of sand. Id. (citing DX 31 (Geologic Cross Section of Lake Bluffs North and South of St. Joseph)). Dr. Larson found that, south of the harbor in the direction of Grand Mere, "the till was no longer there(,] but it was mainly raw sand." Id. 1003:17-18 (Larson).

Plaintiffs attempted in cross examination, Tr. 1036:19-23 (Larson), and briefing to impeach Dr. Larson's testimony that the lake bed in plaintiffs' zone is a mixture of till and sand, see Pls.' Br. 29. In. particular, plaintiffs point to a colloquy between Dr. Larson and plaintiffs' counsel during cross-examination where Dr. Larson acknowledged that he had "recognized downcutting" in an earlier study. Pls.' Br. 29; Tr. 1036:19-23, 1046:19-1049:2 (Larson) (citing PX 33 (1992 Pilot Study) 10). Dr. Larson testified that down-cutting "probably [did] not" indicate the presence of sand, Tr, 1037:2-4 (Larson). Rather, he considered down-cutting probably indicative of the presence of cohesive material. Tr. 1036:24-1037:18 (Larson).

As evidence that Dr. Larson's recent conclusions are erroneous, plaintiffs cite to

between the years 1946 to 1956, he observed that "every so many feet, maybe 15 feet, was about a 3-by-3 hole that went into the water of Lake Michigan." Tr. 789:16-18, 790:1 (Voss); Pls.' Br. 10. Although the holes were covered, "when the waves came in the water would gush up through this hole in recovering, further indicating that it was open underneath." Tr. 789:19-21 (Voss); Pls.' Br. 10.[5]

A "Coastal Engineering Technical Note' fromfife Corps in 1992 (1992 Note) states that "klubble-mound coastal structures contain voids between individual armor units. These voids . . . may result in the passage of water and sediment. The volume of sediment passing through breakwaters, jetties, and groins can be substantial . . .    PX 114 (1992 Note) 1; Tr. 467:14-21 (Thompson); see Pis.' Br. 10. Thus, plaintiffs suggest that the encasement of St. Joseph Harbor jetties in steel was for the purpose of sealing them such that sand would no longer pass through. Pls.' Br. 10 (citing PX 114 (1992 Note) 1-8; Tr. 467:10-468:25, 468:4-9 (Thompson)). Mr. Thompson testified that he had no personal knowledge as to why the timber cribs at St. Joseph were encased in steel, Tr. 484:3-6 (Thompson), but he also stated that harbor structures, including St. Joseph Harbor, tended to be encased in steel "as the timber rock crib deteriorated over time," Tr. 463:24-464:3 (Thompson). He also testified that there were differences between the timber cribs of St. Joseph Harbor prior to their encasement in steel and the rubble-mound structures referred to in the 1992 Note. Tr. 481:6-8, 483:10-15 (Thompson) ("At least as initially constructed, a timber crib would be fairly impervious . . Whereas, a rubble structure has large and varied voids."). However, as a timber crib started to deteriorate, lilt would begin to approach a rubble structure." Tr. 483:16-19 (Thompson).

Plaintiffs' argue that "the piers were not trapping large quantities until the steel encasement was completed." Pls.' Br. 29 (emphasis ornitted).[55] The court understands

_____

[54]Plaintiffs also present, as evidence of the decay of the wooden cribs, photographs showing the destruction of a wooden seawall built to protect some of plaintiffs' property. PX Summary Tab 1, 29; Tr. 752:9-15 (Ehret); Pls.' Br. 10. Presumably, by placing this reference in the section entitled "The Piers (Im) Permeable," plaintiffs are suggesting a generalized assessment as to the susceptibility of wooden structures to the elements. See Pls.' Br. 10.

[55]In support of this assertion, plaintiffs quote from the United States Geological Survey: "The harbor jetties to the north of this area have effectively trapped some of the southerly littoral drift . ." PX 33 (1992 Pilot Study) 10; Tr. 415:18-416:1 (Thompson); Pls.' Br. 28. Plaintiffs assert that "[t]he use of the word 'some' . .. adds to the weight of the idea that the piers were not trapping large quantities until the steel encasement was completed." Pls.' Br. 28-29 (emphasis omitted). This quote may be consistent with plaintiffs' view of the so-called peremability of the jetties prior to steel encasement, but it does not offer definitive support for their conclusion. The littoral drift that was not trapped by the jetties might have been lost beyond the depth of closure,

the import of the argument to be that the Corps' net littoral drift calculation (prior to this litigation) of 110,000 cubic yards per year does not fully and accurately represent the total net sediment transport rate because the 110,000 cubic yards figure is based on the material trapped against the northern jetty prior to the encasement of the jetties in steel, Tr. 1302:14-23 (Nairn) (testifying that 110,000 cubic yards was partly derived from surveys done in 1907 and 1954); see also PX 32 (Interim Report 1975-1984) 5 (stating that "[t]he [1973 Report] determined the net littoral transport interrupted by the harbor structure to be 110,000 cubic yards per year based on available topographic and hydrographic data for the period 1907 to 1971), Tr. 644:24-645:5 (Selegean) (testifying that the jetties were encased in steel from approximately 1952 to 1988 or 1989). If some material was still passing through the jetties at the time of the calculation, the interrupted net littoral drift after total steel encasement could be more than the 110,000 cubic yards per year calculated in the 1973 Report. Thus, plaintiffs argue, "[t]he best explanation for the contradictory information about net littoral drift is that the CORPS felt that only 30% of the sand was being blocked because of the decayed condition of the piers and that 110,000 cy/yr would make up for it." Pls,' Br. 31-32.[56]

However, plaintiffs have failed to prove that the piers were ever permeable. All of the evidence that plaintiffs present is inconclusive. Plaintiffs implicitly interpreted the 1997 Report's statement that "the harbor jetties due to their sheet-pile construction, were assumed to be complete barriers to alongshore transport," PX 24 (1997 Report) 27, as a negative inference that — without the sheet-piling — the jetties would not be complete barriers to transport, see Pls.' Br. 9. This is demonstrated in the following colloquy between plaintiffs' counsel and Dr. Selegean concerning data from the 1997 Report:

> Q: Do you agree that sheet pile construction causes the jetties to be complete barriers?

---

among other possibilities.

'Plaintiffs point to Mr. Thompson's testimony regarding a panel answer at a Shoreham meeting stating that "[t]here is really no way of knowing" whether 110,000 cubic yards per year is equal to 30% of the erosion, PX 61 (Memorandum for Record: Shoreham, MI Village council Meeting 1994) 1; Tr. 448:2-3 (Thompson); Pls.' 10. The court understands plaintiffs' use of Mr. Thompson's testimony as support for what plaintiffs perceive to be "the contradictory information about net littoral drift." Pls.' Br. 31. This argument, the court finds, is very unhelpful to plaintiffs because plaintiffs' evidence offers no alternative quantitative analysis of the relationship between the jetties and erosion, an al mission in the 1973 Report on which plaintiffs' entire liability case depends.

> A: I believe there are complete barriers prior to sheet metal going in, complete barriers in the sense that sand was not — at least not an appreciable quantity of sand, was able to pass through a structure . . ."

Tr. 588:20-25 (Selegean). Although plaintiffs' interpretation is consistent with a negative inference drawn from the 1997 Report, a statement asserting that a certain kind of construction is impermeable does not automatically support the idea that a different kind of construction is not impermeable. Similarly inconclusive is Mr. Voss's eye-witness testimonial evidence showing that some water may have been able to pass through the north jetty as late as 1956. Tr. 789:19-21 (Voss); Pls.' Br. 10_ Mr. Thompson testified that just because a wave can get through the jetties, one cannot assume that sediment will get through as well. Tr. 458:16-.23 (Thompson). In fact, he testified that it "would be fairly difficult" for sand to get through a rock-filled timber crib. Id_

There is, on the other hand, a preponderance of the credible evidence that the jetties are, and long have been, impermeable. As defendant correctly points out, plaintiffs' own expert witness testified that the piers were impermeable even prior to their encasement in steel. See, e.g., Tr. 202:25-203:2 (Chrzastowski) (testifying that the purpose of a rock-filled timber crib, assuming appropriate maintenance and upkeep, would be to act as a total littoral barrier); Tr. 49:8 (Meadows) (testifying that the piers are currently a "near total littoral barrier"); PX 132 (1958 Study) 18 ("This pier [that was constructed in 1836] consisted of an impermeable wooden crib . ."); PX 24 (1997 Report) 79 ("The bypassing analysis showed that the combination of the long jetties and the deep navigation channel acts as a total littoral barrier, trapping all sediment reaching this area from either the north or the south.").

Plaintiffs simply present no evidence, testimonial or documentary, to corroborate their assertion that the alleged permeability of the piers means that 110,000 cubic yards per year represents only 30% of the sediment blocked by the piers. Pls.' Br. 31-32. To the contrary, the 1973 Report and many witnesses interpreting these figures assert that the Corps' position up until the time of litigation was that 110,000 cubic yards represents 100% of the sediment blocked by the piers. See PX 93 (1973 Report) 59; PX 32 (Interim Report 1975-1984) 5; Tr. 420:17-20 (Thompson) (stating that he considered 110,000 cubic yards the figure to he followed at the time of the Interim Report 1975-1984); PX 22 (1974 Report) 235; PX 23 (1996 Report) 2; PX 24 (1997 Report) 17; PX 41 (1999 Report) 4. In at least two of these same Corp Reports, the Corps took responsibility for causing 30% of the erosion south of the structures. PX 93 (1973 Report) 32; PX 22 (1974

results were incorrect. Def.'s Br. 11. Defendant argues that Dr. Meadows, plaintiffs'
expert witness, believes that Dr. Nairn's studies were conducted properly, that the results
were valid, and that a longshore transport rate of 50,000 to 60,000 cubic yards per year is
reasonable. Id, at 14 (citing Tr. 143:24-144:6, 146:15-151:13 (Meadows)).[62]

Defendant also argues that plaintiffs did not "provide any testimony from their
experts that took exception with or found a confidence level of plus or minus [twenty-
five] percent [the confidence level contained in the Nairn Report, DX 1 (Nairn Report) 2-
28] problematic," Id. at 14 (alteration added). On the sediment budget in general,
defendant states that Dr. Nairn considered all sources of sediment and sinks for the area,
that he "approached his analysis trying to make no assumptions, trying to err on the side
of the plaintiffs, and trying to come to conclusions using several different approaches to
ensure checks and balances," and that he tested the results of the modeling calculations.
Id. at 12 (citing Tr. 1120:6-1122:15, 1114:2-22, 1126:22-25 (Nairn).

Defendant argues that the Nairn Report presents a more accurate calculation of the
lon,,shore transport rate than do all of the earlier reports. Mr. Thompson testified that net
littoral drift in any area can be calculated in "several ways" and "over time there would be
changes as well just as improvements in the data and procedures came about." Tr.
423:25-424:6 (Thompson); see also Ti. 1114:18-22 (Nairn) ("[W]e just try to make sure
that we don't base everything on one single methodology .. .. So that we have checks
and balances in our procedures."). Defendant cites to Mr. Thompson's testimony to
support Dr. Nairn's calculations, Def.'s Br. 13, which were done approximately thirty
years after the calculations that yielded a transport rate of 110,000 cubic yards per year,
compare PX 93 (1973 Report) 58, with DX 1 (Nairn Report) 3-63 to -65. Dr. Nairn
employed five different calculations based on three different approaches. DX I (Nairn
Report) 3-63 to -65; Tr, 1141:23-1143:8, 1144;9-22 (Nairn); Def.'s Br. 13. Dr, Nairn's
calculations yielded the following results: 40,500 cubic yards per year, 71,500 cubic
yards per year, 48,000 cubic yards per year, 40,000 cubic yards per year, and 50,000 cubic
yards per year. DX 1 (Nairn Report) 3-63 to -65; Def.'s Br. 13.  Dr. Nairn averaged those
figures to determine the longshore transport rate for use in his sediment budget,
concluding that the rate equals approximately 50,000 cubic yards per year. Tr. 1144;9-22
(Nairn); Def.'s Br. 13-14. The Nairn Report warns that there might be a margin of error
of 25%. see DX 1 (Nairn Report) 2-28, but Dr. Nairn testified that he thinks the real
figure is less than a twenty-five percent difference from his calculation of 50,000 cubic
yards per year, Tr. 1334:13-14 (Nairn). Defendant emphasizes that Di. Nairn's five

--------------------------------

'Defendant also claims that Dr. Nairn's longshore transport rate was corroborated by the
rate calculated by Dr. Meadows' earlier work on behalf of the University of Michigan. Def.'s Br.
22. However, defendant failed to cite to a source that would support this assertion. See id..

different calculations relied upon more recent data and improved technology than the calculations conducted in the 1973 Report. Def.'s Br. 22.

Plaintiffs argue that "[Dr.] Nairn doesn't explain . . how the sand accumulation rate can be known when there is so much disagreement on the subject." Pls.' Resp. 13. That there is disagreement on the subject is clear: Dr. Chrzastowki expressed doubt as to the experts' view that the fillets "have reached equilibrium."[63] Tr. 200:1-9 (Chrzastowski).[64] The Nairn Report, on the other hand, calculates that the south fillet beach "stopped growing in the long term sense" since approximately the 1940s. Tr. 1158:14-1159:7 (Nairn).

Defendant argues that Dr. Nairn "demonstrated that the 1973 [Report] figure was flawed and overstated the true [longsbore transport] rate because of issues with insufficient information regarding the shoreline and fillet growth between 1907 and 1954." Def.'s Br. 22 (citing Tr. 1145:2-1150:25 (Nairn)). Dr. Nairn explained during his testimony that, in the period between 1907 and 1954, which was the snapshot in time used by the authors of the 1973 Report in calculating its longshore transport rate, the fillet beach was growing at a faster rate than the net rate. Tr. 1145:22-24 (Nairn). His underlying theory for that statement is that the fillet beach, when it nears fullness, receives the full amount of sand from the north but not the full amount from the south because of wave defraction.[65] Id. at 1146:24-1147:12 (Nairn). Instead, the southerly

_____

[63]Dr. Chrzastowski testified that vertical accumulation could be seen on the field trip prior to trial. Tr. 200:1-9 (Chrzastowski). As noted above in footnote 10, the site visit to which Dr. Chrzastowski refers did not provide occasion for testimony or evidence. Order of Apr. 12, 2007, 1; Pretrial Tr. 162:4-10. However, as an expert, Dr, Chrzastowski may use sources that are inadmissible as evidence for the basis of his opinions. Fed. R. Evid. 703 ("If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.").

[64]Plaintiffs argue that Dr. Meadows opined that the "fillet on the north side and on the south side continue to grow." Tr. 64:24-65:1 (Meadows); Pls. Resp. 11. However, the expert opinion underlying plaintiffs' argument was stated at trial over objection by defendant that "this is an opinion of his that does not appear in his expert report that he has submitted to the defendants." Tr. 67:15-17 (Meadows). After hearing the objection, plaintiffs withdrew the question. Id. at 71:19-21 (Meadows). The court therefore disregards the argument as lacking a basis in the evidence.

[65]Wave defraction is a process whereby the energy from waves spreads out. See Tr, 1146:24-1147:12 (Nairn).

deprivation. This lets the lake advance shoreward even though the lake level is
going down.

Pls.' Br. 26."

Although plaintiffs present persuasive evidence that the water level in Lake
Michigan is lowering, Tr. 1052:19-25 (Larson); PX 93 (1973 Report) 8; Pls.' Br. 25-26,
they present no persuasive evidence that this lowering in. the St. Joseph area is due to
human intervention from the St. Joseph Harbor. While plaintiffs make a point of citing
sources that indicate that Lake Michigan has been lowering for thousands of years, they
do not distinguish different periods within those thousands of years that could indicate
that the St Joseph Harbor has affected that lowering. See Tr. 1052:19-25 (Larson); see
also PX 93 (1973 Report) 8; see also Pls.' Br. 25-26. In fact, the evidence that plaintiffs
cite presents many other reasons as causes of lake water lowering.  See e.g., PX 93 (1973
Report) 8 ("Following the 18-foot level, the ice border retreated farther north uncovering
the Straits of Mackinac .. . exposing a lower outlet to the east. This outlet reduced the
level of the Lake Michigan Basin to about 10 feet above the present level."). Further,
plaintiffs present no evidence and no explanation of how "[t]he lowering of Lake
Michigan contradicts the theory of a naturally eroding shore," Pls.' Br. 26, especially in
light of the fact that all of the evidence presented at trial from both. parties indicated that
natural erosion occurs around St. Joseph Harbor. Tr. 95:15-17 (Meadows); Tr. 1195:19-
21 (Nairn).

V.    Conclusion

A.    Plaintiffs with a Sandy Shore

Most of plaintiffs' properties are located in a zone that Dr. Larson's and Dr.
Nairn's studies identify as fronting on a sandy lake bed. See Part IV.B.1. This section
discusses the liability of the Corps as to those plaintiffs.

1.    Erosion Damage that Occurred Prior to 1970

Plaintiffs refer to defendant's "dredging records," presumably DX 34, to argue that

---

'Plaintiffs also refer to an argumentative colloquy between Dr. Larson and plaintiffs'
counsel in which Dr_ Larson acknowledged the vertical accretion of dunes due to sand blowing
"up off the beach" during the 5,000-year period that the lake dropped 10 to 15 feet. Tr. 1052:9-
1055:12 (Larson); Pls.' Br. 25-26. So far as the court can discern, this colloquy explains nothing
about subsurface conditions that would affect the water level of Lake Michigan.

defendant did not consider 73 years that, when considered, "add[] 6,234,273 [cubic yards] more removed from the littoral zone." Pls.' Br. 22; DX 34 (St. Joseph Dredging);[5] see Tr. 622:15- 636:25 (Selegean) (testifying how he compiled this record, how the chart is organized, and what the figures mean). The court infers that plaintiffs are pointing out that, regardless of defendant's recent attempts at mitigation, defendant made no effort to mitigate any erosion prior to 1972, when the Corps started sidecasting sediment over the south pier and into the littoral zone. See DX 34 (St. Joseph Dredging); Tr. 633:8-18 (Selegean) (explaining that to "sidecast" over the south pier means that the Corps "extended a pipe over the jetty to the south side and then pumped the material that was inside the dredge . . . out to the south side. So they pumped it over the jetty wall to roughly the area where the southern beach would be, not on the beach but out in the water"). This is the only inference the court was able to draw from plaintiffs' arguments and DX 34, which plaintiffs cite in support. See Pls.' Br. 22-23; DX 34 (St. Joseph Dredging). The figure of 6,234,273 cubic yards includes erosion prior to 1950, notwithstanding the court's earlier opinion ruling, consistent with plaintiffs' then position, that liability would not include erosion that occurred prior to 1950.  Banks (scope) I), 68 Fed. Cl. at 531 Plaintiffs may not change their litigation position in post-trial briefing, nor may they relitigate an issue that has already been decided.

Defendant states that Dr. Nairn employed the sediment budget "to determine whether the Corps had provided enough sediment to the shoreline to offset any erosion attributable to the jetties." Def.'s Br. 12 (citing Tr. 1117:14-21 (Nairn)). Defendant points out that Dr. Nairn concluded that any net erosion is not due to the jetties because "the volume of sediment provided by the Corps to the shoreline south of the St. Joseph Harbor since 1970 is sufficient to have offset any erosion attributable to the jetties." Def.'s Br, 13. **Dr.** Nairn testified that "[s]ince 1970, [the Corps] has on average placed more sand south of the harbor than has been trapped or lost through the influence of the jetties and **the** dredging program of the harbor." Tr. 1117:3-6 (Nairn).

It is undisputed that defendant failed to mitigate for any erosion prior to the early 1970s. See DX 34 (St. Joseph Dredging); Tr. 622:15- 636:25 (Selegean); Tr. 1117:3-6 (Nairn); Def.'s Br. 12. However, defendant and plaintiffs are in disagreement over when mitigation actually began. Plaintiffs implicitly argue that mitigation began in 1972, when defendant started sidecasting sediment over the south jetty and into the littoral zone. See

---

[5] Lathe course of compiling its exhibits, defendant erroneously placed the wrong document in the binders where DX 34 was to have been placed. Tr. 562:3-4. Defendant's counsel stated that "Plaintiffs have had [the correct DX 34] since Dr. Selegean was deposed back in 2005." Tr. 562:2-562:3. Without objection by plaintiffs, the court allowed defendant to substitute the correct exhibit at trial. Tr. 561:4-562:8.

Pls.' Br. 22; DX 34 (St. Joseph Dredging); Tr. 633:8-18 (Selegean).

Defendant's position is that mitigation began in 1970, when the Corps placed the dredged material "two miles south of the piers in 10-20 ft. of water." DX 34 (St. Joseph Dredging) (capitals omitted); Tr. 632:11-19 (Selegean). Defendant's testimony and DX 34 are consistent with activities undertaken to comply with the Marine Protection, Research, and Sanctuaries Act of 1972 (Ocean Dumping Act), Pub. L. No. 92-532, which "put much more stringent regulations on dumping offshore. And that's why the offshore dumping actually ceased and the sand came to the nearshore zone instead." Tr. 1162:9-14 (Nairn). The record also shows the 1970 and 1971 placements, noting the offshore location in the column for the littoral zone. DX 34 (St. Joseph Dredging); Tr. 632:6-10 (Selegean); Tr. 348:10-11 (Selegean) ("[The nourishment program is] still going on and we've beach nourished every year since 1970."); Tr. 607:19-20 (Selegean) ("The Corps started beach nourishing in St. Joseph in 1970.");[2] see DX 1 (Nairn Report) 1-14 ("Since 1970, the [Corps] has on average placed more sand south of the harbor than has been trapped or lost through the influence of the jetties and the dredging program at the harbor."); Tr. 1117:3-6 (Nairn).

The nourishment program at St. Joseph under Section 111 of the Rivers and Harbors Act of 1968, Pub. L. No. 90-483, § 111, 82 Stat. 731, 735 (1970), was not implemented until 1976. PX 23 (1996 Report) 2 ("In 1976, an approved Section 111 erosion mitigation plan authorized annual placement of fill material . . . from maintenance dredging of St. Joseph Harbor to feed the eroding downdrift shoreline."); PX 24 (1997 Report) 5 ("A Section 111 mitigation plan was implemented downdrift of St. Joseph Harbor in 1976 by the [Corps] to address the erosion problems that may be associated with the interception of sediment on the updrift side of the structures."). However, the Corps' effect on erosion is at issue and not the purpose of measures that could effect mitigation; mitigation incidental to another activity carries no less weight than purposeful mitigation. Defendant's Exhibit 34 clearly indicates that nourishment was placed in the littoral zone beginning in 1970. DX 34 (St. Joseph Dredging) L Plaintiffs' counsel never attempted to impeach or question this evidence, see Tr. passim. As the 1997 Report notes: The nourishment program "was initiated in 1976 (with some nourishment placed as early as 1970)." PX 24 (1997 Report) 83. The court finds that mitigation at St. Joseph Harbor began in 1970.

The court disagrees with plaintiffs' view of possible damages. Plaintiffs offered

_____

"In response to the court's inquiry as to whether there is a difference between mitigation and beach nourishment, Dr. Selegean testified that "our form of mitigation right now is beach nourishing." Tr. 608:2-7 (Selegean).

counsel's calculations of the loss of sediment for a period covering ninety-four years. Pls.' Br. 22. Plaintiffs quote from United States v. Dickinson, 331 U.S. 745, 750 (1947) ("[P]ayment need only be made for what is taken, but for all that the Government takes it must pay.") to argue that "all of the material removed from the littoral system must be compensated for." Pls.' Br. 33 (quotation corrected to conform to reported decision). Leaving aside problematic aspects of the calculations, including arithmetic" and the time period involved," defendant is not liable for the amount of sediment removed from the littoral zone; rather, defendant is liable for unmitigated erosion above the high water mark that it caused to plaintiffs' properties. Plaintiffs misread Dickinson. The government must pay for all that it takes from plaintiffs above the high water mark and during the time of any particular plaintiff's ownership and, in this case, not before 1950, Banks (scope) I), 68 Fed. Cl. at 535; defendant is not required to compensate plaintiffs for

_____

"Plaintiffs calculated that the "Notal (by attorney Ehret) for 94 years was 8,027,781 cy/yr." Pls.' Br. 22. Defendant's Exhibit 34 has entries for years 1900 to 2004, that is, 105 years of dredging records. DX 34 (St. Joseph Dredging). For nine of these years, the quantity dredged and placed back into the lake are "unknown." Id. For two of those years, the quantity is 0. Id. The court presumes that the plaintiffs' attorney averaged the 94 years that were known and that had some quantity dredged and placed into the lake above 0,

An initial problem with plaintiffs' counsel's calculations is that a total indicates the total cubic yards dredged rather than the cubic yards per year; the court assumes this was an unintended error in the units recorded. A second problem is that plaintiffs are unclear whether the 8,027,781 cubic yards total represents the sum of the sediment dredged or the difference between the total dredged and the total placed back into the littoral zone. A third problem is that a correct average should include all known quantities, even those quantities that are zero. See American Heritage Dictionary at 124 (4th ed. 2000) (defining "average" as "[a] number that typifies a set of numbers of which it is a function"); id. at 97 (defining "arithmetic mean" as "[t]he value obtained by dividing the sum of a set of quantities by the number of the quantities in the set. Also called average."). Finally, while it would be fair to ascribe an average, representative quantity to the years where there is no record of the dredging and placement quantities, there is no reason to supersede actual records with averages. If the court were to calculate the amount dredged during the years where there was no mitigation, it would not multiply the total number of years not considered by defendant with the average cubic yards per year, as plaintiffs did, Pls.' Br. 22; rather, it would multiply the number of years with unknown records by the average cubic yards per year and add that sum to the sum of the actual quantities known to have been dredged prior to mitigation. The same methodology would apply for calculating the quantities of material placed in the littoral zone.

"Plaintiffs' calculations include years prior to 1950 even though the court held that it would consider damages from the beginning of the encasement of the jetties but no earlier than 1950. Banks (scope) I, 68 Fed. Cl. at 535.

81

impacts of all of the activities that may have eventually led to the taking. See Dickinson 331 U.S. at 750.

Prior to this litigation, defendant admitted in the Corps Reports liability for and a failure to mitigate the 30% of the total erosion south of the jetties. PX 93 (1973 Report) 32; PX 22 (1974 Report) 235; PX 41 (1999 Report) 4; Tr. 63:5-12 (Meadows) (testifying that, according to the 1973 Report, 30% of the total loss of sediment was 110,000 cubic yards per year) (citing PX 93 (1973 Report) 59); Tr. 655:16-21 (Selegean) ("[Thirty] percent of that total erosion the author claims [316,000 cubic yards per year] is due to the harbor.") (citing PX 93 (1973 Report) 32). At trial, defendant did not dispute this admission for the period prior to 1970. See Tr. passim; Def.'s Br. passim; Def.'s Resp. passim. Defendant's expert witness, Dr. Nairn, explicitly stated that he did not believe that the Corps has mitigated for the lost sand. dumped into deep water from dredging prior to 1970. Tr. 1336:7-10 (Nairn). Accordingly, the court holds that defendant did not mitigate any of the erosion it admits to having caused prior to the 1970s and is responsible for it. Defendant is therefore responsible for damages for 30% of each plaintiff's total erosion above the high water mark that occurred after each plaintiff's acquisition of the property (but in no case earlier than 1950) to 1970. See also Banks (scope) 1, 68 Fed. Cl. at 535 (holding that the court will determine defendant's liability from the time of property acquisition but no earlier than 1950); Part 1 n.7.

2.    Erosion Damage that Occurred After 1970

Defendant argues that the Corps is not liable for any erosion after 1970, based on Dr. Nairn's conclusion that "[s]ince 1970, [the Corps] has on average placed more sand south of the harbor than has been trapped or lost through the influence of the jetties and the dredging program of the harbor." Tr. 1117:3-6 (Nairn); Def.'s Br. 13.

The Corps has mitigated some of the erosion it has caused since 1970. Part V.A.1 supra. The court found that coarse material, usually trucked in from outside of the littoral system, is not effective mitigation. Part IV.B .2 supra. Defendant is therefore responsible for damages for any portion of 30% of each plaintiff's total erosion above the high water mark since 1970, but not prior to acquisition, Banks (scope) 1, 68 Fed. Cl. at 535 (holding that the court will determine plaintiffs' liability after property acquisition), that was not effectively mitigated by the Corps' nourishment. The Corps is also liable for damages for 30% of all reasonably foreseeable future loss. Part I n.6 supra.

B.    Plaintiffs with Property at the Northernmost End of Plaintiffs' Zone

As discussed in Part IV.B.1 above, some property at the northernmost end of

plaintiffs' zone appears to be located in a cohesive Lakeshore area. Part IV.B.1 holds that "erosion of cohesive material is permanent and irreversible." Therefore, the Corps' mitigation in this zone was ineffective, and defendant is liable for damages for 30% of total erosion above the ordinary high water mark that occurred after any such plaintiff's acquisition of the property (but in no case earlier than 1950) and for all reasonably foreseeable future loss.  See also Banks (scope) 1, 68 Fed. Cl. at 535 (holding that the court will determine plaintiffs' liability from the point of property acquisition but no earlier than 1950); Part I n.7."

   IT IS SO ORDERED.

           sI Emily C. Hewitt
           EMILY C. HEWITT
           Judge

---

[5] The court was introduced to a rate of recession of plaintiffs' shoreline in the MDEQ letter advising some plaintiffs of new setback requirements for their homes. PX Summary Tab 8; Tr. 245:20-246:11 (Wineberg). Several witnesses, however, testified that the recession rate identified in the letter was high. Tr. 255:11-14, 268:4-22 (Wineberg); Tr. 941:7-12 (Jannereth) (testifying that "15 feet [were] added to all recession rate distances to take into consideration the recession rate variability and the potential for a loss during a sudden storm"); Tr. 1187:22-1188:2 (Nairn). Dr. Chrzastowski relied on the rates from the MDEQ for his analysis, Tr. 208:9-11 (Chrzastowski) (citing PX 24 (1997 Report)), although he acknowledged in a deposition that it would be "prudent to take a conservative approach that gave landowners a sense of the greater rather than the lesser risk of erosion," Tr. 211:7-15 (Chrzastowski).

   Dr. Nairn testified that the rate of recession of the shoreline, as calculated by the MDEQ, is "conservative" — that is, high, — because "they want to instruct property owners whether they should be aware that they're in a hazard or not" and "{tihey don't want to underestimate that." Tr. 1187:22-1188:2 (Nairn). He testifies that "most of the recession rates [of the MDEQ] are roughly equivalent to the mean plus the standard deviation rate." Tr. 1189:7-8 (Nairn) (citing DX 27 (Comparison of Average Annual Bluff Recession Rates MDEQ to Nairn Expert Report, Lincoln Township (Recession Rates Comparison)); DX 2 (Supplemental Report on Review of Plaintiff[s'] Experts' Reports) 22.

# In the Iluiteb ikateo (Court of liberal (Claim

No. 99-4451 L

OAT 99-4452 L, 99-4453 L, 99-4454 **L.** 99-4455 L, 99-4456 **L,** 99-4457 L, 99-4458 L,
99-4459 L, 99-44510 L, 99-44511 L, 99-44512 L, 00-365 L, 00-379 L, 00-380 L,
00-381 L, 00-382 **L,** 00-383 L, 00-384 L, 00-385 L, 00-386 L, 00-387 L, 00-388 L,
00-389 L, 00-390 L, 00-391 L, 00-392 L, 00-393 L, 00-394 L, 00-395 L, 00-396 L,
00-398 L, 00-399 L, 00-400 L, 00-401 L, 05-1353 L, 05-1381 L, 06-72 L

(E-Filed: December 22, 2011)

|  |  |  |
|---|---|---|
| JOHN H. BANKS, ET AL., | ) | |
| Plaintiffs, | ) | 99-4451 L |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |
| EUGENE J_ FRETT, Individually and as Trustee of the Victor J. Horvath and Frances B. Horvath Trust, | ) | 05-1353 L |
| v. | ) | |
| THE UNITED STA IES, | ) | |
| Defendant. | ) | |

Mark E. Christensen, Chicago, IL, with whom was John B. Ehret, Olympia Fields, IL, and with whom at trial was Katherine A. Jones, Chicago, IL, for plaintiffs in No. 99-4451 L. Eugene J. Frett, Chicago, IL, pro se in No. 05-1353 L.

Terry M. Petrie, Environment and Natural Resources Division, United States Department of Justice, Denver, CO, with whom was Ignacia S. Moreno, Assistant Attorney General, and with whom at trial was Mark S. Barron, Trial Attorney, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for defendant. Gary W. Segrest and Don C. Erwin, Office of Counsel, United States Army Corps of Engineers, Detroit, MI, of counsel.

## OHNION[1]

HEWITT, Chief Judge

This is an action for just compensation filed by owners of property along the eastern shore of Lake Michigan. Plaintiffs' properties are located along an area of the shoreline that erodes naturally, but allege that the government's construction and maintenance of a pair of jetties effected a taking by speeding the erosion of their properties.

This Opinion addresses a jurisdictional issue that arose after the second trial held by the court to address the merits of plaintiffs' claims. The court holds that, because plaintiffs' claims accrued earlier than 1952, plaintiffs filed this action outside of the limitations period. The court therefore dismisses plaintiffs' claims for lack of jurisdiction.

"'Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'" Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) (quoting Ex parte McCardle, 74 U.S. (7 Wall) 506, 514 (1868)). For purposes of judicial efficiency, if the reviewing court in any appeal should disagree with the court's view of its jurisdiction, and to avoid the possibility of a trial opinion being drafted months or years after the trial, and the possibility of a repetitive trial, the court also presents here its findings from the trial. These findings are presented in the alternative and, in the absence of jurisdiction, do not entitle plaintiffs to just compensation in the amounts determined by the court.

Before the court are Plaintiffs' Post-Trial Brief (Pls.' Br.), Docket Number (Dkt. No.) 495, filed June 21, 2011; United States' Post-Trial Memorandum (Def.'s Br.), Dkt. No. 496, filed June 21, 2011; Plaintiffs' Response to the United States' Post-Trial Brief

---

[1]The court attaches a Table of Contents at the end of this Opinion.

(Pls.' Reap.), Dkt. No. 497, filed July 12, 2011; and United States' Post-Trial Response Memorandum (Def.'s Reap.), Dkt. No. 498, filed July 12, 2011.

Also before the court is the following briefing on the topic of jurisdiction, filed pursuant to the court's August 9, 2011 Order, Dkt. No. 499: Plaintiffs' Post-Trial Brief on Jurisdiction (Pls.' Jur. Br.), Dkt. No. 501, filed September 7, 2011; United States' Supplemental Post-Trial Memorandum (Def.'s Jur. Br.), Did. No. 502, filed September 7, 2011; United States' Supplemental Post-Trial Response Memorandum (Def.'s Jur. Resp.), Dkt. No. 503, filed September 21, 2011; and Plaintiffs' Post-Trial Reply Brief on Jurisdiction (Pls.' Jur. Reap.), Dkt. No. 504, filed September 21, 2011.

Also before the court is the transcript of the trial of damages (Tr.), held from April 18 through April 21, 2011 and from April 25 through April 28, 2011.

I.    Procedural Background and the Law of the Case

"Plaintiffs[2] are the owners of property along approximately four and a half miles of the eastern shore of Lake Michigan south of St. Joseph Harbor." Sept. 28, 2007 Op., Banks v. United States (Liability Op.), Dkt. No. 245, 78 Fed. Cl. 603, 604 (2007). Beginning in the 1830s, the United States government, acting through the United States Army Corps of Engineers (defendant or the Corps) re-constructed the mouth of the St.

_____

[2]Plaintiffs identify themselves as follows in their briefing, which also contains the addresses of their properties: Michael R. and Janice Anderson; John H. and Mary Banks; Andrew C. Bodnar and Christine M. Zajl-Bodar; Gregory R. and Candice C. Boyce; Frank H. Bunker; Richard R. and M. Lynn Carter; Donald R. and Gail L. Chapman; the J. Thomas Concklin Trust; Gerard V. Cosgrove; Marilyn J. Cunat individually and as Personal Representative of the Estate of Robert Cunat; Marc and Mary Del Mariani; Ehret Michigan Trust; Victor J. Horvath and Frances B. Horvath. Trust under Trust Agreement dated November 16, 1995; George J. Gregule, Jr.; Victoria Jackson aka Victoria 111sen; Hyun S. Jyung Trust; Robert J. and Patricia Kane; Frank F. and Charlotte D. Lahr; Richard Neuser; Robert S. and Pamela S. Pancoast; Dorothy A. Renner[!,. as Trustee of the Dorothy Renner Declaration of Trust aka Dorothy Renner Trust dated September 6, 1996; Leonard J. Smith; Kay F. Varga aka Kay F. Smith; Marcia Wineberg; Robert D. and Maria Melcher; Carolynne K. Morvis Trust; Craig D. and Cherie Okonski; Kent A. and Margaret Werger; Roger B. and Ann C. Wilschke; Country, LLC; Greenbriar Development; L. Richard and. Nancy A. Matzke; Donald D. and Judith E. Miller; Notre Dame Tennis and Swim Club aka Notre Dame Path Condominium Association; Herzl Ragins, M.D.; Elizabeth S. Errant aka Elizabeth Saphir, individually and as Trustee to the James W. Errant, Jr. Trust; Bank One fka NBD Bank, N.A., Trustee of the Thelma C. McKay Trust. Pls.' Post-Trial Br. (Pls.' Br.), Docket Number (Dkt. No.) 495, at 3-7; see also Pls.' Ex. (PX) 248 (first stipulation regarding ownership); PX 249 (second stipulation regarding ownership); PX 250 (third stipulation regarding ownership); PX 251 (fourth stipulation regarding ownership). Although missing from plaintiffs' list, the Estate of Yolanda P. Stevens is included in one of the stipulations provided by the parties. See PX 248 (first stipulation regarding ownership) Ex. A at 2.

Joseph River and began constructing harbor jetties that jutted into Lake Michigan in order to accommodate commercial shipping vessels exiting the St. Joseph River into Lake Michigan. Id. Over time, the Corps lengthened the jetties and then encased them in steel. Id. Plaintiffs claim that the Corps' construction and maintenance of the jetties caused erosion of their shoreline property. Id. Specifically, plaintiffs allege that the encasement of the jetties in "sand-tight" steel sheet piling during the period from 1950 -to. 1989 interrupted the natural littoral[3] drift of sand to their properties, resulting in erosion. See Aug. 9, 2011 Order, <u>Banks v. United States (Order to Brief Jursisdiction)</u>, Dkt. No. 499, 99 Fed. Cl. 622, 624 (2011).

Several factors obscure the effect of the jetties on plaintiffs' properties. Plaintiffs' properties are located along a shoreline that is eroding naturally, see Tr. 2594:24-25 (Nairn); Tr. 710:22-23 (Mackey), making it necessary to distinguish the baseline of natural erosion from erosion caused by defendant. The comparatively slow process of long-term erosion is also masked by far larger swings in the width of the beaches next to plaintiffs' properties caused by cross-shore sand transport, a cyclical process by which sand is moved offshore during times of high lake levels and returned to the shore during times of low lake levels. See Tr. 2593:3-19, 2594:2-2595:2 (Nairn) ("So, I mean, you've got swings of hundreds of feet related to the cross or reversible process and then you've got a very [s]low retreat, we believe to be around .62 [feet] per year on the south end, going on in the background of all those very large swings back and forth."); cf. Tr. 1624:9-12 (Shabica) (stating that "predicting lake levels is like predicting the weather, but if we look in the past, high lake levels from one high lake level to the next have ranged anywhere between 11 years and 22 years"). Furthermore, the composition of a shoreline, a characteristic that impacts how the shoreline erodes and how it reacts to efforts to mitigate erosion, can be hidden by surface sediments, and may be complex and difficult to characterize into one of the two categories--sandy and cohesive--used by coastal engineers and geologists. See <u>infra</u> Part ITI.B.

Defendant filed a motion to dismiss on the ground that plaintiffs' claims are time-barred. July 31, 2001 Op. and Order, <u>Banks v. United States (Accrual</u> <u>On.</u> Dkt. No. 3, 49 Fed. Cl. 806, 809 (2001), <u>rev'd</u>, 314 F.3d 1304 (Fed. Cir. 2003) <u>(Accrual Op. II)</u>. The court granted defendant's motion to dismiss, finding that plaintiffs' claims accrued no later than 1989, more than six years before plaintiffs filed suit. See id. at 825. For reasons discussed below, see <u>infra</u> Part IIf.A.1, the United States Court of Appeals for the Federal Circuit (Federal Circuit) reversed and remanded for further proceedings, <u>Accrual Op. II</u>, 314 F.3d at 1310.

_____

[3] The littoral zone is, "li.ln beach terminology, an indefinite zone extending seaward from the shoreline to just beyond the breaker zone." <u>Coastal Engineering Manual</u>, App. A (Glossary) A-45 (2003). Littoral drift or transport refers to "[t]he movement of beach material in the littoral zone by waves and currents," and "[i]ncludes movement parallel (long shore drift) and sometimes also perpendicular (cross-shore transport) to the shore." Id.

that the court order defendant to pay plaintiffs $124,918,219, an amount that plaintiffs argued was equal to the cost of the shore protection installed by plaintiffs, the loss of real property and structures to erosion, the loss of rent, the loss of beach access, "prospective damages" and interest. Id. at 1-3, 5. Plaintiffs did not attach adequate documentation or detailed calculations to their status report to support the amount of their alleged damages. See id. passim. Plaintiffs stated that "[p]laintiffs have reviewed numerous available appraisals and find them to be unhelpful in that they use comparables, i.e., other sold properties, which likewise lack unhindered (i.e., no need for shore protection) lake access." Id. at 6. Without explanation, plaintiffs attached to their status report a newspaper article titled "River dredging faces obstacles"; a list--largely typed but partly written by hand--of the plaintiffs and the sums alleged to be due to each; a copy of two filings in this case related to interrogatories; and a list--largely written by hand but typed in part--entitled "Properties Sold or Destroyed[,] Reasonably Foreseeable Loss." Id. at Exs. 1-4.

Plaintiffs then filed Plaintiffs' Motion for Leave to Supplement Status Report, Dkt. No. 253, attached to which was a status report with the subtitle "taking is spoliation," id. at 1. In their status report, plaintiffs stated that "defendant/spoliator, who has been found liable for taking private property landward of the high water mark (OHWM), now wants to foist upon the judicial process a tediously cumbersome effort to measure that very property which it has destroyed or disposed of by its own continuing activity." Id. at 1-2. Plaintiffs argued that "[t]he best evidence of sand loss to each plaintiff is based on his or her own recollection, photographs, appraisals, etc. listed in plaintiffs' answers to defendant's 2nd set of interrogatories." Id. at 2 (capitalization omitted). Plaintiffs further argued that "[a]n appropriate sanction for the defendant/spoliator would be for the [c]ourt to accept the calculations which have been available to defendant since July 16, 2001--over six years."Id. at 2. Plaintiffs argued that "defendant/spoliator has acted intentionally, in an anti-constitutional, anti-environmental, anti-due process, and unnecessary manner." Id. at 3.

The court conducted two telephonic status conferences with the parties, see Jan. 22, 2008 Order, Dkt. No. 258, at 1-2, and scheduled briefing on the issue of whether plaintiffs would be permitted to present additional evidence of shoreline composition at the trial of damages, see Feb. 19, 2008 Order, Dkt. No. 260, passim. Plaintiffs filed a memorandum that the court treated as a motion for reconsideration on the issue of shoreline composition. Oct. 15, 2008 Op. and Order, Banks v. United States (Order Granting Recons.), Dkt. No. 276, 84 Fed. Cl. 288, 290 (2008). Plaintiffs argued that they should be permitted at the trial of damages to present additional evidence that the shoreline in plaintiffs' zone' is cohesive.[6] Id. The court concluded that "[c]ontrary to

---

[6]Plaintiffs' zone includes portions of Lincoln Township, St. Joseph Charter Township and Stevensville, all of which are located in Berrien County, Michigan. See Pls.' Br. 3-7; see also Deffs Ex. (DX) 293 (Mickelson Report) 4, Fig. 1 (map of plaintiffs' zone); DX 172 (Nairn OHWM Report) 22, Fig. 4.1 (map of "Properties to the North"); DX 172 (Nairn OHWM Report)

appealed from, minus those explicitly reserved or remanded by the court--are foreclosed from further consideration.' Amado v. Microsoft Corp., 517 F.3d 1353, 1360 (Fed. Cir. 2008) (quoting Engel Indus., Inc. v. Lockformer Co., 166 F.3d 1379, 1383 (Fed. Cir. 1999)). "Unless remanded by [the appellate] court, all issues within the scope of the appealed judgment are deemed incorporated within the mandate and thus are precluded from further adjudication." Engel Indus., 166 F,3d at 1383.

Much like the law of the case doctrine, which "is not applicable to issues neither presented nor decided in a former proceeding," Halpern, 384 F.3d at 1301, the mandate rule provides that the trial court "may act on matters left open by the mandate," Laitram, 115 F.3d at 951 (internal quotation marks omitted); see, e.g., Exxon Chem. Patents, Inc. v. Lubrizol Corp. (Exxon), 137 F.3d 1475, 1484 (Fed. Cir. 1998) (holding that the scope of the judgment appealed from, limited to literal infringement, did not preclude adjudication of infringement by the doctrine of equivalents). "Interpretation of an appellate mandate entails more than examining the language of the court's judgment in a vacuum." Exxon, 137 F.3d at 1484. "The scope of the issues presented . on appeal must be measured by the scope of the judgment appealed from, not by the arguments advanced by the appellant." Engel Indus., 166 F.3d at 1382 (citations omitted). The Federal Circuit has cautioned that, "both the letter and the spirit of the mandate must be considered." Id. at 1383.

[FL Discussion

A.    Jurisdiction

In their original complaint," plaintiffs alleged "that defendant effected a gradual taking of their shorefront property through the construction and maintenance of 'a series

---

"After the court denied class certification, the parties filed a notice of additional plaintiffs--identifying thirty-seven plaintiffs--and filed separate complaints for each plaintiff. July 31, 2001 Op. and Order, Banks v. United States (Accrual OD, Dkt. No. 3, 49 Fed, Cl. 806, 808 (2001), rev'd, 314 F.3d 1304 (Fed. Cir. 2003) (Accrual Op. 11). The individual complaints supplanted the original complaint and were deemed to have been filed on July 9, 1999, the filing date of the original complaint. Id. at 808 n.2. Plaintiffs' counsel has represented that the allegations in each of the individual complaints are the same. Id. Plaintiffs have twice amended their complaints, but both amendments addressed the naming of existing plaintiffs and the adding or reinstating of additional owners of certain parcels rather than the substance of the allegations. See Pl.'s Mot. for Leave to File an Am. Compl., Dkt. No. 294, at 2 ("The [pl]aintiffs do not seek to amend the substance of the [c]oiriplaint,"); Pls.' Am. Mot. for Leave to File an Am, Compl., Dkt. No. 340, at 2 (stating same). In the past, "for ease of reference and unless otherwise noted, the court [has referred] to the individual complaint filed by the first named plaintiffs, John and Mary Banks, when addressing plaintiffs' claims in this action." Accrual Op. 1, 49 Fed. Cl. at 808 n.2. The court continues in this Opinion its practice of referring to the individual complaint filed by the Banks plaintiffs.

A.102

of 15 jetties along 200 miles of the eastern coast of Lake Michigan for over 100 years."' Accrual Op. I, 49 Fed. Cl. at 810 (quoting Compl. ¶ 26, Banks v. United States, No. 99-445 L (Fed. Cl_ filed July 9, 1999), Dkt. No. 1). Plaintiffs narrowed their claims in the individual complaints they filed after the court denied class certification, focusing on the effect of the j etties at St. Joseph Harbor. Compl. ₁₁₁ 4-7. The jetties at St. Joseph Harbor were originally built in the 1830s, and were lengthened several times, reaching their current length in 1903. Liability Op., 78 Fed_ Cl. at 604 (citations omitted).

Although the jetties had been in place at their current length for nearly a century—a period of time longer than the six-year limitations period applicable takings claims, see 28 U.S.C. § 2501--plaintiffs' complaints alleged that the accelerated erosion of their properties was caused not by construction of the jetties, but by a maintenance activity that took place more recently. Specifically, plaintiffs alleged that the jetties "continued to exist without harmful interference to the natural littoral flow of sand and river sediment until the [Corps] gradually installed sand-tight steel sheet piling during the period of 1950 to 1989," which installation has "alter[ed] the supply of sand to the lake bed and subaerial visible beach in front of the plaintiffs' property." Compl. 716-7. After plaintiffs filed their individual complaints, defendant filed a motion to dismiss on jurisdictional grounds, arguing that "the takings causes of action accrued, at the latest, in 1989," when the government completed its encasement of the jetties in the steel sheet piling. Accrual On I, 49 Fed. Cl. at 811.

The briefing filed by defendant in support of its motion to dismiss and the opinions filed by the court and by the Federal Circuit make it clear that defendant, the court and the Federal Circuit presumed the truth of plaintiffs' allegation that encasing the jetties in steel sheet piling made them impermeable to sand, interfering with the littoral flow of sand and damaging plaintiffs' properties. Defendant stated in its motion that it "[a]ccepted as true for the sake of defendant's motion" that the steel sheet piling "prevents the drift of sand from passing through the jetties and proceeding south along the eastern shore toward plaintiffs' lands." Mot. to Dismiss at 6, Banks v. United States, 49 Fed. Cl. 806 (2001) (No. 99-445 L), Dkt. No. 64 (Mot. to Dismiss).

In its opinion addressing defendant's motion to dismiss, the court noted that "[w]hen considering a motion to dismiss, the court must presume that well pleaded factual allegations in the complaint are true." Accrual Op. I, 49 Fed. Cl. at 808 (citing, inter alia, Miree v. DeKalb Cnty., 43 U.S. 25, 27 n.2 (1977)). Quoting the allegations in the Banks plaintiffs' complaint, the court stated, "Plaintiffs claim that the jetties did not cause 'Iiarrait̯intorferen.ce T6 the natural littoral flow of sand and river sediment until the Corps gradually installed sand-tight steel sheet piling during the period of 1950 to 1989.'" Id. at 808 (quoting Compl. ill 6); see also id. at 824 ("Plaintiffs allege in their complaints, which the court construes in favor of the complainants, see Scheuer, 416 U.S. at 236, that the Corps completed the installation of 'sand-tight steel sheet piling' in 1989." (quoting Compl. ¶ 6)).

Applying Applegate, the court considered and rejected plaintiffs' argument that, after the installation of the steel sheet piling was completed in 1989, the government delayed the accrual of plaintiffs' claims by promising to mitigate the erosion caused by the jetties. Accrual Op. I, 49 Fed_ Cl. at 812-13, 822-23. In Applegate, the Federal Circuit held that the plaintiffs' claims for a taking by erosion did not accrue while promises by the government to mitigate the damage made the plaintiffs "justifiably uncertain" whether a permanent taking had occurred. Applegate, 25 F.3d at 1583-84; see also infra Part 111.A.1 (applying Applegate to the facts of this case).

Examining the evidence cited by the parties, the court found that "the evidence here does not show that the Corps' sand transfer program constituted a promise on which plaintiffs could rely to postpone the filing of their suits, as contemplated by the Applegate case." Accrual Op. I, 49 Fed. Cl_ at 823. The court therefore found that "the time for filing suit expired in 1995," six years after installation of the steel sheet piling was completed. Id. at 825. Because plaintiffs did not file suit until 1999, the court granted defendant's motion to dismiss. Id. at 825-26.

The Federal Circuit reversed, finding that after the steel sheet piling was installed, mitigation efforts that the government had begun in 1970 created uncertainty as to whether any erosion damage caused by the jetties was "permanent and irreversible." Accrual Op. II, 314 F.3d at 1309-10. The Federal Circuit found that plaintiffs' claims accrued with the publication of three Corps reports that concluded that the mitigation efforts were ineffective. See id_ On remand, the court determined that, because the last of these reports was published no earlier than January of 2000, plaintiffs' claims accrued in January of 2000. May 3, 2007 Op., Banks v. United States, Dkt. No. 200, 76 Fed. Cl. 686, 696 (2007).

After conducting a trial of liability, the court found that, contrary to the allegations in plaintiffs' complaints--allegations that the court had presumed to be true when considering defendant's motion to dismiss, see Accrual Op. I, 49 Fed. Cl. at 808--the jetties were impermeable to sand before they were encased in steel sheet piling, Liability Op., 78 Fed. Cl. at 636 (stating that "plaintiffs' own expert witness testified that the piers were impermeable even prior to their encasement in steel"). The court further found that "plaintiffs have failed to prove that the piers were ever permeable." Liability Op., 78 Fed. Cl. at 635.

The implication of the court's finding is that the installation of steel sheet piling had not altered the supply of littoral sand to plaintiffs' properties as plaintiffs had alleged, see Compl. ¶¶ 6-7, thereby exacerbating the erosion of plaintiffs' properties. The most recent government action that could have effected a taking by increasing the erosion of plaintiffs' properties was not the installation of steel sheet piling, a process that ended in 1989, but rather the extension of the jetties, a process that ended in 1903. See Liability Op., 78 Fed. Cl. at 604.

alleged in plaintiffs' complaints to be caused by the jetties, plaintiffs lost almost eighty feet of shoreline to erosion between 1950 and 1989, an amount "sufficient to put plaintiffs on inquiry notice of their potential takings claims." Accrual Op. I, 49 Fed. Cl. at 825. The court granted defendant's motion, finding that "plaintiffs' takings claims accrued no later than 1989 and the time for filing suit expired in 1995." Id. at 825-26.

The Federal Circuit reversed, stating:

> In Applegate, the mere promises of a sand transfer plant, held out by the Corps and repeatedly renewed but never implemented, indicated that "the landowners did not know when or if their land would be permanently destroyed." Here, even greater uncertainty was created by the Corps' mitigation plan. While the Corps in Applegate made promises of a mitigating sand transfer plant, the Corps in this case actually performed its mitigation activities for several years before the filing of this action.

Accrual Op. II, 314 F.3d at 1309-10 (quoting Applegate, 25 F.3d at 1582). The Federal Circuit noted that the government's mitigation activities began in 1970, delaying accrual of plaintiffs' claims until the publication of three reports by the Corps, which determined that the mitigation program had not been effective and "collectively indicated that erosion was permanent and irreversible." Id. at 1310.

The Federal Circuit did not discuss whether the government's promises to mitigate erosion created justifiable uncertainty before the Corps began mitigation efforts in 1970. See id. passim. However, beginning in 1958, "[t]he Corps released a series of reports . . . over several decades describing the erosion caused south of St. Joseph Harbor by the jetties, outlining a plan to mitigate the erosion alitibutable to the jetties, and evaluating the effectiveness of the mitigation program that was eventually implemented." Liability Op., 78 Fed. Cl. at 612.

The first of these reports, a study released in 1958 (1958 Study), was published before mitigation efforts began. See id. at 604, 612. Plaintiffs contend that the 1958 Study delayed the accrual of their claims, pursuant to Applegate, because the 1958 Study "promises that the government will attempt to mitigate the loss." Pls.' Jur. Br. 16-18. The 1958 Study is a "beach erosion control study," transmitted by the Corps to the Speaker of the United States House of Representatives. Pls.' Ex. (PX) 132 (1958 Study) v. It assessed erosion in a "study area" including plaintiffs' zone that is "about 32 miles in length from the north city limit of Benton Harbor to the Michigan-Indiana State line." Id. at 3. The study recommended building a sand berm to protect a portion of the shoreline north of plaintiffs' zone, See id. at 24-25. It calculated the economic benefits of extending the sand berm south to the southern limit of the village of Shoreham, id. at 44, which is in plaintiffs' zone. The 1958 Study determined, however, that "[t]his downcoast reach is entirely privately owned, would have no public benefits to make it eligible for Federal aid," and would cost more to protect than the value of extending the

21

sand berm. Id. The study noted, however, that even without including this area in the project, "this reach and adjacent shores to the south would receive substantial benefits of shore stabilization due to restoration of normal littoral drift." Id.

Plaintiffs' argument is that the 1958 Study created justifiable uncertainty about the permanence and extent of the taking of their property, when viewed in the light of Applegate. See Pls.' Jur. Br. 16-18. The 1958 Study proposes a shore protection project that, while not intended to protect plaintiffs' properties directly, was expected to benefit them by "restor[ing] normal littoral drift." PX 132 (1958 Study) 44. The sand transfer plant promised by the Corps in Applegate, unlike the sand berm proposed here, was intended directly to address the erosion of the plaintiffs' properties. See Applegate, 25 F.3d at 1580. However, it was uncertainty about the permanence of the taking, rather than the government's intentions in undertaking shore protection efforts, that delayed accrual of the plaintiffs' claims in Applegate. See id. at 1582 ("With plans for a sand transfer plant pending, the landowners had no way to determine the extent, if any, of the permanent physical occupation."); Boling II, 220 F.3d at 1372 ("[T]he critical element that delayed stabilization in Applegate [is] the justifiable uncertainty about the permanency of the taking.").

Even accepting plaintiffs' contention that the justifiable uncertainty created by the Corps began, not with the commencement of mitigation efforts in 1970, but with publication of the 1958 Study,[12] for plaintiffs' claims to be timely, the situation must not have stabilized, Accrual Op. II, 314 F.3d at 1308, before 1952, six years before the possible creation of justifiable uncertainty by the publication of the 1958 Study.[13]

2.    Claim Accrual and Stabilization: the Impermeability of the Jetties is the Law of the Case

"The accrual of a takings claim where the government leaves the taking of property to a gradual physical process occurs when the situation has 'stabilized.'" Id. (quoting Boling II, 220 F.3d. at 1370). Stabilization of claims for a taking by erosion occurs "when the erosion ha[s] substantially encroached the parcels at issue and the damages [are] reasonably foreseeable." Boling II, 220 F.3d at 1373. "'[S]tabilization occurs when it becomes clear that the gradual process set into motion by the government

––––––––––––––––––––

[12]Because the court finds below that plaintiffs' claims accrued earlier than 1952, see infra Part 11I.A.2, it is immaterial whether the United States Army Corps of Engineers (defendant or the Corps) began to create justifiable uncertainty about the permanence and extent of the harm created by the jetties in 1958 or in 1970.

[13]Plaintiffs cite no case in which untimely takings claims were revived by promises made by the government after the statute of limitations had run, see Pls.' Post-Trial Br. on Jurisdiction (Pls.' Jur. Br.), Dkt. No. 501 passim; Pls.' Post-Trial Reply Br. on Jurisdiction (Pls.' Jur. Resp.), Dkt. No. 504 passim, and the court is not aware of any such case.

has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined    Accrual Op. II, 314 F.3d at 1308 (alteration in original) (quoting Boling II, 220 F.3d at 1370-71).

Defendant contends that plaintiffs' claims stabilized with the Corps' publication of the 1958 Study, which "acknowledged that the construction and maintenance of the St. Joseph Harbor was interfering with the littoral flow to properties south of the jetties and advised that the United States did not intend to take action to protect that shoreline." Def.'s Jur. Br. 12.

The court, in its Liability Opinion found the 1958 Study to be highly persuasive evidence that plaintiffs' properties are, and were understood to be, within the zone of influence of the jetties. Liability Op., 78 Fed. Cl. at 621 ("Although not specifically pointed out by plaintiffs, the court views the most persuasive evidence to be contained in the 1958 Study, an admission by defendant."). Although a number of Corps reports were introduced as exhibits and were before the court, id_ at 612, the court found the 1958 Study to be "the most persuasive evidence" of whether and for how long plaintiffs' properties have been considered to be within the jetties' zone of influence, id. at 621, The court concluded that "plaintiffs' properties have been considered in the zone of influence of the jetties at least as far back as the 1950s, even if the specific impact of the jetties was not quantified until later." Id.

It is therefore the law of this case that plaintiffs' properties were considered to be within the zone of influence of the jetties at least as far back as the 1950s. It is also the law of the case that the jetties have caused 30% of the erosion in plaintiffs' zone since 1950. See id. at 654-57. In its Liability Opinion, the court agreed with plaintiffs' argument that "[u]ntil this litigation, the Army Corps had repeatedly endorsed the fact that the structures at St. Joseph had interrupted, dredged or diverted" a volume of sand equal to "30% of the total annual loss to the littoral zone," id. at 636 (quoting Pls.' Opening Post Trial Br., Dkt. No. 241, at 30-31), finding that the Corps had maintained, "as an admission, that the piers caused approximately 30% of the erosion to the south of the harbor," id. The court therefore found, based on plaintiffs' argument that the Corps had admitted the percentage of the erosion in plaintiffs' zone caused by the jetties,[14] see id., that the government is liable for the portion of 30% of the erosion in plaintiffs' zone since 1950 not mitigated by the government, see id. at 654-57.

Plaintiffs do not argue that any exception to the law of the case doctrine applies here. See Pls.' Jur. Br. passim; Pls.' Jur. Resp. passim, Plaintiffs do not argue that the

---

[14] Plaintiffs also argued that, since the installation of steel sheet piling, the jetties had blocked more sediment and were responsible for a greater portion of the erosion in plaintiffs' zone than the Corps had admitted, an argument the court found unpersuasive. Liability Op., 78 Fed. Cl. at 633-36.

jetties did not begin to impact their properties until later than 1950. See Pls.' Jur. Br. passim; Pls.' Jur. Resp. passim. Plaintiffs, in fact, argue that the jetties caused significantly more than 30% of the erosion in plaintiffs' zone since 1950. See infra Part III.C.1 (discussing plaintiffs' arguments that the jetties have caused 60-70% of the erosion in plaintiffs' zone since 1950).

It therefore remains the law of the case--based on an argument made by plaintiffs and found persuasive by the court, see Liability Op., 78 Fed. Cl. at 636--that the zone of influence of the jetties reached plaintiffs no later than 1950, causing 30% of the erosion of plaintiffs' properties for no fewer than two years before 1952. Moreover, for the reasons stated below, it is the view of the court that, based upon the documentation of erosion in plaintiffs' zone contained in the 195 8 Study and upon the conclusions reached by defendant's expert, Dr. Nairn, the jetties began to increase the erosion of plaintiffs' properties before 1950 and that stabilization occurred significantly earlier than 1952, more than six years before plaintiffs argue, see Pls.' Jur. Br. 16-18, that the government began to create justifiable uncertainty by publishing the 1958 Study.[15]

---

[15] Implying that the Corps' 1958 Study (1958 Study) is applicable only to the northernmost portion of plaintiffs' zone, plaintiffs argue that the focus of the 1958 Study was "on the area immediately south of the jetties." Pls.' Jur. Resp. 9. Plaintiffs quote the following passage of the 1958 Study: "Detailed field investigations and development of a specific plan of improvement were limited to that reach of the shore between St. Joseph Harbor and the south limits of the village of Shoreham." Id. (quoting PX 132 (1958 Study) 8). Taken out of context, this sentence appears to suggest that the study was limited to the area north of the southern limit of the village of Shoreham. Plaintiffs do not quote the next sentence, which states: "The county shoreline south of Shoreham and north of the St. Joseph Harbor was covered in a general manner by means of aerial photographs and available maps." PX 132 (1958 Study) 8. This sentence indicates that the authors, although they made their most detailed measurements in the area north of the southern edge of the village of Shoreham, studied the rest of the study area as well, using aerial photographs and maps. The fact that the authors of the study made their most detailed measurements in the area where they were proposing that shore protection be built, see id. at 24-26 (describing proposed shore protection measures), does not render the 1958 Study an unreliable source of information regarding the southern portion of plaintiffs' zone.

Nor is the 1958 Study an unreliable source of information about the history of erosion in plaintiffs' zone because its ultimate purpose was to address ways of mitigating the erosion rather than to study the erosion or to determine the exact proportion of the erosion in any given portion of the study area attributable to the jetties. See Liability Op., 78 Fed. Cl. at 621 ("Even though the focus of the 1958 Study was not to assess erosion from the St. Joseph Harbor specifically, it nevertheless recognized that erosion was attributable to the harbor structures and their maintenance.").

24

Defendant is correct that the Corps acknowledged in the 1958 Study that the jetties had long caused erosion in plaintiffs' zone.[16] The 1958 Study notes that "[t]he navigation channel at St. Joseph Harbor is dredged annually to maintain project depth, and for this reason little or no beach building material is believed to pass the harbor entrance and reach the downdrift shore." PX 132 (1958 Study) 4; see also id. at 20-21 (describing the quantity of sand blocked by the jetties since 1907 and the amount of sediment dredged from the navigation channel).

The 1958 Study concluded that, if the shore protection recommended in the study were constructed, an area continuing south "to the south limit of the village of Shoreham" and the "adjacent shores to the south would receive substantial benefits of shore stabilization due to restoration of normal littoral drift." PX 132 (1958 Study) 44. Implicit in the statement that the project would restore "normal littoral drift," id., is the understanding that normal littoral drift had been disrupted. Plaintiffs acknowledge that this statement in the 195 8 Study refers to a segment of shoreline that includes their properties. See Pls.' Br. 18 (stating that "the 1958 [Study] indicates that the properties in the [p] laintiffs' zone would benefit from the mitigation program").

The 1958 Study also documented the greater rate of erosion south of the jetties since their construction:[17]

---

[16]Plaintiffs argue that the 1958 Study "focuses extensively on erosion from natural causes and makes no attempt to assess what, if any, impact the jetties have on exacerbating natural erosion." Pls.' Jur. Resp. 8. In support of their interpretation of the 1958 Study, plaintiffs cite a passage in which the 1958 Study states that "[t]he purpose of this cooperative beach erosion control study of the shore of Berrien County, Mich[igan], is to determine the most suitable plans for preventing the erosion of the shore by waves and currents." Id. (quoting PX 132 (1958 Study) 7). Waves and currents, however, are the mechanism by which erosion washes away sediment, regardless of whether the erosion stems from natural causes or jetties built by the government. See infra Part Iff.B.3.d (describing shoreline behavior); Liability Op., 78 Fed. Cl. at 631-33 (describing littoral drift of sediment). Similarly, erosion rarely manifests itself as a steady retreat of the ordinary high water mark; erosion claims more property at times of high lake levels and during storms. See infra Part BI.D.4.b. References in the 1958 Study to remedying the effects of waves, currents, storms, and high lake levels do not, as plaintiffs contend, indicate that the 1958 Study did not address erosion caused by the jetties.

Moreover, the 1958 Study recognized that the shoreline in plaintiffs' zone "would receive substantial benefits of shore stabilization due to restoration of normal littoral drift from the sand fill to the north," PX 132 (1958 Study) 26, a conclusion that is based on the recognition that the normal littoral drift adjacent to plaintiffs' properties had been interrupted.

[17]Plaintiffs also argue that the 1958 Study does not specifically state that erosion is taking place above the high water mark. Plaintiffs misinterpret the 1958 Study. The 1958 Study documented widespread and longstanding erosion above the high water mark in plaintiffs' zone, See, e.g., PX 132 (1958 Study) 12 (describing erosion in the entire thirty-two mile study area as

Case 1:99-cv-04451-ECH Document 505 Filed 12/22111 Page 26 of 143

> The shores for about a mile north of the harbor structures and 1,200 feet
> south thereof have been advancing lakeward since the entrance structures
> were built. South of the latter accreting area, however, erosion of the bluffs
> has been severe, causing the loss of, or necessitating the movement of: a
> number of valuable residences and threatening a railroad and public
> highway. Numerous protective structures have been erected but have
> exhibited only moderate effectiveness.[18]

PX 132 (1958 Study) 3. The 1958 Study observed that, in the area up to 500 feet north of
the jetties, "the shoreline has been accreting at a rate of approximately 4 feet per year

---

follows: "Over the 82-year period of record, with few exceptions, continuous recession of clay
and sand bluffs in this region [has] occurred. In recent years (1943-54), due to the cycle of high
lake levels, recession of the bluffs has been intensified, resulting in serious damage and property
destruction"); id_ at 17 ("The rate of erosion of the bluff in the study area from the harbor
entrance to the south limits of the village of Shoreham has averaged 2.1 feet per year."); id. at 11
(stating that, in an area continuing southward to the southern edge of the village of Shoreham,
"Several residential structures originally constructed along the top of the bluff have been moved
several times in the past few years to avoid being toppled into the lake, High lake levels have
eroded the toe of clay banks causing large slides along the entire stretch of shore front"); see also
infra Part III.D.1 (describing the lakeward toe of the bluff as representing the ordinary high water
mark for properties characterized by bluffs).

      Plaintiffs correctly note, regarding an area beginning in Lincoln Township and extending
to the south, that the 1958 Study observed that "`[much] of the area is fronted by extensive sand
dune deposits that provide a source of material to the beaches.[']" Pls.' Jur. Resp. 9 (first
alteration in original) (quoting PX 132 (1958 Study) 20). However, beaches along Lake
Michigan can vary dramatically in width from year to year and even month to month. See infra
Part IH.D.3.b.i (collecting statements by individual plaintiffs that their beaches "come and go");
see supra Part I (describing the process of cross-shore sand transport, which can cause beaches to
vary in width by hundreds of feet) (quoting Tr. 2593:3-19, 2594:2-2595:2 (Nairn)). The 1958
Study does not state that the beaches in the area with sand dune deposits were sufficiently wide
and immobile to prevent erosion of areas above the ordinary high water mark. See PX 132 (1958
Study) passim. Rather, the fact that sand dunes are providing material to the beaches suggests
that erosion is taking place above the ordinary high water mark, inland from the beach.

      [18]Analysis developed for purposes of this trial using modern techniques indicates that the
rate of erosion south of the jetties is also naturally higher than the rate of erosion north of the
jetties. DX 1 (Nairn Report) v, 2-27 to 2-30 (discussing how the lakebed profile concentrates
wave energy along the ten-mile stretch of shoreline south of the jetties). see also infra Part
10.8.3.d (discussing shoreline behavior). In light of this analysis, it appears that the 1958 Study
would have overestimated the amount of erosion caused by the jetties because it did not account
for the possibility that some of the increase in erosion south of the jetties was naturally
occurring. See PX 132 (1958 Study) passim.

since 1830," id. at 10, a rate of growth that, in the court's view, would have been apparent to landowners.

In addition to the disruption of normal littoral drift in plaintiffs' zone and the increase in erosion, the 1958 Study also documented the proliferation of shore protection structures south of the jetties after their construction, a trend that is consistent with--although it does not independently establish--an increased rate of erosion south of the jetties after their construction and lengthening. See id. at 18, 20. Describing the area northward from the jetties to the northernmost edge of Benton Harbor, the 1958 Study states:

> Beach erosion in this reach of shoreline has been limited to the extreme northern end near the Benton Harbor city limits. No extensive beach protective structures have been built in this reach with protective efforts limited to the placement of an occasional steel barrel filled with sand. The remaining portion of this shoreline has been accreting.

Id. at 18. In contrast, in the area extending southward from the edge of the shore protection adjacent to a highway to the southern edge of the village of Shoreham, shore protection was very common: "Approximately 22 individual structures built by property own'grs are in existence and range from typical groin construction to steel sheet-pile seawalls and revetments. The protection provided by a large portion of this work is limited, and erosion is continuing in those intermediate areas not protected." Id. at 20. Further to the south, where the southernmost properties owned by plaintiffs are located, there were few shore protection structures, but the land was largely undeveloped, see id., making them less necessary.

The disruption of normal littoral drift and the increased erosion south of the jetties documented in the 1958 Study are consistent with the conclusion reached by Dr. Nairn in his 2006 expert report that the jetties have long contributed to erosion south of the harbor. See Def 's Ex. (DX) 1 (Nairn Report) 4-151 to 4-152. Dr. Nairn, using a sediment budget[19] and several types of numerical modeling, quantified the impact of the jetties on erosion in the an area of shoreline beginning at the jetties and continuing for ten miles to

---

[19] Dr. Nairn verified the results of his sediment budget analysis by comparing projected rates of erosion to the observed rates of bluff recession over time. See DX 1 (Nairn Report) 4-150 to 4-158. Dr. Nairn included in his report a summary of bluff erosion rates over time, both for plaintiffs' zone as a whole, see id. at 4-118 to 4-120, and for plaintiffs' individual properties, see id. at App. D. The summary provided by Dr. Nairn, however, is not sufficiently detailed to be of assistance in determining the effect that the jetties had on erosion in plaintiffs' zone after 1903. Dr. Nairn provided recession rates for four time spans: 1830 to 1871, 1871 to 1938, 1938 to 1%0 and 1960 to 2002_ Id. at 4-120. Because the most relevant time span, 1871 to 1938, includes 32 years before the jetties reached their full length, it is not a reliable representation of how bluff recession rates changed when the jetties reached their full length.

the south.  See infra Parts         (explaining and finding persuasive Dr. Nairn's use of
sediment budgets and numerical modeling to predict rates of erosion and the
effectiveness of mitigation). Dr. Nairn determined that, during the period from 1836 to
1875, when the jetties were shorter, erosion in the study area continued to fall "within the
range of pre-harbor erosion estimates."[20] DX 1 (Nairn Report) 4151. Between 1876 and
1903, as the Corps continued to lengthen the jetties, the rate of erosion in the study area
did not increase and, in fact, decreased slightly from pre-harbor levels.  See id. at 4-152.

The impact of the jetties began to be felt when they reached their final length. In
terms of volume, Dr. Nairn calculates that between 1904 and 1969, the year before the
Corps began its mitigation efforts, the jetties were responsible for 25% of all erosion in
the study area. See id. at 4-158. This impact would have been greatest in the northern
part of the study area and would not be the same for each property.[21] See id. at 4-159.

---

[20]It appears, however, from the bluff recession rates, that the jetties increased erosion in
the northernmost portion of Dr. Nairn's study area during this time. To study bluff recession
rates, Dr. Nairn divided his study area into four reaches, from north to south. See DX 1 (Nairn
Report) 4-110. In the first reach, which contains the properties of the northernmost plaintiffs,
Dr. Nairn estimates that the rate of erosion averaged 5.25 feet per year between I 830 and 1871,
id. at 4-118, 4-120, indicating that the jetties had already begun to impact this area, see Tr.
2755:1-5 (colloquy between Dr. Naim and defendant's counsel). This accelerated rate of erosion
before the jetties were lengthened suggests that the properties located furthest to the north may
have been substantially encroached upon by erosion even before the jetties reached their final
length. Because the court determines that all of the plaintiffs' properties were substantially
encroached by erosion caused by the jetties earlier than 1952, the court does not consider
whether erosion caused by the jetties substantially encroached upon plaintiffs' properties in this
northernmost area at an earlier time.

[21]At the trial of damages, Dr. Nairn suggested that the zone of influence of the jetties may
not have included the properties of the southernmost plaintiffs until after 1970. See Tr. 2760:6--
14 (colloquy between Dr. Nairn and defendant's counsel). Discussing his table of bluff recession
rates, Dr. Nairn stated that, between 1938 and 1960, the third reach of the study area, which
begins at the Miller property, see id. at 2759:8-14, "does not appear to show any effect of the
harbor," id. at 2755:2-2758:3; cf. id. at 2759:15-25 (stating that if the harbor did not impact the
third reach during this time, it also did not impact the fourth reach). Dr. Nairn then stated that "it
could be even beyond 1970 that there is no impact of the harbor there." Id. at 2760:6-14. Dr.
Nairn qualified these statements, suggesting that the zone of influence of the jetties may have
ended "somewhere in reach three" between 1938 and 1960. Tr. 2758:4-7 (Nairn). Dr. Nairn
further testified, "[T]o be honest with you, that's a bit beyond our science to say exactly how
[erosion rates] vary] along the shore on a, say, 100 meter by 100 meter basis." Tr. 2758:18-21
(Nairn). Dr. Nairn's view that the zone of the influence of the jetties may not have included the
southernmost plaintiffs until after 1970 was not argued by defendant in its briefing following the
trial of liability.  See Liability op., 78 Fed. Cl. at 613 n.17 (stating that defendant had not argued
in its briefing that the zone of influence of the jetties did not include plaintiffs' properties).

In their post-trial briefing addressing the measure of their damages, plaintiffs argue that Dr. Nairn's approach significantly underestimates the impact of the jetties on their properties since 1950.[22] See infra Part III.C.1. Plaintiffs contend that:

> the United States has (1) substantially undercounted the volume of sand being blocked by the jetties, as well as the jetties['] percentage contribution to the erosion in the [p]laintiffs' zone; and (2) substantially overcounted the volume of sand blocked] by the C&O and MDOT revetments, so that the jetties['] percentage contribution to the erosion in the [p]laintiffs' zone is well in excess of 30% and is fairly calculated as being between 60% and 70%.

Pls.' Br. 23; see also Tr. 19:7-24 (plaintiffs' counsel) (stating, in his opening argument, that Dr. Mackey's testimony about the flaws in Dr. Nairn's methods will demonstrate that the jetties have caused 60 to 70 percent of the erosion in plaintiffs' zone since 1950). As described below, the court finds plaintiffs' criticisms of Dr_ Nairn's erosion analysis unpersuasive. See infra Parts III.B-C. However, the court finds plaintiffs' argument that the jetties caused 60-70% of the erosion in plaintiffs' zone after 1950 inconsistent--absent evidence cited by plaintiffs to explain the sudden change--with a finding that the jetties did not cause significant and noticeable erosion in plaintiffs' zone prior to 1950.

Because of the interruption of littoral drift and the erosion documented in the 1958 Study and because of Dr. Nairn's calculations of the jetties' impact on erosion, which plaintiffs fail persuasively to contradict (suggesting instead that Dr. Nairn has underestimated the amount of erosion caused by the jetties), the court finds that the

---

Because Dr. Nairn's estimate of the zone of influence of the jetties is inconsistent with the law of the case, pursuant to which the jetties are responsible for a portion of the erosion in all of plaintiffs' zone since 1950, see id. at 654-57, and because Dr. Nairn reached this conclusion based on a table that documents periods of time that would not properly capture the effect of the lengthening of the jetties, see supra note 19, the court does not adopt Dr. Nairn's theory that the properties of the southernmost plaintiffs may have remained outside of the zone of influence of the jetties until after 1970.

[22]The trial of damages focused on the damage caused by the jetties since 1950 because plaintiffs argued--and because the court accepted plaintiffs' argument--that this was the correct time period to consider. See Stabilization Op., 68 Fed. Cl. at 525 (agreeing with plaintiffs' argument that each plaintiff is entitled to just compensation for erosion proven to have occurred after plaintiffs acquired their properties, but in no case earlier than 1950); Law of Damages Op., 88 Fed. Cl. at 688 (agreeing with plaintiffs' argument that plaintiffs were entitled to just compensation for erosion proven to have occurred in or after 1950, regardless of the date on which each plaintiff had acquired his or her property).

erosion caused by the jetties in plaintiffs' zone was a longstanding problem by 1952, beginning as early as 1903.[23]

To determine the point at which plaintiffs' claims stabilized, the court must determine the point at which this additional erosion "substantially encroached the parcels at issue and the damages were reasonably foreseeable." Boling II, 220 F.3d at 1373. The Federal Circuit has advised that, in making this determination, a court must "take into account the uncertainties of the terrain, the difficulty in determining the location of the government's easement, and the irregular progress of erosion." Id. Plaintiffs are correct that, to some extent, the exact rate of erosion--and therefore changes in the rate of erosion--would have been obscured by natural variations, such as changes in lake level, barometric pressure, and wind direction, as well as "the dynamic nature of the [p]laintiffs' shoreline." Pls.' Jur. Br. 13; see also supra Part I (describing variations in beach width caused by cross-shore sand transport and changes in lake levels). Plaintiffs contend that fluctuations in lake levels of up to 1.8 feet occur with annual frequency and that, as numerous plaintiffs testified at trial, beaches "'come and go' as lake levels changed and storms occurred." Pls.' Jur. Br. 13.

However, the erosion relevant to plaintiffs' claims, that is, the erosion of property above the ordinary high water mark, can be gauged more clearly because the erosion of such property does not vary as widely as does the profile of beaches below the ordinary high water mark with changes in lake depth, barometric pressure, and wind direction. As described below in Part 111.D.1, the court finds persuasive a delineation of the high water mark that lies, on properties characterized by bluffs, at the toe of the bluff, and, on properties characterized by dunes, at the edge of permanent vegetation. Although the evidence presented in this case establishes that beaches are somewhat ephemeral, see infra Part. III.D.3.b.i, the ordinary high water mark is defined by these, more permanent, features, see infra Part III.D.1; Tr. 2343:18-22 (Nairn) (defining the ordinary high water mark for bluff properties as the toe of the bluff and distinguishing permanent vegetation from "ephemeral vegetation," such as marine grass and dune grass); Tr. 2363:11-13 (Nairn) (stating that the ordinary high water mark, when defined by bluffs, normally moves only in one direction). Plaintiffs cite no evidence that bluffs and permanent vegetation "come and go" as rapidly as beaches do. See Pls.' Jur. Br. passim; Pls.' Jur. Resp. passim. The rate of erosion above the ordinary high water mark, therefore, can be determined with some confidence.

---

[23]Notwithstanding Dr. Nairn's calculation that the jetties are also responsible for 25% of the erosion in plaintiffs' zone since 1950, see DX 1 (Nairn Report) 4-158, the court concluded in its Liability Opinion, based on admissions by the Corps, that, excluding the effect of any mitigation efforts, the jetties have caused 30% of the erosion in plaintiffs' zone since 1950, see Liability Op., 78 Fed. Cl. at 654-57. Because the difference is not material to the present discussion, the court does not consider whether it would be more accurate to adjust upward Dr. Nairn's estimate of the effect the jetties had on plaintiffs' zone before 1950.

The location of the ordinary high water mark, because it is characterized by observable features, can be identified by landowners such as plaintiffs.  See Loesch, 227 Ct. Cl. at 61, 645 F.2d at 925 (stating that "the OHWM on a riverbank is a physical fact, subject to determination by inspection of the riverbank" (citation omitted) (citing Kelley's Creek & Nw. R.R. Co. v. United States, 100 Ct. Cl. 396, 406 (1943) ("The high watermark is not to be determined by arithmetical calculation; it is a physical fact to be determined by inspection of the river bank. It is the line where the water stands sufficiently long to destroy vegetation below it.")). "It is not unreasonable to expect that plaintiffs, as riparian landowners, were familiar to some degree with their [shoreline]." Id. at 61, 645 F.2d at 925. It is therefore not unreasonable to expect that plaintiffs, as well as the prior owners of their properties, would have observed where the ordinary high water mark lay on their properties and would have observed its changing location over time.

Any uncertainty would have been further reduced by the significant span of time-- forty-nine years--between the year 1903, when the jetties reached their final length, and 1952, the date after which plaintiffs' claims must have accrued, under plaintiffs' reading of Applegate, see supra Part III.A.1, for the uncertainty created by the 1958 Study to render plaintiffs' claims timely. Although bluffs and permanent vegetation would not be expected to "come and go" as beaches do, erosion is often an irregular process, accelerating at times of high lake levels and during storms.  See infra Part III.D.4.b. The rate of erosion, and therefore the effect of the jetties, would have become clearer with the passage of time.[24]

---

[24]Although not necessary to the court's conclusion, the court observes that plaintiffs' own expert witness, Dr. Meadows, agreed at a deposition given in this matter that an "ordinary layperson who owns property on the shore" would be able to perceive both the role that the jetties play in exacerbating erosion in plaintiffs' zone and the growth of the jetties' zone of influence over time:

> I believe someone who has lived on the shoreline for a number of years would be able to notice these trends.
>
> From day-to-day exposure that you would be able to see that towards the harbor there is death and destruction and the further away from the harbor you get the less apparent that is, and that, particularly an astute observer, might notice that that area of sediment depletion is migrating.

Accrual Op. I, 49 Fed. Cl. at 819.

The Corps' dredging activities would have reinforced the perception that the jetties caused erosion. Between 1903 and 1945, the Corps removed an average of 43,500 cubic yards of sediment from St. Joseph Harbor per year, see DX I (Nairn Report) 3-49, Fig. 3.8 (dredging history at St. Joseph Harbor), a volume of sediment that would fill a football field, exclusive of end zones, to a depth of nearly twenty-five feet, see 2011 Official Playing Rules and Casebook

During the forty-nine years between 1903, when the jetties reached their final length, and 1952, the jetties were responsible for 25% of the material eroded from Dr. Nairn's study area, the ten mile segment of shoreline south of the jetties. See DX 1 (Nairn Report) 4-15g. Neither party cites--and the court does not find in the record--estimates of how many additional feet of erosion occurred in plaintiffs' zone during this period as a result of the jetties. See supra note 19 (discussing Dr. Nairn's analysis of bluff recession rates). However, a study published in 1976 determined the rate of bluff recession, averaged across all of Berrien County over 120 years to be .6 meters, or two feet, per year. See DX 40 (1997 Report) 3. Given this rate of erosion and the passage of forty-nine years between 1903 an. 1952, the court concludes that the additional erosion caused by the jetties was not limited to "mere inches." Boling If, 220 F.3d at 1372.

The well-documented additional erosion caused by the lengthened jetties would have made it clear to a reasonable landowner well before 1952 that the government had effected a permanent taking. See PX 132 (1958 Study) 3-4, 10-12, 17-18, 20-21; DX 1 (Nairn Report) 4-152, 4-158. This is particularly true given the lower rates of erosion (and the accretion of sand) occurring further north since construction of the jetties, and given the diminishing impact of the jetties on properties further south from the jetties. At this time, the extent of the damage would have been reasonably foreseeable from the increased rate at which erosion had occurred for forty-nine years.

Plaintiffs assert that "[e]ven if, for the sake of argument, the 1958 [Study] placed [p] 1 aintiffs on inquiry notice that the harbor jetties caused some degree of erosion, they were clearly not on notice that the jetties had caused erosion to their specific properties, much less a permanent loss." Pls.' Jur. Br. 14-15. Plaintiffs are correct that the 1958 Study did not discuss their properties individually. See PX 132 (1958 Study) passim. Because the 1958 Study was not prepared for purposes of this litigation, it would not be expected to discuss plaintiffs' properties individually, or to measure separately the amount of erosion caused by the jetties in plaintiffs' zone.

However, "plaintiff[s] bear[l the burden of showing jurisdiction by a preponderance of the evidence." Taylor, 303 F.3d at 1359 (citing Thomson, 315 U.S. at 446). It is not enough for plaintiffs to argue in briefing that the general pattern of erosion that followed the lengthening of the jetties in 1903 might not have affected certain of their individual properties. Because plaintiffs have the burden of showing the court's jurisdiction, they must cite evidence that erosion caused by the jetties had not reached their properties when the 1958 Study, PX 132 (1958 Study) 3-4, 10-12, 17-18, 20-21, and Dr. Nairn's analysis, see DX 1 (Nairn Report) 4-152, 4-158, indicate that it reached the

---

of the National Football League iv (2011) (stating that the dimensions of a football field are 300 feet by 160 feet), available at httplistatie.ntleomistatiekontentipublichmageirulebookipdfs./ 2011 Rule_Book.pdf_

32

erosion in plaintiffs' zone until at least 1997. Because there was evidence apparent to an ordinary landowner that the jetties accelerated erosion, plaintiffs were not entitled to postpone the filing of their claims until they received scientific confirmation or a technical explanation of the subsurface processes causing the harm. See Accrual Op. I, 49 Fed. Cl. at 820 (quoting Fallini, 56 F.3d at 1380).

The court therefore finds that, significantly earlier than 1952, the erosion caused by the jetties "had substantially encroached the parcels at issue and the damages were reasonably foreseeable." Boling II, 220 F.3d at 1373. Because the situation stabilized prior to 1952, the court finds that plaintiffs' claims accrued prior to 1952, see id., and that, by waiting to file a complaint until 1999, plaintiffs failed to file their claims within the six-year limitations period set out in 28 U.S.C. § 2501.

3.    The Accrual Suspension Rule

In their opening brief on jurisdiction, plaintiffs argue that their claims "could not have accrued, as a matter of law, prior to the issuance of the Owen decision" because "[p]rior to Owen[,] it was settled federal law that a property owner could not recover for a taking of its fast land absent a physical invasion."[30] Pls.' Jur. Br. 21. According to

_____

[30]In Owen, the United States Court of Appeals for the Federal Circuit (Federal Circuit) heard the plaintiff's appeal en bane "to clarify [its] precedents with respect to the scope of the government's navigational servitude." Owen v. United States, 851 F.2d 1404, 1406 (Fed. Cir. 1988) (en banc). "[U]pon the determination of Congress to improve navigation, the navigational servitude defines the appropriate boundaries within which the United States can assert its power to supersede private ownership interests without creating an obligation to pay just compensation under the Eminent Domain Clause of the Fifth Amendment." Id. at 1408.

The Federal Circuit stated that "[w]ile holdings of the [United States Supreme Court (Supreme Court)] and the other federal courts make clear that no compensation is owed by the government for injury or destruction of a riparian owner's property which is located in the bed of a navigable stream." Id. at 1409. The court therefore addressed "what constitutes the boundaries of the 'bed' of a navigable stream, determination of which will also define the scope of the navigational servitude." Id. The Federal Circuit "conclude[d] that Supreme Court precedent undeniably requires our holding that the navigational servitude does not provide a blanket exception to the Takings Clause of the Fifth Amendment where improvements to navigation made by the government result in erosion to land located above or outside the bed of the stream as delineated by the high-water mark at the time of the construction." Id. at 1412.

The Federal Circuit found that "nearly all of our own precedents are in accord with those of the Supreme Court," id., but overruled two cases "to the extent that they allow the navigational servitude to reach fast land above and outside the bed of navigable water," exempting the government from liability for erosion, id. at 1416 (overruling Pitman v. United States, 198 Ct. Cl. 82, 457 F.2d 975 (1972) and Ballam v. United States, 806 F.2d 1017 (Fed. Cir. 1986)). The Federal Circuit further stated that "[s]imilar statements in other [United States Court of Claims (Court of Claims)] cases, although not always necessary to their respective

"The 'accrual suspension' rule is `strictly and narrowly applied:    . [The plaintiff] must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date.'" Martinez, 333 F.3d at 1319 (alteration in original) (quoting Welcker v. United States, 752 F.2d 1577, 1580 (Fed. Cir. 1985)). "Mindful that the 'accrual suspension rule' is to be 'strictly and narrowly applied,' courts have concluded that a misunderstanding of the meaning of the law or one's legal rights does not trigger this rule." Petro-Hunt, L.L.C. v. United States, 90 Fed. Cl. 51, 62 (2009) (citation omitted); see also Catawba Indian Tribe v. United States, 982 F.2d 1564, 1572 (Fed. Cir. 1993) ("[A]11 the relevant facts were known. It was the meaning of the law that was misunderstood."). The accrual suspension rule "is based on a construction of the term 'accrues' in section 2501," and "is distinct from the question whether equitable tolling is available under that statute, although the term 'tolling' is sometimes used in describing the rule." Martinez, 333 F.3d at 1319.

Because plaintiffs did not raise their accrual suspension argument in their opening brief, see Pls.' Jur. Br. passim, defendant did not have an opportunity to respond to it, and the court finds the argument to be waived, see Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1320 n.3 (Fed. Cir. 2005) (finding an issue not properly raised in an opening brief to be waived); Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792, 800 (Fed. Cir. 1990) ("[W]e see no reason to depart from the sound practice that an issue not raised by an appellant in its opening brief ... is waived.").

Even if the accrual suspension rule had been properly raised, it is inapplicable to plaintiffs' claims. Plaintiffs' argument is that, before Owen was decided in 1988, plaintiffs "had no cause of action" because "federal cases uniformly held that erosion damage was not a taking where the damage from the federal project was caused, not by a rise in water levels, but as a consequence of some other interference with the natural water flow."[31] Pls.' Jur. Br. 21. Plaintiffs are therefore arguing that the legal basis--rather than the factual basis--of their claims was "inherently unknowable," Ingram, 560 F.3d at 1315 n.1 (citing Martinez, 333 F.3d at 1319), until Owen was decided.

---

[31] Plaintiffs also argue, citing cases decided in the supreme courts of the states of California and Michigan, that "the uniform rule," Pls.' Jur. Resp. 12 n.3, in state courts before Owen was that "riparian owners ... are not entitled to compensation for erosion damage created by navigable improvements," id. at 12 (quoting Peterman v. Michigan, 521 N.W.2d 499, 511 (Mich. 1994) and citing, in an accompanying footnote, Miramar Co. v. City of Santa Barbara (Miramar), 143 P.2d 1, 2-4 (Cal. 1943)). The boundaries of the navigational servitude held by the states of California and Michigan are irrelevant to plaintiffs' claims, which involve the taking of property by the United States government. See Peterman, 521 N.W.2d at 511 (discussing the navigational servitude held by the state of Michigan); Miramar, 143 P.2d at 2-4 (discussing the navigational servitude held by the state of California).

However, both <u>Red Chevrolet</u> and <u>Neely</u> "involve[ed] claims that were filed to obtain the benefit of a new constitutional rule that the Supreme Court expressly held to have retroactive application."[3] <u>Venture Coal,</u> 57 Fed. Cl. at 55 (citing <u>United States v. United States Coin & Currency (U.S. Coin),</u> 401 U.S. 715, 723-24 (1971)). The statutory provisions at issue in <u>Red Chevrolet</u> and <u>Neely</u> "commanded that gamblers submit special registration statements and tax returns that contained information which could well incriminate them in many circumstances." <u>U.S. Coin,</u> 401 U.S. at 717. In a pair of cases decided on the same day, the Supreme Court held that, "[b]ecause the risk of self-

---

not accrue until, at the earliest, the decision in [<u>Owen</u>]" in 1988. Pls.' Jur. Resp. 12. Plaintiffs therefore contend that their claims accrued, at the earliest, eighty-five years after the acts that caused the erosion of their property. "The 'accrual suspension' rule is 'strictly and narrowly applied . . ..'" <u>Martinez v. United States,</u> 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc) (quoting <u>Weleker v. United States,</u> 752 F.2d 1577, 1580 (Fed. Cir. 1985)). Plaintiffs cite no case--in this court or any other--in which the suspension accrual rule rendered claims timely notwithstanding that they were filed nearly a century after the acts that gave rise to them. See Pls.' Jur. Resp. <u>passim.</u>

[38]Another difference between this case and the decisions in <u>Red Chevrolet</u> and <u>Neely</u> is that, although adverse precedent existed that may have made it difficult for plaintiffs to recover for the erosion of their properties, it is not clear that plaintiffs' claims were completely foreclosed. Plaintiffs' claims accrued before 1952, see <u>supra</u> Part III.A.2, more than twenty years before <u>Pitman</u> was decided and more than thirty years before <u>Ball</u> was decided.

Moreover, even after <u>Pitman</u> was decided, it was not clear that it barred recovery for erosion absent flooding. See <u>Stockton v. United States,</u> 214 Ct. Cl. 506, 519-20 (1977) (Davis, I., concurring) (noting, five years after the decision in <u>Pitman,</u> that the court's opinion and the court's prior decisions do not determine whether the plaintiffs would have been able to recover for the erosion caused by wind, water and waves in the absence of flooding of a small portion of their land).

The trial court in <u>Owen</u> "understandably concluded that it had no choice but to enter judgment for the defendant as the precedent of [the Federal Circuit and the Court of Claims], specifically <u>Pitman</u> and <u>Ballam,</u> completely foreclosed any possible recovery." <u>Owen,</u> 851 F.2d at 1418. However, the Federal Circuit found <u>Pitman</u> and <u>Banana</u> to be contrary to controlling precedent established by the Supreme Court, which would have allowed the plaintiffs to recover. See id. ("If the only relevant precedent was that of the Supreme Court, it is certain that the Payne complaint would have withstood the government's motion for a judgment on the pleadings."). The <u>Owen</u> court stated that "nearly all of our own precedents are in accord with those of the Supreme Court." Id. at 1412, The <u>Owen</u> trial court could have applied the precedents that were in accord with those of the Supreme Court rather than <u>Pitman</u> and <u>Ballam.</u>

Unlike in <u>Neely</u> and <u>Red Chevrolet,</u> where plaintiffs had no cause of action before one was recognized by the Supreme Court, see <u>United States v. United States Coin & Currency,</u> 401 U.S. 715, 723-24 (1971), plaintiffs here merely would have found it "difficult." <u>Boling v. United States,</u> 220 F.3d 1365, 1374 (Fed. Cir. 2000), to recover.

installation of steel sheet piling,[36] see Mot. to Dismiss at 10 (stating that a non-governmental report "indicate[d] that erosive processes preceded plaintiffs' theory that such erosion only began after the commencement of sheet piling maintenance by the Corps in 1950"); id. at 8 (stating that many of the exhibits submitted by plaintiffs with an earlier filing "reiterate the conditions of erosion plaintiffs complain of as having existed for decades or even more than a century").

The court, however, reviewed the evidence submitted by the parties only to resolve the dispute upon which the court decided defendant's motion: whether plaintiffs' claims had accrued, at the latest, in 1989, when the Corps finished installation of steel sheet piling, or whether the government's promises to mitigate erosion delayed accrual. The court stated that        the jurisdictional facts in the complaint are disputed, . . the court may consider relevant evidence beyond the pleadings to decide the jurisdictional question." Accrual Op. I, 49 Fed. Cl. at 809 (emphasis added) (footnote omitted) (citing, inter alia, Land v. Dollar, 330 U.S. 731, 735 n.4 (1947)). The court therefore considered the evidence submitted by the parties as it pertained to when, after installation of steel sheet piling, plaintiffs' claims would have accrued. The court did not weigh the evidence of whether the jetties caused erosion in plaintiffs' zone or whether the steel sheet piling, in fact, exacerbated the erosion caused by the jetties. See id. passim. The court made no findings of fact regarding whether the jetties caused erosion in plaintiffs' zone or whether the steel sheet piling did, in fact, exacerbate erosion caused by the jetties. See id. passim. The court resolved these fact-intensive questions, with the assistance of extensive expert testimony and the parties' post-trial briefing, only after the trial of liability. See Liability Op., 78 Fed. Cl. passim.

On appeal of the court's dismissal of plaintiffs' claims, the Federal Circuit addressed the proper application of accrual principles rather than the factual issues of whether the jetties actually caused erosion in plaintiffs' zone or whether the steel sheet piling exacerbated this erosion. The Federal Circuit stated that "the question is whether the 'predictability [and permanence]' of the extent of damage to the [plaintiffs] land' was made justifiably uncertain by the Corps' mitigation efforts." Accrual Op. II, 314 F.3d at 1309 (alterations in original) (quoting Applegate, 25 F.3d at 1583). The Federal Circuit determined that "the Court of Federal Claims and defendant misread Applegate as requiring the presence of a legally binding promise or duty or a matter requiring a congressional appropriation," Id. The Federal Circuit reversed the dismissal of plaintiffs' claims "[b]ecause the Court of Federal Claims misapplied the standard for

---

[36]Defendant did not argue in its motion to dismiss that any erosive effect of the jetties was not increased by the installation of steel sheet piling. See Mot. to Dismiss passim, Banks v. United States, 49 Fed. Cl. 806 (2001) (No. 99-445 L), Dkt. No. 64. Rather, defendant stated that plaintiffs' allegation that "the jetties did not interfere with their littoral drift of sand until the Corps began a program of installing steel sheet piling in 1950" is "{a]ccepted as true for the sake of defendant's motion." Id. at 6.

claim accrual under Applegate, and because plaintiffs remained uncertain as to the permanent nature of the taking until the Corps reported that the erosion was permanent and irreversible," Id. at 1310. The Federal Circuit did not address whether the installation of steel sheet piling increased erosion in plaintiffs' zone. See id. passim.

In addition to the text of the Federal Circuit's decision and the judgment from which plaintiffs appealed, the court is mindful of the Federal Circuit's admonition that "both the letter and the spirit of the mandate must be considered." Engel Indus., 166 F.3d at 1383. Whether the jetties, with or without the steel sheet piling, cause erosion in plaintiffs' zone goes to the merits of plaintiffs' claims. As the Federal Circuit has explained, an appellate court reviewing the disposition of a motion to dismiss does not examine the ultimate merits of the case: "That is what the trial judge will do on remand. Appellate courts do not do that, even if we had a record on which to do it." Henke, 60 F.3d at 801 n.5; see also Cordis Corp. v. Boston Scientific Corp., 658 F.3d 1347, 1360 (Fed. Cir. 2011) ("It would be illogical for this court to remand for findings on unresolved outcome determinative issues, while simultaneously foreclosing reconsideration of the outcome after the district court considered those issues for the first time."). The court therefore concludes that the Federal Circuit did not intend to address the merits of whether the jetties cause erosion in plaintiffs' zone before the issue was taken up, and before trial was held on the issue, by the trial court."

A trial court may act on matters left open by the mandate. Laitram, 115 F.3d at 951. The issue "actually decided on appeal," Amado, 517 F.3d at 1360 (brackets omitted), was whether, under Applegate, plaintiffs' claims could have accrued between 1989 and 1999 despite promises and efforts by the government during that period of time to mitigate erosion damage caused by the jetties. Since the decision of the Federal Circuit, the court has found, based on evidence presented at trial rather than allegations made in plaintiffs' complaints, that the most recent government act that increased the rate of erosion of plaintiffs' properties took place, not in 1989, but in 1903, more than fifty years before the government first proposed to mitigate erosion in plaintiffs' zone. See supra Parts III.A.1-2. Because the Federal Circuit addressed only the delay of accrual resulting from promises and efforts to mitigate erosion, the court finds that whether plaintiffs' claims accrued before the government made its first promises of mitigation is an issue left open by the mandate. The mandate rule therefore does not bar the court's holding that plaintiffs' claims were filed after the end of the limitations period.

B.    Composition of the Shoreline

---

"The court has also concluded, see Mar. 30, 2011 Order, Banks v. United States, Dkt. No. 452, 98 Fed. Cl. 123, 126 (2011), that the Federal Circuit did not, in addressing when plaintiffs' claim accrued, determine whether erosion damage caused by the jetties is in fact "permanent and irreversible," as the Corps reports appeared to indicate, see Accrual Op. II, 314 F.3d at 1310.

layers of sediment are located below the depth to which the nearshore lakebed is eroding. See DX 155 (Nairn Composition Report) 30 (stating that, for this reason, Dr. Nairn would examine sediments to a depth of eight meters); DX 293 (Mickelson Report) 20, 34 (stating that, in characterizing the composition of plaintiffs' shoreline, Dr. Mickelson would focus on sediments up to twenty feet below the surface of the lake).

At this point, the geological histories of the northern reach and the southern reach diverge because the southern reach underwent further change. When the glacier that formed the moraine retreated, lake levels rose and the edge of the lake reached the edge of the moraine, submerging the southern reach under water.[70] Tr. 2029:19-2030:7 (colloquy between Dr. Mickelson and defendant's counsel). As a result, the surface was "cleaned off by waves" and covered in sand. Tr. 2029:25-2030:12 (colloquy between Dr. Mickelson and defendant's counsel); Tr. 2032:3-4 (Mickelson) (stating that "sand would have been delivered to the area at the time the lake level was high").

Approximately 9,000 years ago, the lake level dropped, creating a land surface with shallow ponded areas, on which organic material began to collect. Tr. 203214-10 (Mickelson). This organic material accumulated into a layer of peat and logs approximately ten centimeters thick and located approximately seven feet below the current surface of the lake. DX 3 (Larson Report) 16_ This material is cohesive, but because of its thinness, constitutes a small fraction of the sediment in the shoreline. DX 293 (Mickelson Report) 36. Approximately 6,000 years ago, lake levels again rose, submerging this layer and depositing sand above it. See Tr. 2032:22-2033:8 (Nickelson). The thin layer of organic-rich materials was penetrated by two of the well logs, as well as the two engineering borings conducted by the United States Geological Service (USGS). See DX 293 (Mickelson Report) 3.[71]

---

[70]The map of plaintiffs' properties reveals why the southern reach was submerged although the northern reach was not. See DX 293 (Mickelson Report) 4, Fig. 1 (topographic map of plaintiffs' zone). Because the moraine runs at an angle to the shoreline, disappearing into the water where the northern reach begins, the southern reach lies between the moraine and the edge of the lake. See id. When the water levels rose to the edge of the moraine, the southern reach would have been submerged. See id. The area that forms the northern reach was, at the time, separated from the lake by a section of the moraine, which has since eroded into the lake. See Tr. 2049:10-21 (colloquy between Dr. Mickelson and defendant's counsel). This section of the moraine prevented the northern reach from being submerged when lake levels rose.

[71]The evidence presented by plaintiffs confirms defendant's evidence about the thin, organic-rich layer that has become exposed in some parts of plaintiffs' zone. The samples collected by divers and analyzed by Mr. Shires contained significant quantities of organic material. See PX 141 (Shires Report) 8-9 (stating that samples he tested contained an average of 11.1% organic material). The divers retained by plaintiffs to search the lakebed for "in-place exposures of cohesive bottom sediments," PX 141 (Shires Report) App. A (Letter from Prism) 1, searched for, and found, the samples of organic-rich material tested by Mr. Shires only in the

This thin, organic-rich layer has become exposed offshore in some areas in the southern reach of plaintiffs' properties. See id. at 36. As it erodes, it creates rafts of organic-rich material that wash up on the beach. See id. at 3, Radiocarbon testing of one of the rafts of material determined its organic material to be approximately 6,980 years old, DX 3 (Larson Report) 17, roughly the same age as the organic material in the thin, organic-rich layer, see id* at 16-17 (stating that radiocarbon dating of this layer revealed the presence of organic materials approximately 6,630 to 6,675 years old).

The geologic history described by Dr. Mickelson strongly suggests that the southern reach of plaintiffs' zone is composed primarily of sand, with a thin layer of organic-rich material deposited approximately 6,600 years ago. Tr. 2029:19-2033:8 (colloquy between Dr. Mickelson and defendant's counsel); see also DX 293 (Mickelson Report) 3-6 (describing the geological history of the southern reach). The geologic history is less probative of the shoreline composition in the northern reach. The stratigraphy of the northern reach is more complex, containing two layers of till layered with other sediments. See DX 3 (Larson Report) 34, Fig. 9 (geological map and cross section of plaintiffs' zone).

    b.    Grain Size Distribution in the Northern. and Southern Reaches

In addition to describing the geological history of the area, Dr. Mickelson calculated the sand content of the nearshore lakebed as a percentage of its overall composition.[72] DX 293 (Mickelson Report) 10, 20. Dr. Mickelson restricted his analysis to sediments located between the level of the lake surface and a level twenty feet below

---

southern reach, see PX 141 (Shires Report) App. A (Letter from Prism) 1 (stating that diving activities would take place between Grand Mere State Park and West Glenlord Road), App. A, Attachment A 1-3 (maps showing sample locations).

    Plaintiffs acknowledge that the rafts of material that wash up on the beach adjacent to plaintiffs' properties "were tested and determined to be over 6,000 years old." Pls.' Br. 13. Dr. Mackey inferred that the rafts of material washing up on the beach were eroding from an exposed layer located immediately offshore from where the rafts were found. PX 136 (Mackey Report) 21. Dr_ Mackey observed a scarp or "mini cliff" of material that be interpreted as cohesive in the southern reach of plaintiffs' properties. Tr. 532: 1-533:3 (colloquy between Dr. Mackey and court). The court interprets this scarp to be an outcropping of the thin, organic-rich layer described by defendant.

    [72]Dr. Mickelson also calculated the sand content of the area inland of the beach, see DX 293 (Mickelson Report) 10, a figure Dr. Nairn uses in his sediment budget analysis, see infra Part TIT.B.3.cl.

the lake surface.[73] Id. at 20, 34. Dr. Mickelson states that whether a sediment is cohesive depends in part on grain size:

> Gravel and sand are not cohesive. Coarse silt, if well sorted[,] is usually not cohesive. Medium and fine silt and clay typically have cohesion. A mix of sizes, such as occurs in till, can be cohesive depending on the amount of clay and silt it contains. Both till units (Saugatuck and Ganges) have cohesion. Most of the lake sediment between the till is not cohesive.

Id. at 10.[74]   Plaintiffs do not argue otherwise.[75]   See Pls.' Br. passim; Pls.' Resp. passim. As sources of data, Dr. Mickelson relied upon well logs, his own observations, sediment samples that Dr. Mickelson and a graduate student under Dr. Mickelson's supervision collected and analyzed, Dr. Larson's observations and "various reports and papers including USGS reports and journal articles." DX 293 (Mickelson Report) 6-7.[76]

---

[73]The court, without objection, took judicial notice at trial that--according to data published by the Corps--the surface of Lake Michigan was located at 576.808 feet above the International Great Lakes Datum in March, 2011. Tr. 2104:7-13 (colloquy between court, plaintiffs' counsel and defendant's counsel); cf. Tr. 2332:12-15 (Nairn) (stating that "IGLD" stands for International Great Lakes Datum).

[74]Dr. Mickelson employs the Wentworth scale, which he characterizes as "the scale most commonly used by geologists and soil scientists," to classify grain sizes. DX 293 (Mickelson Report) 10; cf. PX 137 (Mackey Response to Mickelson) 2 ("Dr. Mackey also uses the Wentworth grain-size scale to identify and describe the grain-size distribution of sediment"). On the Wentworth scale, grains larger than .0625 millimeters are classified as sand. DX 293 (Mickelson Report) 10. Smaller grains are classified as silt or clay. Id. Dr. Mickelson notes that engineers typically use a different system, in which grains larger than .074 millimeters are classified as sand. Id.

[75]Mr. Shires wrote in his expert report that sediments with a high sand content may nonetheless exhibit cohesive properties if they contain a high proportion of organic material. See PX 141 (Shires Report) 5 (discussing sediment samples with both high sand content and cohesive characteristics). However, Mr. Shires did not dispute Dr. Mickelson's classification of the sediment types that are ordinarily viewed as cohesive. See id. passim.

[76]Dr. Mickelson "concur[redj with [Dr. Larson's] interpretation of the well logs and his extrapolation of well logs out to the bluff face," DX 293 (Mickelson Report) 7, with the exception of minor changes he made, based on his own observations, id. at 9 (describing the modifications Dr. Mickelson made to Dr. Larson's interpretation).

the proposed work would have no impact on navigation, a Department of the Army permit would not have been required," id. II 11. Plaintiffs cite no evidence that indicates that IVIDOT did not install revetments prior to 1969 pursuant to a letter of permission, a general permit or a determination that the revetments would have no impact on navigation. See Pls.' Br. 19-20.

The court finds plaintiffs' criticisms of Dr. Nairn's sediment budget unpersuasive, particularly in light of plaintiffs' failure to introduce a competing sediment budget, numerical model of erosion, hydrodynamic model of wave conditions or any other comprehensive assessment of the erosional behavior of the shoreline in plaintiffs' zone. See Pls.' Br.pasan; Pls.' Resp. passim. Dr. Nairn's study of the erosional behavior of plaintiffs' shoreline provides highly persuasive evidence that the shoreline in plaintiffs' zone should be categorized as a sandy shoreline.

Plaintiffs bear the burden of demonstrating "that a taking has occurred justifying the payment of just compensation." Loesch, 227 Ct. Cl. at 44, 645 F.2d at 914. The additional evidence of shoreline composition presented by plaintiffs is unpersuasive and, at times, repetitive of evidence rejected by the court in the past. See supra Part Irma In contrast, the government has presented additional evidence of shoreline composition that the court finds persuasive. Based on credible and persuasive evidence, the court finds that plaintiffs' properties are located in an area of sandy shoreline, with the exception of the Werger property, which defendant's expert witness, Dr. Nairn, locates along a section of cohesive shoreline. See DX 155 (Nairn Composition Report) 31.

C.    Mitigation

1.    The Proportion of the Erosion Caused by the Jetties

This case has been bifurcated to allow the issues of liability and damages to be treated separately. Following the trial of liability, the court found that, if unmitigated, the jetties are responsible for 30% of the erosion taking place in plaintiffs' zone. Liability Op., 78 Fed. Cl. at 654-57. Notwithstanding the court's finding, plaintiffs now argue that "the United States is responsible for between 60% and 70% of the erosion to [p]laintiffs' properties." Pls.' Br. 23. Plaintiffs have not filed a motion for reconsideration on the scope of the government's liability. See Pls.' Damages Trial Mem., Dkt. No. 264, passim (requesting reconsideration on the issue of shoreline composition but not requesting reconsideration of the scope of the government's liability). It therefore remains the law of this case that, if unmitigated, the jetties are responsible for 30% of the erosion taking place in plaintiffs' zone.

Plaintiffs do not acknowledge that it is the law of the case that, if unmitigated, the jetties are responsible for 30% of the erosion taking place in plaintiffs' zone. See Pls.' Br. passim; Pls.' Resp. passim. Neither do plaintiffs list the three "exceptional circumstances," Mendenhall, 26 F.3d at 1582 (internal quotation marks omitted), that

may warrant departure from the law of the case or argue that any of the three is present, see Pls.' Br. passim; Pls.' Resp. passim.

Plaintiffs do cite one line of evidence that plaintiffs allege was not available at the trial of liability, arguing that dredging records "obtained in the damages phase of this matter demonstrate that the United States is responsible for between 60% and 70% of the erosion to Plaintiffs' properties." Pls.' Br. 23; cf DX 34a (updated dredging data). However, Dr. Nairn's initial expert report contained a thorough analysis of the sediments dredged from the St. Joseph Harbor since the 1860s. See DX 1 (Nairn Report) 3-47 to 3-49, 3-85 to 3-86. Plaintiffs do not argue that the dredging data analyzed by Dr. Nairn were unavailable to them before the trial of liability. See Pls.' Br, passim; Pls.' Resp. passim; cf. DX 34 (dredging data presented at the trial of liability). Nor do plaintiffs explain how the dredging data now available differ from the data available to plaintiffs at the trial of liability. See Pls.' Br. passim; Pls.' Resp. passim.

Plaintiffs' expert witness, Dr. Mackey, examined the percentage of the dredged material dumped at a confined disposal facility against the percentage used for mitigation, concluding that the dredged material contains more sandy material appropriate for beach nourishment than Dr. Nairn calculated. PX 140 (Mackey Response to Nairn) 8-10.[97] However, plaintiffs do not state that records of where dredged material was dumped were unavailable before the previous trial. See Pls.' Br. passim; Pls.' Resp. passim. Dr. Mackey also concludes, on the basis of the dredging records, that Dr. Nairn's estimate of the quantity of sediment delivered to the inner harbor by the St. Joseph River

---

[97]The court finds Dr. Mackey's use of dredging records to determine the sand content of the dredged materials speculative. Dr. Mackey states that "[t]ypically, contaminated sediments, fine-grained materials (silts and clays), and/or materials with a high organic content are placed in a [confined disposal facility] to minimize impacts to the environment. In most cases, clean sand that contains a low percentage of silt and clay will be suitable for beach nourishment and/or open lake disposal." PX 140 (Mackey response to Nairn) 8. Dr. Mackey does not state what qualifies as a "low percentage of silt and clay." See id. Dr. Mackey states that "for the period 1978 to 2004, there were 13 years where no dredged materials were placed in the CDF and all of the dredged materials were placed in the littoral zone for beach nourishment," and, from this, assumes that the dredged materials have "100% sand content (otherwise the materials would not have been used for beach nourishment)." Id. Observing that, between 1978 and 2004, approximately 30% of the dredged sediment was sent to a confined disposal facility and that approximately 70% of the sediment was used for mitigation, Dr. Mackey concludes that the dredged material consists of 70% sand. Id. at 9. However, if dredged sandy material is suitable for beach nourishment when it "contains a low percentage of silt and clay," id. at 8, and if "[s]and is a valuable commodity," making it "unlikely that dredged material consisting of clean sand would be placed in a [confined disposal facility] unless it was either contaminated or had a high silt-clay/organic content," id. at 9, Dr. Mackey's assumption that dredged material used for mitigation is 100% sand appears improbable.

may warrant departure from the law of the case or argue that any of the three is present, see Pls.' Br. passim; Pls.' Resp. passim.

Plaintiffs do cite one line of evidence that plaintiffs allege was not available at the trial of liability, arguing that dredging records "obtained in the damages phase of this matter demonstrate that the United States is responsible for between 60% and 70% of the erosion to Plaintiffs' properties." Pls.' Br. 23; cf. DX 34a (updated dredging data). However, Dr. Nairn's initial expert report contained a thorough analysis of the sediments dredged from the St. Joseph Harbor since the 1860s. See DX 1 (Nairn Report) 3-47 to 3-49, 3-85 to 3-86. Plaintiffs do not argue that the dredging data analyzed by Dr. Nairn were unavailable to them before the trial of liability. See Pls.' Br, passim; Pis.' Resp. passim; cf. DX 34 (dredging data presented at the trial of liability). Nor do plaintiffs explain how the dredging data now available differ from the data available to plaintiffs at the trial of liability. See Pls.' Br. passim; Pls.' Resp. passim.

Plaintiffs' expert witness, Dr. Mackey, examined the percentage of the dredged material dumped at a confined disposal facility against the percentage used for mitigation, concluding that the dredged material contains more sandy material appropriate for beach nourishment than Dr. Nairn calculated. PX 140 (Mackey Response to Nairn) 8-10. [7] However, plaintiffs do not state that records of where dredged material was dumped were unavailable before the previous trial. See Pls.' Br. passim; Pls.' Resp. passim. Dr. Mackey also concludes, on the basis of the dredging records, that Dr. Nairn's estimate of the quantity of sediment delivered to the inner harbor by the St. Joseph River

---

[7]The court finds Dr. Mackey's use of dredging records to determine the sand content of the dredged materials speculative. Dr. Mackey states that "[t]ypically, contaminated sediments, fine-grained materials (silts and clays), and/or materials with a high organic content are placed in a [confined disposal facility] to minimize impacts to the environment, In most cases, clean sand that contains a low percentage of silt and clay will be suitable for beach nourishment and/or open lake disposal." PX 140 (Mackey response to Nairn) 8. Dr. Mackey does not state what qualifies as a "low percentage of silt and clay." See id. Dr. Mackey states that "for the period 1978 to 2004, there were 13 years where no dredged materials were placed in the CDF and all of the dredged materials were placed in the littoral zone for beach nourishment," and, from this, assumes that the dredged materials have "100% sand content (otherwise the materials would not have been used for beach nourishment)." Id. Observing that, between 1978 and 2004, approximately 30% of the dredged sediment was sent to a confined disposal facility and that approximately 70% of the sediment was used for mitigation, Dr. Mackey concludes that the dredged material consists of 70% sand. Id. at 9. However, if dredged sandy material is suitable for beach nourishment when it "contains a low percentage of silt and clay," id. at 8, and if "[s]and is a valuable commodity," making it "unlikely that dredged material consisting of clean sand would be placed in a [confined disposal facility] unless it was either contaminated or had a high silt-clay/organic content," id, at 9, Dr. Mackey's assumption that dredged material used for mitigation is 100% sand appears improbable.

However, the only comprehensive examination of the results of the Corps' mitigation efforts, created by Dr. Nairn, indicates that defendant has successfully mitigated all of the erosion damage caused by the jetties to properties located along sandy sections of shoreline since 1970. See DX 155 (Nairn Composition Report) 25, Table 3.2 (revised sediment budget). Dr. Nairn reached this conclusion based both on the erosion rates he projected by creating a sediment budget and the erosion rates directly observed in plaintiffs' zone. See id., columns xxi(a), xxi(b) (showing projected and historical erosion rates from 1836 to 2005).

Plaintiffs' criticisms of the Corps' mitigation program are unpersuasive. Plaintiffs argue that "beach nourishment requires, at a minimum, yearly monitoring of beach conditions at the nourished site."[101] Pls.' Br. 27. Plaintiffs allege that there were gaps of up to 18 months in placement of nourishment materials and that a portion of the dredged material was placed at a disposal facility or used for construction purposes rather than being placed in the littoral zone. Id. at 28. Plaintiffs also contend that, "[a]s established in the liability phase of the trial, beach nourishment material must have the same physical properties as the natural material on the beach and nearshore." Id. at 27 (citing, inter alia, Liability Op. 78 Fed. Cl. at 630). Plaintiffs assert that "a substantial portion of the beach nourishment placed by the United Stated did not have the same physical properties at the natural material." Id.

However, because "the Corps' effect on erosion is at issue,'? Liability Op., 78 Fed. Cl. at 655, rather than the techniques used by the Corps to mitigate erosion, the ultimate issue is whether the Corps' mitigation efforts have been successful. Plaintiffs have developed no comprehensive study of the effect of the mitigation program to dispute the sediment budget developed by Dr. Nairn.[102] See Pls.' Br. passim; Pls.' Resp. passim. Dr.

---

[101] On the following page of plaintiffs' Brief, plaintiffs cite a dognnent titled "Annual Report on the Section 111 Beach Nourishment Monitoring Program" (1999 Report). See Pls.' Br. 28 (citing PX 41 (1999 Report)); cf PX 41 (1999 Report) 5 (discussing prior funding "for several years" of "annual monitoring"). Plaintiffs do not explain why the monitoring discussed in the 1999 Report is inadequate. See Pls.' Br_ 26-30.

[102] Although plaintiffs have not developed a comprehensive study of the effectiveness of the Corps' mitigation program, plaintiffs argue that defendant has admitted that the program is ineffective. See Pls.' Br. 28-29. Plaintiffs cite the following statement from a 1996 Corps report co-authored by Dr. Nairn: "these [mitigation] techniques were developed for sandy shores and may not provide the protection required by the cohesive shorelines that exist at St. Joseph." Id. at 29_

Notwithstanding the foregoing, the court has concluded that, with one exception, plaintiffs' properties are located along a sandy shoreline, See supra Part 111.B. Plaintiffs rely on the conclusion of the Federal Circuit that "the Corps issued reports in 1996, 1997 and **1999** that `collectively indicated that erosion [due to the government's construction of jetties at St. Joseph Harbor] was permanent and irreversible." Pls.' Br. 29 (alteration in original) (quoting Accrual

Naim's sediment budget indicates that, regardless of any potential flaws in the Corps' program, it has been effective.[103] See DX 155 (Nairn Composition Report) 25, Table 3.2 (revised sediment budget). Furthermore, the court finds plaintiffs' criticisms of the Corps' mitigation program unpersuasive.

In its <u>Liability Opinion,</u> the court found that "the nourishment program needs to provide sediment that has the same physical characteristics as the shore that is to be nourished." <u>Liability Op.</u>, 78 Fed. Cl. at 630 (internal quotation marks omitted). Plaintiffs are correct that some of the nourishment material placed by the Corps was

---

<u>Op. I.T,</u> 314 F.3d at 1305). Not only is there a "sharper focus" on plaintiffs' zone and the issues of this case in the expert witnesses' reports and trial testimony than in publications unrelated to the case, see <u>supra</u> note 48, but the court has determined that the Federal Circuit addressed only the accrual of plaintiffs' claims--not whether erosion caused by the jetties was in fact permanent and irreversible, see <u>supra</u> note 37. Plaintiffs cite no evidence that persuades the court that the mitigation program was uniformly ineffective for the entire area downdrift of the jetties, notwithstanding variations in shoreline composition or proximity to the jetties and the beach nourishment material. See Pls.' Br. 28-29; cf. DX 155 (Nairn Composition Report) 12 (describing an area of cohesive shoreline north of plaintiffs' zone).

Plaintiffs also argue that an open file report published by the United States Geological Survey shows "little evidence of sand reaching the [p]laintiffs' properties, other than in the immediate vicinity of the beach nourishment site." Pls.' Br. 29 (citing Tr. 613:3-615:2 (colloquy between Dr. Mackey and plaintiffs' counsel); PX 136 (Mackey Report) 9, Fig. 6 (map showing accretion and erosion of lakebed adjacent to plaintiffs' properties between 1945 and 1991)). Plaintiffs misunderstand the significance of Dr. Mackey's testimony. Dr. Mackey testified that there had been lakebed downcutting in plaintiffs' zone, visible as a change in bathymetry. Tr. 612:4-19 (Mackey). Dr. Mackey also testified that there had been a net accretion of sediment immediately south, west and offshore from where nourishment material had been placed. Tr. 612:9-14 (Mackey). Dr. Mackey testified that "[w]hat we don't see is accretion or accumulation of material to the south." Tr. 612:14-15 (Mackey). However, the ongoing downcutting discussed by Dr. Mackey does not indicate that defendant's mitigation efforts have been unsuccessful. Even if defendant mitigates the portion of the erosion caused by the jetties, which only accounts for 30% of the erosion taking place in plaintiffs' zone, see <u>Liability Op.</u>, 78 Fed. Cl. at 654-57, erosion caused by natural processes and exacerbated by large installations of shore protection, see DX 1 (Nairn Report) iii-iv, can be expected to continue and to prevent the widespread accumulation of nourishment material.

[103]Dr. Nairn notes in the report he prepared for the trial of liability that, notwithstanding the Corps' mitigation efforts, overall erosion rates have increased over time. <u>See</u> DX 1 (Nairn Report) 4-132, This is due to a number of factors, including high lake levels in the 1970s and 1980s and the resulting installation of shore protection by a large number of landowners-- including the C&O and MDOT. See id. at 4-156-57. Controlling for such factors, Dr. Nairn concludes that the rate of erosion since the commencement of mitigation efforts has been approximately equal to the "pre-harbor erosion rate." Id. at 4-156 to 4-157.

Because plaintiffs bear the burden of proving the amount of just compensation to which they are entitled for severance damage, Miller, 223 Ct. Cl. at 383-84, 620 F.2d at 828, the court first considers the evidence of damages presented by plaintiffs.

"The concept of just compensation . . cannot be reduced to a formula . . . ." Ga.-Pac., 226 Ct. Cl. at 106, 640 F.2d at 336 (citing Miller, 317 U.S. at 375). Nor can just compensation "be confined to inexorable rules." Id. (citing United States v. Toronto, Hamilton & Buffalo Navigation Co., 338 U.S. 396, 402 (1949)). However, the "standard" method of proving severance damages is to determine the value of a property before and after a taking occurs. Id.; see United States v. Va. Elec. & Power Co., 365 U.S. 624, 632 (1961) (stating that comparing the value of a property before and after a taking is "indeed the conventional method"). "This is generally the simplest and perhaps the most widely used approach in severance damage determinations." Ga.-Pac., 226 Ct. Cl. at 106, 640 F.2d at 336.

Plaintiffs did not present evidence of the value of their properties before or after the erosion caused by the government occurred. See Pls.' Br. passim; Pls.' Resp. passim. Plaintiffs instead adopt the hypothetical appraisals presented by defendant's expert witness, Mr. Burgoyne, of the values of plaintiffs' properties in January 2000 with their 1950 dimensions and January 2000 improvements. See, e.g., Pls.' Br. 36. Rather than presenting evidence of the value of their properties after the erosion took place, plaintiffs presented the testimony of Dr. Moore, an economist, who determined that, although sale prices of properties affected by the jetties rose in the time period after the publication of the 1999 Report, they may have risen less than did sale prices in areas not affected by the jetties.[113] Tr_ 149:18-19 (Moore). Plaintiffs determine the amount of damage to their

_____

[113]Dr. Moore, see PX 149 (Moore Report) passim, and plaintiffs, see Pls.' Br. passim, refer to an announcement made by the Corps in January of 2000. In its opinion reversing the court's dismissal of plaintiffs' claims on statute of limitations grounds, the Federal Circuit determined that, "[w]ith the mitigation efforts underway, the accrual of plaintiffs' claims remained uncertain until the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that erosion was permanent and irreversible." Accrual Op. II, 314 F.3d at 1310. The 1999 Report was published in January 2000. Banks, 76 Fed. Cl. at 696; see also PX 41 (1999 Report). The court understands Dr. Moore and plaintiffs to be referring to publication of the 1999 Report when referring to the January 2000 "announcement."

Dr. Moore writes in his report that he focused on the effect of the 1999 Report on the value of plaintiffs' properties because the impact of the report can be measured:

In my opinion, it is not possible in this litigation to estimate the full impact of the beach erosion on real estate values, It is apparent that information about the problem was emerging at an early state, and there is no record available to identify the timing or the content of events and information releases from 1950 to 2000.

properties by calculating how much their properties' pre-erosion values, as determined by Mr. Burgoyne, failed to increase. See Pls.' Br. 38; PX 275 (table showing plaintiffs' estimates of the erosion damage to each property); see also Tr. 154;4 (Moore) (stating that he did not prepare PX 275).

Dr. Moore "employed a hedonic regression model to determine the effect of the United States'[ [a]nnouncement on the value of the [p]laintiffisl properties." Pls.' Br. 37. Hedonic regression "looks at the price of a good and tries to determine how much of that price is due to each of the attributes that enter into the market pricing." Id. (citing Tr. 132:6-133;3 (colloquy between Dr. Moore and court)). For example, a hedonic model for the price of a house may include variables for the "number of bedrooms, square footage, [and] the lot size." Tr. 133:1-2 (Moore).

Dr. Moore states that the hedonic pricing model "is directly applicable to computing the economic effects of discrete 'events' as seemingly disparate as

---

. .. It is possible, however, to estimate the effects of the January 2000 public information release.

PX 149 (Moore Report) 9.

Plaintiffs' focus on the publication of the 1999 Report is a relatively indirect manner of calculating plaintiffs' damages. The publication of the 1996 Report, the 1997 Report and the 1999 Report is significant in this case because the Federal Circuit determined that the three reports eliminated reasonable property owners' justifiable uncertainty as to whether the Corps' mitigation efforts have been generally successful. See Accrual Op. II, 314 F.3d at 1309-10; see also Applegate v. United States, 25 F.3d 1579, 1583 (Fed. Cir. 1994) (stating that uncertainty about the permanence of damage to property can stay the accrual of a takings claim); see supra Part III.0 (concluding that, notwithstanding the Corps reports, which appeared to indicate that, in general, the Corps' efforts to mitigate erosion caused by the jetties have been unsuccessful, the Corps' mitigation efforts have been completely successful since 1970 in mitigating erosion caused by the jetties to the properties of every plaintiff but one).

However, the potential taking at issue in this case is the erosion of plaintiffs' properties caused by the jetties, not the publication of reports studying the Corps' mitigation efforts. Regardless of whether the mitigation program has been effective for the entire zone of influence of the jetties, additional study focused specifically on plaintiffs' properties has revealed that the mitigation program has completely compensated for the effect of the jetties since 1970 on the properties of every plaintiff but one. See supra Part 1II.C.2. The government's expert witness, Dr. Nairn, acknowledges that a segment of cohesive shoreline is present north of plaintiffs' properties. DX 1 (Nairn Report) 2-26 (describing a section of cohesive shoreline approximately 1.9 miles long). Mitigation efforts may have been ineffective for this reach of cohesive shoreline. See Liability Op., 78 Fed. Cl. at 628 (holding that the erosion of cohesive material is permanent and irreversible). The issue in this case is the mitigation of the erosion of plaintiffs' properties specifically. See supra Part III.C,2.

environmental contamination, an attempt to fix prices, a violation of the securities laws, or beach erosion due to a taking." PX 149 (Moore Report) 5. In a case involving securities fraud, for example, "Mlle price change around the time of the event would give a market-based estimate of the perceived fraud." Id. at 6. Dr. Moore testified that this type of analysis is called an "event study." Id. at 5; Tr. 176:25-177:1 (Moore).

To create his dataset, which contained 107 observations, PX 149 (Moore Report) Ex. 5, Dr. Moore used data on sales of properties up to three years before and three years after the publication of the report, Tr. 204:21-24 (colloquy between Dr. Moore and defendant's counsel), a time period that "equates to the years 1997 through 2003,"[114] Tr. 206:16-19 (colloquy between Dr. Moore and defendant's counsel). Dr. Moore described in his report how he coded his data. Dr. Moore "created the dependent variable 'price per lakefront foot [(LFF)]," by dividing selling price by reported lake frontage." PX 149 (Moore Report) 15. He created indicator variables for whether each property was located inside the affected area (treatment) and whether it was sold after the announcement (post), as well as a variable for the interaction of these two indicator variables (treatpost). Id. Because of "data limitations," Dr. Moore used three control variables: "a measure of square footage of the structure and dummy indicators of LFF between 100 and 150 feet, and LFF greater than 150 feet--to control for differences in price due to differences in the size of the house and for potential nonlinearities in the effects of LFF on price."[115] Id. at 16 (footnote omitted).[116] Dr. Moore noted that "No the extent square footage is correlated with other characteristics (number of rooms, number of bathrooms), controlling for square footage will capture price variation due to these features too." Id.

---

[114] Dr. Moore explained that it was necessary to consider this broader time span in order to assemble enough data: "In this particular analysis, there aren't a lot of observations out there. So[,] if you confine your attention to a very narrow event window, . you'll get extremely imprecise estimates. So you extend] it out a little bit." Tr. 177:15-19 (Moore). According to Dr. Moore, it is necessary "to strike a balance," Tr. 177:23 (Moore), because "[i]f you only go out plus or minus one year, then you can be more certain that any changes you see are due to the event, and the event alone. if you go out farther, there might be intervening events," Tr. 177:3-6 (Moore).

[115] Dr, Moore further explained at trial one nonlinearity of the effect of lake frontage on price: "if prices go up steadily, up to maybe a threshold point of 100 feet. And then tend to . get flatter, up to 150 feet." Tr. 144:21-24 (Moore).

[116] In Dr. Moore's model, "The location indicator variable 'treatment' equals one if the sale is in the affected area, and equals 0 otherwise. The variable 'post' equals 1 if the sale occurred on or after January 27, 2000, and 0 if before. Finally, the 'interaction term' treatpost equals the product of 'treatment' and 'post.' PX 149 (Moore Report) 15 (footnote omitted).

b.       The limitations of Dr. Moore's Analysis

Defendant argues that Dr. Moore's event study is inapplicable to the question of just compensation because "Unlike Mr. Burgoyne's appraisals--which attempt to capture the value of different properties at the same point in time—Dr, Moore's analysis attempts to track movement in the prices of the same properties across different times." Def.'s Br. 30. Defendant further argues that "[e]ven if Dr. Moore's analysis was applicable to the question before the liclourt, [p]laintiffs' reliance on Dr. Moore's report does not account for the flaws that Dr. Moore himself acknowledges in his work." Id. at 30-31. Defendant lists three such flaws. "First, Dr. Moore acknowledges that the quantity of data he was provided is less than ideal for performing a regression analysis." Id at 31 (citation omitted). "Second, rather than show a loss in value, Dr. Moore acknowledges that property values within the erosion zone increased generally after January 2000." Id. "Third, Dr. Moore did not control for any preexisting differences in the rates of increases in the prices before January 2000." Id

Defendant is correct that Dr. Moore's analysis is unpersuasive. Although Dr. Moore's analysis of the data provided to him is credible, the limited dataset, the fact that Dr. Moore's estimates reflect unrealized appreciation rather than a loss in value, and Dr. Moore's failure to examine and--if necessary--control for preexisting trends in price increase for the treatment group and the control group, together with plaintiffs' application of Dr. Moore's analysis--which generalizes across plaintiffs' zone--to each individual property regardless of the actual erosion damage it suffered or did not suffer leave the court unconvinced that plaintiffs have carried their burden, see Miller, 223 Ct. Cl. at 383-84, 620 F.2d at 828, to prove their severance damages.

i.       Insufficient Data

Defendant argues that "Dr. Moore acknowledges that the quantity of data he was provided is less than ideal for performing a regression analysis." Def's Br. 31. Plaintiffs respond that lajlthough Dr. Moore testified under cross-examination that he would `ideally' like more data, more importantly[,] he also testified that he performed a series of sensitivity tests to ensure that the results he obtained with the data he used were accurate and reliable." Pls.' Resp. 8 (citing Tr. 204:21-206:15 (colloquy between Dr. Moore and defendant's counsel)). [119]

---

[119]Plaintiffs also argue that "Dr. Moore used the same universe of data as United States' expert David Burgoyne." Pls.' Br. 8 (citation omitted). Mr. Burgoyne, however, did not conduct a hedonic regression analysis of property values in plaintiffs' zone. See, e.g., DX 295 (Anderson Appraisal) passim. Mr. Burgoyne testified that his appraisal methods did not include statistical analysis: "[O]ne does not take the data and add it up and divide it, or do a linear-regression analysis or some sort of statistical analysis. One looks at the data, considers the differences in the relevant characteristics of the data, and comes to a conclusion of market value." Tr. 70:4-11 (Burgoyne). Mr. Burgoyne further testified that Title idea of an appraiser is sort of to put

Plaintiffs appear to conflate reliability--the ability to get the same results--with accuracy--the closeness of an estimate to its true value. Compare American Heritage Dictionary 13 (stating, as one definition of "accuracy," "[t]he ability of a measurement to match the actual value of the quantity being measured"), with id. at 1474 (stating, as one definition of "reliable," "[y]ielding the same or compatible results in different clinical experiments or statistical trials"). Dr. Moore's description of the sensitivity tests he performed appears to indicate that the sensitivity tests were a minor part of his analysis, see PX 149 (Moore Report) passim (not mentioning sensitivity tests), and that he was testing the reliability of his estimates by changing the parameters underlying his model, such as "varying the event window," Tr, 205:12-13 (Moore), which did not result in "a qualitative change in the results," Tr. 205:14-15 (Moore). Although both accuracy and reliability are important, Dr. Moore does not claim, and plaintiffs have not demonstrated, that Dr. Moore's sensitivity tests would also reflect the accuracy of his estimate.

Dr. Moore's discussion of confidence intervals[120] and statistical significance[121] concerns the accuracy of his estimates.     Dr. Moore described his use of confidence

---

themselves in the mind of a potential purchaser," Tr. 2479:3-5 (Burgoyne), and that "it's much more of an art than a science," Tr. 2482:18-19 (Burgoyne). It is therefore conceivable that the amount of data that would be sufficient for an appraiser such as Mr. Burgoyne to put himself "in the mind of a potential purchaser," Tr. 2479:4-5 (Burgoyne), would be insufficient to support a statistical analysis of the type undertaken by Dr. Moore.

[120]Dr. Moore did not define the term "confidence interval" at trial or in his expert report, see PX 149 (Moore Report) passim; Tr, 117:1-251:19 (testimony of Dr. Moore).  A confidence interval can be described as:

A range of values, calculated from the sample observations, that are believed, with a particular probability, to contain the true parameter value. A 95% confidence interval, for example, implies that were the estimation process repeated again and again, then 95% of the calculated intervals would be expected to contain the true parameter value.

B.S. Everitt, The Cambridge Dictionary of Statistics 86 (2d ed, 2002).

[121]In testimony, Dr. Moore referred both to confidence intervals and to what the court understands to be the functionally analogous concept of confidence levels.  See, e.g., Tr. 229:17-230:20 (colloquy between Dr. Moore and defendant's counsel) (using the terms interchangeably); Tr. 242:14-243:17 (Moore) (same). A confidence interval is "[t]he percentage of samples in which we want our confidence interval to contain the population value." Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach 833 (2d ed. 2003). Dr. Moore also used the term "p-value" when discussing confidence intervals and confidence levels.  See, es,, Tr. 242:14-243:17 (Moore). A p-value is "[t]he probability of the observed data (or data showing a more extreme departure from the null hypothesis) when the null hypothesis is true." The Cambridge Dictionary of Statistics 304. For purposes of clarity, the court refers only to confidence intervals.

intervals as follows: "once you establish a confidence interval, and you look at your data, and you see if your test statistic lies outside your confidence interval, then you can reject your [null] hypothesis . . . ."[122] Tr. 237:18-21 (Moore). Notwithstanding that Dr. Moore calculated the difference-in-differences in four different ways, revealing a range of results, see supra Part III.D.2,a, Dr. Moore writes in his report that, using a 95% confidence interval, none of the results was significantly different than zero. See PX 149 (Moore Report) 16-18. At trial, Dr. Moore indicated that, with more data, he might have been better able to determine whether the effect of the publication of the 1999 Report on housing prices in the affected area was statistically significant: "[T]here are a number of . . . interpretations you could put on this. One would be that you just don't have enough observations to estimate it precisely." Tr. 231:23-232:1 (Moore); see also PX 149 (Moore Report) 18 ("Neither the 13% nor the 27% estimates are significantly different from zero. Given the small numbers of observations in the relevant cells, this is not surprising.").

Dr. Moore used a 95% confidence interval in his report, see Tr. 230:17-19 (colloquy between Dr. Moore and defendant's counsel), a threshold that, he states, is "standard in academic research," Tr. 244:2 (Moore); see also Tr. 230:19 (Moore) (stating that he used a 95% confidence interval "as a matter of course"). Plaintiffs cite two cases in which, plaintiffs argue in explanatory parentheticals, courts found that the use of confidence intervals lower than 95% satisfied a party's "burden of proof of the preponderance of the evidence." Pls.' Br. 37; cf. Tr. 238:16-17 (Moore) (stating that the confidence interval a researcher might employ "depends on the application"); Tr. 232:12-14 (Moore) ("I can't tell you what the burden of proof is that we have here.").

Regarding the statistical significance of his 42% difference-in-differences estimate, Dr. Moore remarked for the first time at trial that if the court adopted a "one-tailed" test (or a "directional hypothesis" test), that estimate would be statistically significant. Tr. 242:11-243:19 (Moore). Dr. Moore performed a series of calculations at trial, concluding that, using a 90% confidence interval and a one-sided hypothesis test, a finding of a 42% difference-in-differences estimate between the affected area and the control group would be significantly less than zero. Tr. 242:11-243:19 (colloquy between Dr. Moore and defendant's counsel). Plaintiffs contend that the court should adopt the lower threshold of a 90% confidence interval and find that their properties diminished in value by 42%. See Pls.' Br. 37. However, this is not the analysis recommended by Dr. Moore in his report. See PX 149 (Moore Report) 17-18.

It is unnecessary to determine whether use of a confidence interval lower than 95% would be sufficient to satisfy plaintiffs' burden. As explained below, see infra Parts

---

[122] A "null hypothesis" is the "'no difference' or 'no association' hypothesis to be tested (usually by means of a significance test) against an alternative hypothesis that postulates nonzero difference or association." Id. at 269_

383-84, 620 F.2d at 828. In light of the appraisals presented by defendant, which persuasively and directly establish the extent of the erosion damage to plaintiffs' properties between 1950 and 2000, see infra Part 111.D.3, plaintiffs have not met their burden.

> iii.    Failure to Control for Differences in Preexisting Rates of Increase in Market Values

As Dr. Moore emphasized, "[Tin the differences-in-differences test, average differences between the affected and unaffected properties at baseline must remain constant over time, so that change in the relative values of the two groups of properties can be attributed to the erosion." PX 149 (Moore Report) 8.

Defendant contends that "Dr. Moore did not control for any preexisting differences in the rates of increases in the prices before January 2000." Def.'s Br. 31. Plaintiffs respond that "the United States omits critical testimony on this issue; namely, that Dr. Moore also testified that the differences in the rates of increase before the [a]nnouncement would be reflected in the higher mean [price per lakefront foot] and would therefore be properly controlled for." Pls.' Resp. 8. As his trial testimony and expert report indicate, however, Dr. Moore did not explore whether it was necessary to control for differences in preexisting price trends and--if necessary--control for them,[12]

Asked at trial if he had controlled "for any preexisting differences in the rates of increases in the prices in your regression," Tr. 216:12-14 (defendant's counsel), Dr. Moore responded, "I did not," Tr. 216;15 (Moore). Asked whether, in light of his decision not to control for different preexisting trends, he "really can't be sure" that the observed difference in prices is a result of the 1999 Report rather than preexisting differences in the rate of price increases between the properties, Tr. 216:18-25 (defendant's counsel), Dr. Moore responded, "I didn't do that, so 1 don't know what . . .

---

[1/5] Dr. Moore drew his sales data from a number of localities, which he described only by whether they are inside or outside of the area affected by the jetties: "Communities in the affected area [(treatment group)] include portions of St. Joseph and Stevensville. Communities in the unaffected area [(control group)] include portions of St. Joseph and Stevensville, as well as Benton Harbor, Coloma, Bridgman, Chikarning, Lakeside, New Buffalo, Sawyer, and Union Pier." PX 149 (Moore Report) 13 n,24. Dr. Moore's report did not indicate that he considered any attributes of the communities other than whether they were in the affected area when constructing his treatment and control groups. See id, 'passim. In contrast, Mr. Burgoyne identified an array of local characteristics that would affect the value of plaintiffs' properties and the market in which they were being sold. See infra Part III.D.3.a. Dr. Moore failed to consider how characteristics such as those identified by Mr. Burgoyne influence the manner in which property values change over time.  See PX 149 (Moore Report) passim.

the implications would be." Tr. 217:1-3 (Moore). Dr. Moore and defendant's counsel then engaged in the following colloquy:

> Q . So at bottom, though, that leaves open, does it not, the possibility that the changes in prices that you see post-2000 may be, to some extent, influenced or caused by the rates of increases, preexisting differences in the rate increases, before January 2000?
>
> A I'll grant you that. I think [that] if there are differences in the rates of increase before . . the announcement, those would be reflected in the higher mean in one group more than the other. To a certain extent[,] they will be controlled for in the differences.

Tr. 217:14-25 (colloquy between Dr. Moore and defendant's counsel). Beyond his general statement that "[p]rice changes will reflect market participants' views of . . all known factors that affect price," PX 149 (Moore Report) 4, Dr. Moore did not quantify--and the court declines to guess--the extent to which differences in mean prices could control for variation in preexisting trends, see id. passim; Tr. 117:1-251:19 (testimony of Dr. Moore).

Because Dr. Moore failed to control for differences in preexisting rates of price increase for properties in the affected area and in the control group, or to explain why it is unnecessary to do so, the court finds his conclusions unpersuasive.

> iv.    Plaintiffs' Application of Dr. Moore's Conclusions to Each Property Regardless of Actual Erosion

A final drawback to Dr. Moore's model is that--because he focuses on the publication of the 1999 Report as the event of interest, rather than the amount of actual erosion--it is difficult for the court, in a takings case, where the amount of actual erosion caused by the government is the issue, to apply Dr. Moore's results in a reasoned manner. Plaintiffs suggest that the court award the same proportion of damages to all plaintiffs. See Pls.' Br. 36-39.

Plaintiffs' approach to calculating damages is inappropriate because the extent of the erosion damage has been greater for some properties than for others. The property of one plaintiff "went from being a buildable lot to being an unbuildable remnant because [a] substantial portion is down in the lake." Tr. 79:11-13 (Burgoyne). The properties of other plaintiffs eroded, but are deep enough that most of the property remains and is buildable.  See, e.g., DX 297 (Bodnar Appraisal) 11, Fig. A-6 (photograph of property showing variation of ordinary high water mark over time). Nearly half of the properties owned by plaintiffs grew in size between 1950 and 2000, owing to the deposition of sand or the placement of shore protection lakeward of the ordinary high water mark. See supra Part III.D.1; see, e.g., DX 295 (Anderson Appraisal) 11, Fig. A-6 (photograph of property

showing variation of ordinary high water mark over time). To treat plaintiffs' damages as though each plaintiff were similarly situated would not accurately reflect the erosion damage that each has suffered.[126]

> 3. Defendant's Evidence of Damages Between 1950 and 2000: Appraisals Performed by Mr. Burgoyne

> a. Mr. Burgoyne' s Analysis and Conclusions

To quantify the extent to which the jetties have harmed plaintiffs' property values, defendant presented property appraisals proposed by Mr. Burgoyne. See Def.'s Br. 26-30 (discussing Mr. Burgoyne's appraisals). For each property, Mr. Burgoyne created three appraisals, two of which are relevant under the law of this case.[127] See id. at 27-28. Both appraisals were prepared with a valuation date of January 2000, "cone reflecting the conditions of the land that existed in 2000 [(2000 appraisal)], [and] one reflecting the

---

[126] In a footnote, plaintiffs argue in the alternative that they are entitled to just compensation of $18,700,000 for the erosion their properties suffered between 1950 and 2000, a sum equal to the cost, plaintiffs argue, of replacing the material eroded by the jetties with sand. Pls.' Br. 39 n.27. Plaintiffs argue in their response brief that, absent shore protection, an additional volume of material equal to the volume that eroded between 1950 and 2000 will erode between 2000 and 2050. Pls.' Resp. 6-7. In support of these arguments, plaintiffs presented at trial the expert opinions of Dr. Meadows, who attempted to quantify the volume of sediment eroded from plaintiffs' properties. See generally PX 143 (Meadows Volume Report); PX 144 (Meadows Revised Volume Report).

It is the law of the case, however, that "[i]n a permanent taking scenario such as this ease, plaintiffs are entitled to the value of the property permanently lost, rather than restoration of property lost." Law of Damages Op., 88 Fed. Cl. at 684; see also id. at 686 ("Contrary to plaintiffs' argument, plaintiffs are not entitled to recover for the cost of replacing or restoring the land lost to erosion." (citation omitted)). Defendant is correct that "[p]laintiffs' volumetric approach fails because it cannot be reconciled with the [c]ourt's instructions and is inconsistent with controlling caselaw." Def.'s Br. 24; see generally Law of Damages Op., 88 Fed. Cl. 665.

[127] A third appraisal of each property "'reflected the conditions of the land that existed . . . on the date that the [p]laintiff acquired the property.' Def.'s Br. 27 (quoting Tr. 98:20-25 (Burgoyne) (ellipsis in original). Before trial, defendant argued that "plaintiffs, who have established that they were the property owners as of January 2000, are entitled only to damages that occurred during their 'periods of actual ownership.'" Law of Damages Op., 88 Fed. Cl. at 674-75. After considering the relevant caselaw, the court rejected this argument, concluding that "[e]ach plaintiff is therefore entitled to compensation for any damage attributable to the jetties from the time the jetty improvements began in 1950, notwithstanding the fact that 1950 may be prior to the date on which that plaintiff acquired its respective property interest." Id. at 680.

A.202

and people know that" Tr. 2516:14-15 (Burgoyne). Mr. Burgoyne further testified that "shore protection is relatively ubiquitous." Tr. 2516:11-12 (Burgoyne).

Mr. Burgoyne concluded that 36 of the 41 parcels he appraised had, the same market value with their 2000 characteristics as with their hypothetical 1950 characteristics. See DX 336 (Summary of Appraisals) 1-2.[132] The five properties that Mr. Burgoyne determined had a lower market value in their 2000 condition belong to plaintiffs Jackson, Neuser, Chapman, Notre Dame Path Association and Renner. See id. According to Mr. Burgoyne, the total loss of market value of these five properties is $465,000. See id. at 2.

Mr. Burgoyne determined that the value of the property owned by the Notre Dame Path Association diminished by $65,000, DX 333 (Notre Dame Path Association Appraisal) 9, the sum that a potential buyer would be compelled to spend immediately to replace a crumbling revetment protecting homes located on the edge of a bluff, Tr. 2512:21-2513:20 (Burgoyne). Mr. Burgoyne stated that, although other properties lack shore protection or have shore protection that will fail in the near future, none of the other properties have structures that will be imminently threatened by erosion. Tr. 2513:21-2514:4 (Burgoyne). As an example, Mr. Burgoyne described portions of the property owned by plaintiff Greenbriar Development that lack shore protection but are located

_____

[132]There are several ways to count the properties owned by plaintiffs because certain of the properties have multiple tax identification numbers, see DX 172 (Nairn OHWM Report) 19, Table 3.3 (table of plaintiffs' properties), and may have been formed from multiple parcels. Defendant and Dr. Nairn treat the Del Mariani property as a single property and treat plaintiffs as owners of 40 properties. See, e.g., DX 172 (Nairn OHWM Report) 19, Table 3.3 (table of plaintiffs' properties); Def.'s Br, 32 n.9 (stating that there are 40 parcels).

Mr. Burgoyne treats the property owned by the Del Mariani4Otiffs as two separate properties and performed separate appraisals for each. See DX 306 (liel Mariani Appraisal, improved. Parcel) 10; DX 328 (Del Mariani Appraisal, Unimproved Parcel) 10. The two properties have different tax identification numbers, see PX 248 (first stipulation regarding ownership), Ex. A at 2, and addresses. compare DX 306 (Del Mariani Appraisal, Improved Parcel) 2, with DX 328 (Del Mariani Appraisal, Unimproved Parcel) 2, but appear to be adjacent to one another and undivided, compare DX 306 (Del Mariani Appraisal, Improved Parcel) 12 (aerial photograph), with DX 328 (Del Mariani Appraisal, Unimproved Parcel) 11 (aerial photograph) (both showing what appears to be a single, undivided property). Mr. Burgoyne identifies 41 properties. See Tr. 74:20-23 (colloquy between Mr_ Burgoyne and plaintiffs' counsel) (agreeing that there are 41 properties).

Dr. Mickelson treats the property owned by the Del Mariani plaintiffs as two properties, but treats the two properties owned by the Wineberg plaintiffs as a single property, see DX 293 (Mickelson Report) 5, Table 1 (list of plaintiffs' properties), with the result that Dr. Miekelson identifies 40 properties, see id. The precise number of properties owned by plaintiffs does not affect the court's determination of the just compensation owed to plaintiffs.

121

"hundreds of feet from any improvements, so that the erosion wouldn't impact anything for many, many years." Tr. 2513:25-2514:4 (Burgoyne).

According to Mr. Burgoyne, the value of the Neuser property diminished by $305,000. DX 315 (Neuser Appraisal) 10. In 1950, the area of the Neuser property was 1.25 acres. Id. In 2000, the area of the Neuser property was .69 acres. Id. Between 1950 and 2000, the property lost a significant portion of its depth. Id. at 12 (map of ordinary high water marks). Mr. Burgoyne stated that, because of zoning regulations and the setback required for high risk erosion areas, the parcel was no longer deep enough to support new construction. Id. at 100. The property, which was vacant in January 2000, id., "went from being a buildable lot to being an unbuildable remnant." Tr. 79:11-12 (Burgoyne).

Mr. Burgoyne concluded that the properties owned by the Chapman, Jackson and Renner plaintiffs diminished in value by $35,000, $30,000 and $30,000, respectively. DX 336 (Summary of Appraisals) 1. Mr. Burgoyne testified that these three properties declined in value because "[t]he indication was they had a beach in 1950; and that because of the acts of erosion, they did not have a beach in 2000." Tr. 79:24-80:1 (Burgoyne).

Mr. Burgoyne found that, with regard to the rest of plaintiffs' properties, the value of the property in his 1950 appraisal was the same as in his 2000 appraisal. See DX 336 (Summary of Appraisals) 1-2.

b.    Plaintiffs' Criticisms of Mr. Burgoyne's Analysis

Plaintiffs argue that, for a number of reasons, "Mr. Burgoyne's opinions regarding the diminution in the value of [p]laintiff[s] properties caused by erosion lack any recognize[d,] reasonable methodology and are entitled to no weight." Pls.' Br. 41.

However, plaintiffs' criticisms of Mr. Burgoyne's methods are undermined by plaintiffs' reliance on Mr. Burgoyne's valuation of their properties in their own damage calculations. Plaintiffs determine the amount of their damages in part by multiplying the hypothetical value of their properties in Mr. Burgoyne's 1950 appraisals by the largest additional percentage of their value by which their properties may have appreciated, according to Dr. Moore, in the absence of the publication of the 1999 Report. See Pls.' Br. 37-38; PX 275 (table showing plaintiffs' estimates of the erosion damage to each property). Mr. Burgoyne explained that he applied the same techniques to both his pre-taking and post-taking appraisals: "The methodology doesn't differ; only the relevant characteristics of the properties differ." Tr. 104:15-16 (Burgoyne).

Plaintiffs do not explain why Mr. Burgoyne's hypothetical 1950 appraisals are sufficiently reliable for plaintiffs to incorporate them into plaintiffs' damage calculations, but Mr. Burgoyne's January 2000 appraisals, which apply the same techniques, "lack any

A.207

property within the boundaries of this servitude, "'the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject.'" Cherokee, 480 U.S. at 704 (quoting Rands, 389 U.S. at 123).

Plaintiffs cite no evidence, specifically pointed out at trial, that would allow the court to determine whether the beaches that were lost ended at the ordinary high water mark, or whether, on any property, the "landward extent of sand," DX 155 (Nairn Beach Width and Comparables Report) 13, extended inland beyond the ordinary high water mark as it stood in 1950, see Pls.' Br. passim; Pls.' Resp. passim; see also Mar. 2, 2011 Order, Dkt, No. 439, at 2, (stating that the court may disregard any exhibit or portion of an exhibit not "[s]pecifically pointed out" at trial "with an indication of how the evidence supports or disproves a fact in issue"). Plaintiffs have not carried their burden to prove that they are owed just compensation for the loss of beaches in front of their properties.[133]

    iii.      Selection and Treatment of Comparable Properties

Plaintiffs contend that there are several flaws in Mr. Burgoyne's selection and treatment of comparable properties. See Pls.' Br. 40. Plaintiffs argue that Mr. Burgoyne, "in attempting to determine the 'before taking' value of [p]laintiffs' properties, used market data from after the [a]nnouncement, despite his admission that post-announcement data would already reflect the impact of the [a]nnouncement." Id. Plaintiffs also argue that "even though Mr. Burgoyne used comparable sales that spanned

---

[38]Plaintiffs also argue that "Mr. Burgoyne also fails to understand that loss of sand, which results in loss of lateral support, is fundamental to property value and not 'just an amenity." Pls.' Br. 41. The court has stated on several occasions that "'[t]he federal navigational servitude defines the boundaries within which the government may supersede private ownership interests to improve navigation.'" OHWM Op., 71 Fed. Cl, at 504, (alteration in original) (quoting Jan. 9, 2006 Op., Banks v. United States, Dkt. No. 114, 69 Fed. Cl. 206, 209 (2006) (quoting Stabilization Op., 68 Fed. Cl. at 531)). Analogizing to takings of land adjacent to navigable rivers, the court explained:

> In general, destruction by the United States of lands located within a stream bed does not constitute a taking for which compensation is due; however, when land below the high water mark supports fast land located beyond the high water mark, any fast land that is destroyed as a consequence of government action may be compensable.

Id. at 507 (citing, inter alia, Owen, 851 F.2d at 1409-1410). Therefore, only to the extent that the erosion of beach sand below the ordinary high water mark results in erosion of land above the ordinary high water mark may plaintiffs be entitled to just compensation. To the extent that any loss of lateral support may have harmed land located above or outside the ordinary high water mark, plaintiffs cite no evidence that would quantify, in monetary terms, the amount of that loss. See Pls.' Br. passim; Pls.' Resp. passim.

passim; Def.'s Resp. passim; cf. Tr. 1684:20-21 (Shabica) (describing the structures built by all but two of the plaintiffs with shore protection as "amateur shore protection"). Plaintiffs claim that their full cost of installing and maintaining shore protection was approximately $2.2 million. See Pls.' Br. 50. Defendant's expert witness, Mr. Burgoyne, calculated the market value of plaintiffs' properties in January 2000 to be approximately $25 million. See DX 336 (Summary of Appraisals) 2. The cost of building and maintaining shore protection since 1950, as calculated by plaintiffs, although not adjusted for inflation, is approximately 10% of the value of plaintiffs' properties in 2000.

Because the shore protection efforts undertaken by plaintiffs are relatively inexpensive compared to the value of plaintiffs' properties, and because defendant's expert witness, Mr. Burgoyne, testified that shore protection similar to the shore protection installed by plaintiffs is "relatively ubiquitous," Tr. 2516:11-15 (Burgoyne), reflecting a judgment by the adjacent property owners that shore protection is sound economy, plaintiffs have met their burden of demonstrating that the shore protection efforts that they have undertaken in the past are "sound economy," Vaizburd, 384 F.3d at 1286. This is so notwithstanding that plaintiffs have not presented evidence of the effect that erosion would have had on the market value of their properties in the absence of shore protection. See Ridge Line, 346 F.3d at 1354-55 (funding that, where the plaintiff prevented storm water runoff from the government's property from causing further erosion damage by taking measures that constituted sound economy, the trial court erred in holding that plaintiff had not demonstrated damages simply because it had not produced appraisals of its property showing a loss in value).

Plaintiffs do not state in their briefing, see Pls.' Br. passim; Pls.' Resp. passim, or in the stipulation filed by the parties regarding shore protection costs, see Trial Stipulations of Fact, Dkt. No. 456, passim, when plaintiffs incurred their shore protection expenses. There are references in plaintiffs' trial testimony, see, e.g., Tr. 1217:15-23 (colloquy between plaintiff Kay Varga-Smith and plaintiffs' counsel), and in the documentation of shore protection expenses presented by plaintiffs, see, e.g., PX 261 (receipts for shore protection expenses), to when certain shore protection measures were undertaken. Because these references are scattered across several thousand pages of trial testimony and documentary evidence, the court will not, in the absence of briefing or a stipulation by the parties, undertake to determine which of plaintiffs' shore protection expenses were incurred between 1950 and 1970, the period of time during which the government was responsible for 30% of the erosion taking place in plaintiffs' zone, see Liability Op., 78 Fed. Cl. at 656, and with respect to which, plaintiffs are entitled to 30% of their shore protection expenses incurred, see supra Part I. Neither will the court undertake to determine which of plaintiffs' expenses were incurred after 1970, the period of time during which the government has completely mitigated the erosion caused by the jetties. See supra Part          If the reviewing court does not agree with the court's determination that it lacks jurisdiction to address plaintiffs' claims, the court will direct the parties to file a stipulation--or briefing, if the parties do not agree--to enable the court

to determine which of plaintiffs' shore protection expenses were incurred prior to 1970 and which were incurred subsequent to 1970. Because plaintiffs had sufficient opportunity to prove the amount of their damages at trial, the court will not accept additional evidence regarding the amount of their expenses.

> 5.    Reasonably Foreseeable Future Damages

The court previously determined that defendant is liable for damages for any portion of 30% "of all reasonably foreseeable future loss" not mitigated by defendant. Liability Op., 78 Fed. CL at 656.

If further erosion of plaintiffs' properties is "in fact preventable by prudent measures, the cost of that prevention is a proper basis for determining the damage." Law of Damages Op., 88 Fed. Cl. at 683 (quoting Dickinson, 331 U.S. at 751); see also Vaizburd, 384 F.3d at 1286 (stating that expenditures to cure the effects of a taking were recoverable if they were reasonable, meaning that "'it would have been sound economy, in view of the character and nature of the property, to have made the expenditure[sr (alteration in original) (quoting Dickinson, 152 F.2d at 870)).

If the installation of shore protection would be sound economy, it is not necessary for plaintiffs to provide appraisals to prove the exact amount of the damage their properties will suffer in the future without shore protection. See Ridge Line, 346 F.3d at 1354-55. However, to determine whether the installation of shore protection to prevent future erosion would be sound economy, the court must consider whether the government's share of the cost of shore protection would be greater than the government's share of the amount by which plaintiffs' property values would decline in the reasonably foreseeable future absent shore protection.[142] See Law of Damages Op.,

---

[142]Plaintiffs argue that "[w]hen determining the character and nature of the property at issue, courts look to both the private interests of the owner and whether the rights of the public will be affected by the taking." Pls.' Br. 43. The cases plaintiffs cite, however, do not support this proposition. Plaintiffs first cite United States v. Chicago, 13. & Q.R. Co. (Chicago I), 82 F.2d 131, 140 (8th Cir. 1936), a case that plaintiffs state is "cited with approval in United States v. Dickinson, 152 F.2d 865, 870-71 (4th Cir. 1946)." Pls.' Br. 43 (emphasis omitted). Plaintiffs describe Chicago I with a parenthetical that reads as follows: "upholding verdict of $240,000 for cost to cure when land had 'little, if any, market value' because the rights of the public were affected by the taking." Pls.' Br. 43 (quoting Chicago I, 82 F.2d at 140).

Plaintiffs are correct that, in Chicago I, "the actual land involved had little, if any, market value." Chicago I, 82 F.2d at 140. However, the Chicago I court affirmed the trial court's verdict, not because of "the rights of the public," Pls.' Br. 43, but because of the harm done to the remaining portion of the property, Chicago I, 82 F.2d at 134. The government planned to build a dam that would flood a portion of the plaintiff's right of way adjacent to the plaintiff's railroad embankment. Id. at 132. The government sought to condemn a floodway easement over the flooded portion of the plaintiffs land_ Id. When the water reached its planned depth, the

properties. Law of Damages Op., 88 Fed. Cl. at 683. The court stated that "[p]laintiffs may not be financially able to pay 70% of the cost to construct shore protection measures out of their own pockets, resulting in continued erosion of their property." Id. The court held that "as an alternative to seeking 30% of the cost of shore protection measures, plaintiffs may instead seek 30% of the cost of 'reasonably foreseeable future loss' to their property, although this amount may result in greater cost to the government" Id. at 684. Plaintiffs have elected to pursue just compensation equal to the government's share of shore protection rather than the government's share of future erosion damage. See Pls.' Br. 42-50 (discussing the cost of shore protection but not the dollar amount of reasonably foreseeable loss to plaintiffs' properties).

The court has determined that defendant is completely mitigating the erosion caused by the jetties to every property owned by plaintiffs but one, and has done so since 1970. See supra Part III.C.2. Therefore, for every property but one, no "reasonably foreseeable future loss," Liability Op., 78 Fed. Cl. at 656, will result from the government's actions. Plaintiffs argue that "what little dredging nourishment there is is in serious jeopardy of being cut off completely." Pls.' Br. 29. Plaintiffs further argue that "the unrebutted testimony at trial was that there is no funding available in 2012 for dredging of the St. Joseph Harbor." Id. at 29-30. Plaintiffs' argument that funding for the mitigation program "is in serious jeopardy" of lapsing in the future is speculative and dependent upon future actions by the government. At present, the mitigation program continues to provide nourishment material to plaintiffs' shoreline, as it has for more than forty years. Liability Op., 78 Fed. Cl. at 655 (finding that mitigation began in 1970). The court therefore concludes that, with the exception of one property, plaintiffs have not proven that they will suffer any reasonably foreseeable future loss as a result of the government's actions.

Furthermore, to determine whether it would be sound economy to install shore protection to prevent any reasonably foreseeable future loss, the court must compare the cost of shore protection to the damage to plaintiffs' properties expected to occur in the absence of shore protection. See Law of Damages Op., 88 Fed. Cl. at 683. For almost every plaintiff, it would not be possible for the future loss in market value to be greater than the cost of installing shore protection because the cost of the form of shore protection that plaintiffs argue is most appropriate, see Pls.' Br. 48, as estimated by plainti Cis, is greater than the full value of almost every plaintiff's property, compare, e.g., id. 48 (stating that the cost to install a headland beach[143] at the Bovee property in 2010

---

[143] "i10amid beaches consist of a single [promontory] or paired engineered promaiitery[ies] protruding from the shore and a sand beach between the paired promontories or on the updrift side of a single promontory." PX 145 (Chrzastowski Report) 4. Plaintiffs argue that hci)cl land beaches both prevent future erosion of the shoreline and preserve a sand beach, see Pls.' 13:. 4d, and that headland beaches "create a quiet zone along the shoreline that can be used for swimming or boating," id. at 45. Plaintiffs contend that "[al headland beach also provides critical environmental benefits," by supporting vegetation, including several species of

For the reasons stated above, see <u>supra</u> Part TILA, the court finds that it lacks jurisdiction to hear plaintiffs' claims. The findings of fact and conclusions of law presented in Parts            of this Opinion are presented for purposes of judicial efficiency if the reviewing court in any appeal should disagree with the court's view of its jurisdiction, and to avoid the possibility of a trial opinion being drafted months or years after the trial, and the possibility of a repetitive trial. These findings are presented in the alternative and, in the absence of jurisdiction, do not entitle plaintiffs to just compensation in the amounts determined by the court.

The Clerk of Court shall ENTER JUDGMENT for defendant in each of the above-captioned cases DISMISSING each of plaintiffs' complaints.


IT IS SO ORDERED.

<div style="text-align:right">

<u>Emily C. Hewitt</u>
EMILY C. HEWITT
Chief Judge

</div>

Page 1003

(1) And what I'm trying to demonstrate here is what
(2) the bluffs are made out of. And) think it's better to move
(3) down to this illustration because It's a bit bigger and one
(4) can see, and I can go back to here. This one is just from
(5) St. Joseph south. Its this part just blown up. And here
(6) is St. Joseph end here are the bluffs.
(7) And what I could see and what I could sample and
(8) map out quite clearly back in *the '80s* was the stratigraphy
(9) of the bluffs. The stratigraphy means the layering of the
(10) sediments. And everything above this dashed line, if you
(11) look right here, this is the dashed line. This dashed line
(12) represents lake level. And lake level is about 579 feet
(13) above sea level. So I could see fairly clearly what was in
(14) the bluffs above that dashed line.
(15) And so I saw here where St. Joseph.is and south
(16) of St. Joseph a layer of till, beneath which was sand. And
(17) then over here I could see that the till was no longer there
(18) but it was mainly raw sand, and then when I got to Grand
(19) Mere Lakes, then the bluffs disappear and I end up with
(20) mainly a beach. And then when f get over to here, these are
(21) the Warren Dunes which are actually over a hundred feet
(22) high, And so I was able to put together this stratigraphy
(23) here as well as north of the harbor. And you can see here
(24) that the layer of till is like a carapace or a veneer over a
(25) unit of sand.

A.1235

Page 1004

(1) And so basically I was able to put together the
(2) stratigraphy.
(3)     Q Now, what did you do when you were trying. to
(4) decide what was below lake level?
(5) "A That was a problem. I couldn't, because I
(6) couldn't see beneath the lake level under the bluffs. And
(7) so I used another approaeh, and that was to probe and look
(8) at the well logs that are on file with the Michigan
(9) geological survey.
(10)     Would you explain what well logs are?
(11) A Well logs, there's a law in Michigan that every
(12) well driller must report what the driller is going through.
(13) It's a requirement by the department of public health,
(14) Michigan department of public health. And then they have to
(15) submit that by a certain amount of time to the State of
(16) Michigan, and then it is put on an electronical file now.
(17) There are some old ones that aren't electronical
(18) that well, they're PDF files, but you can access those
(19) easily through the Internet now.
(20) And what I did in this instance is the same thing
(21) that petroleum people do. They look at well logs and then
(22) they try to characterize the geology based on the
(23) information recorded in those well logs.
(24) It's a bit tricky when you do that because you
(25) have to, first of all, make sure that the well log is

A.1236

Page 1005

(1) located where the driller thinks the driller Is, And a lot
(2) of time the driller isn't where he thinks, he or she thinks
(3) he is, based on thedescription of the well log, But the
(4) State of Michigan does have a set of tiles where they've
(5) gone out and verified those locations.
(6) So that's one of the things I did. I used mainly
(7) those that are verified as to locations.
(8) *And* then I also wanted to look at many of the
(9) deeper ones, because I was interested in bedrock. If you
(10) look at the bottom here, the bottom where this cross-section
(11) terminates, that's because of these well logs penetrated
(12) into shale. So this Is the bedrock in here.
(13) And it turns out, then, if you look at the layers
(14) of sand and the layers of clay, they all sit on top of
(15) bedrock. And those layers constitute anywhere from about
(16) 200 feet in thickness to about 30 to 40 feet In thickness.
(17) And so I used these well logs to see what was
(18) recorded below lake level under the bluffs, and then I
(19) characterized the geology based on standard geologic
(20) technique, saying its basically a characterization, for
(21) example, right in here. Everything below this line is built
(22) on well logs. And what I've done is I've put all the well
(23) logs that I used in red, these vertical lines.
(24) In addition to.that, you can see where the well
(25) logs are because I've put a little dot right along the

A.1237

Page 1006

(1) shore. There are some green dots and some red dots,
(2) depending on the different type of wells that were
(3) available.
(4)     O    Now, before you tell us what you found using
(5) those well logs, do you have experience dealing with the
(6) renability of well logs?
(7) A Yeah, I've used them quite extensively. In the
(8) 1980s I co-authored a paper on the use of well logs
(9) particularly on an electronical basis, and we used thousands
(10) end thousands of well logs. And one of the things we
(11) learned is that about 30 percent of them are unreliable.
(12) Either they are mislocated or they just are just not
(13) realistic. For example, I've seen well fogs In this area
(14) saying they're going through granite, and there's no granite
(15) for 200 miles from here, So you just have to scrutinize
(16) them very carefully.
(17)     Q    I think you may have partially answered my next
(18) question. How did you deal with that variability, then?
(19) A You basically eliminate. You don't use a well
(20) log that you have any doubt about, okay.
(21)     Q    So tell us what you have been able to determine
(22) using those well logs.
(23) A Well, the record shows, and again, if you look at
(24) these layers right in here, these layers are
(25) characterization. It doesn't mean that that layer of till,

A.1238

<u>INTRODUCTION</u>

This Memorandum addresses the critical issue of each individual Plaintiff's ability to present specific evidence of damages following a finding of liability in Plaintiffs' favor in a bifurcated trial.

Consistent with the Court's decision, each Plaintiff is required to submit specific damages evidence. While threshold evidence that damage resulting from the construction of St. Joseph's jetties was necessary and submitted in the liability phase to establish a taking by the Army Corps of Engineers under the Fifth Amendment of the United States Constitution, each individual Plaintiff should not be precluded from offering specific evidence of damages to his or her shoreline. The issue of the full nature and extent of *each* Plaintiff's damages was not before this Court in the liability phase, nor was it necessary for the Court to render its opinion. Notwithstanding the government's position, Dr. Graham Larson's testimony concerned only the *natural* and historical lakeshore erosion. He refused to consider the effects of human intervention on littoral drift in this case. Dr. Robert Nairn merely accepted Dr. Larson's opinion as an assumption in his modeling that the Corps' mitigation was sufficient to make up for the sand (littoral drift) blocked by the piers. The Court rejected Dr. Naim's opinion on mitigation, thus, the issue of the profile of the shoreline for each Plaintiff after each has suffered a taking without just compensation remains undetermined. Indeed, the Court's opinion establishes that the lakeshoreilakebed has changed due to the Corps' taking.

While each individual Plaintiff cannot now relitigate the 30% taking holding of this Court, the nature and extent of the specific damage as to each individual Plaintiff was not determined by the ruling and is ripe for adjudication by this Court after submission of the proofs on these issues. The government's position to the contrary

1

eviscerates the concept of bifurcation undermining this Court's administration of justice, and stretches the concept of issue preclusion collateral estoppel beyond accepted judicial constructs. This Memorandum will set out the historical procedural status of the trial, the Court's ruling on bifurcation, the Court's judgment in favor of the Plaintiffs, Plaintiffs' proposed damages, and Dr. Nairn's and Dr. Larson's lack of competent evidence on the current lakeshore profile. Plaintiffs' position on the damages evidence necessary to he introduced at this stage of the trial can be completely harmonized with the Court's liability decision.

## I.    PROCEDURAL HISTORY

This matter was tried on remand after the United States Court of Appeals for the Federal Circuit held that the statute of limitations did not begin to run "[w]ith the mitigation efforts underway...until the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that erosion was permanent and irreversible." *Banks v. United States* 78 Fed. Ct. 603, 604, (September 28, 2007), *citing* 314 F. 3d 1304, 1310 (Fed. Cir. 2003). The Federal Circuit had before it as part of the record on appeal the Corps Reports, and relied on the admissions contained therein in confirming that Plaintiffs' claims were timely filed and presented a justible taking claim.

By the government's own admission, the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that erosion was permanent and irreversible, thus, at the liability phase of the trial this Court was "charged with determining the extent of any damages [to plaintiffs] that is "permanent and irreversible." *Id.* at 607, FN 6.

2

evidence before it and concluded that plaintiffs had failed to show by a preponderance of the credible. evidence that the composition of the nearshore lakebed in plaintiffs' zone is cohesive, Banks Liability Opinion, 78 Fed. Cl. at 628. The court found defendant's experts credible, and made findings regarding the composition of the nearshore lakebed in plaintiffs' zone, Id. at 624-28. For the foregoing reasons, plaintiffs' arguments fail to demonstrate any of the three circumstances which would support reconsideration: the occurrence of an intervening change in the controlling law, the availability of previously unavailable evidence, or the necessity of allowing the motion to prevent manifest injustice. Matthews, 73 Fed. Cl. at 526.

However, in order to avoid possible inefficiency and delay in resolving plaintiffs' claims, the court will accept additional evidence regarding the composition of the nearshore lakebed in plaintiffs' zone. The history of the dispute out of which this case arises counsels this decision.

Activities by defendant at St. Joseph's Harbor date to the 1830s. Banks Liability Opinion, 78 Fed. CL at 604. Remediation activities by defendant affecting plaintiffs' zone began in 1970. Id. at 655 (citing Defendant's Exhibit (DX) 34 (St. Joseph Dredging)). Plaintiffs brought suit in 1999. Id. at 604. In 2001, the court granted defendant's motion to dismiss plaintiffs' claims, concluding that plaintiffs' claims were barred by the statute of limitations. Id. at 605 (citing Banks v. United States, 49 Fed. Cl. 806, 825 (2001)). Plaintiffs appealed and the Federal Circuit reversed and remanded, determining that the suit had been timely brought. Banks v. United States, 314 F.3d 1304, 1310 (Fed. Cir. 2003). The case was reopened in 2003. The court and the parties have addressed numerous pretrial issues, Banks Liability Opinion, 78 Fed. Cl. at 604-10, culminating in the liability trial held in June 2007.

Were the Federal Circuit to disagree with this court's conclusion regarding plaintiffs' entitlement to present additional evidence regarding the composition of the nearshore lakebed, the delay occasioned would be extraordinary. The court believes that justice will be better served by permitting plaintiffs the opportunity to present additional evidence of the composition of the nearshore lakebed in an expeditious manner at this time. See RCFC 1 ("[The RCFC] shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."); see also Yuba Natural, 904

---

the fact that preparation for trial was otherwise nearly complete, the court noted its agreement with defendant's position regarding the lacunae in plaintiffs' case, Pretrial Tr. 174:5-15, but permitted plaintiffs the opportunity to present evidence of ownership at a later time in order to expedite the case. Id. at 174:16-175:2. The court recommended that plaintiffs proceed with a motion for summary judgment as soon as practicable after trial to address the property interest issue. Id. Plaintiffs have not done so.

14

government has effected a permanent taking. *Boling v. United States,* 220 F.3d 1365, 1370 (2000). Because compensation is due at the time of the taking, the owner at that time, not the owner as an earlier or later date, receives the payment. *Dow,* 357 U.S. at 20-21, *citing Danforth v. United States,* 308 U.S. 271, 284, 84 L. Ed. 240, 60 S. Ct. 231 (1939); *see also Hansen,* 78 Fed. Cl. at 128; *Bailey,* 78 Fed.C1, at 263. The rationale is that by physically using or physically interfering with the use of the property, the entity operating under the eminent domain power has permanently removed the property interest from the private owner and must substitute a full meaure of compensation in its stead. *Hansen,* 78 Fed. Cl_ at 78; *see also Bailey* at 268. Indeed, just compensation includes recovery for all damages, past, present, and prospective. *Dickinson,* 152 F.2d 865, 867, affd 331 U.S. 745.

In this case, the Court of Appeals has already determined that stabilization-- and thereby accrual of the takings claims-- occurred when the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that erosion was permanent and irreversible. *Banks,* 314 F.3d at 1310. Before that, "Nile Corps' mitigation operations at St. Joseph appeared to successfully stave off the damaging effects of the jetties." Ibid. In other words, prior to January 2000 no takings claim had yet accrued because no permanent taking had been established.

The issues of stabilization, permanent taking and accrual of plaintiffs' takings claims are no longer an issue in this case because the Court of Appeals has already ruled upon these matters, and pursuant to the law of the case doctrine, the decision of the Court of Appeals continues to govern this case. *See Patterson v. Haskins,* 470 F.3d 645, 660-61 (6th Cir. 2006) (the law of the case doctrine states that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case); *see also Wilson v. Morgan,* 477 F.3d 326, 334 (6th Cir. 2007) (the law of the case doctrine precludes

A.1694

consideration of issues that have been decided in a previous appeal). As a result, stabilization and the accrual of plaintiffs' takings claims occurred in January of 2000.

Consequently, the plaintiff landowners holding title to their respective properties as of January, 2000 are the plaintiffs who are entitled to damages. *See Dow,* 357 U.S. at 20-21; *Hansen,* 78 Fed. ,Cl. at 128; *Bailey,* 78 Fed. Cl. at 263. And the government must pay for all that it takes. *Dickinson,* 331 U.S, at 750. Therefore, the January 2000 plaintiff landowners are entitled to just compensation, which includes past, present, and future damages for the taking of their property. *See Dickinson,* 152 F.2d at 867.

> **1.    The Taking is the result of one government act --- the building of the jetties -- and all damages flowing from that act are due to the plaintiff landowners who held their property interests at the time that the takings claim accrued.**

Plaintiffs in this case are entitled to the following measure of damages (1) the cost of **shore** protection measures *(United States v. Dickinson,* 331 U.S. 745, 751, 91 L. Ed. 1789, 67 S. Ct. 1382 (1947); (2) compensation for the value of the property taken *(Cooper v. United States,* 827 F.2d 762, 764 (1987)); and (3) reasonably foreseeable future damages *(Hansen,* 76 Fed. Cl. at 126). More to the point, those plaintiffs who held title in January of 2000 are entitled to the complete and total measure of damages caused by the government's taking. *See Dickinson,* 152 F.2d at 867 (landowners whose land was taken by a permanent physical taking that is slow and gradual in nature are entitled to just compensation, which includes past, present, and future damages for the taking of their property). *Dickinson, Cooper,* and *Hansen,* as discussed below, expound upon the measure of damages that Plaintiffs may claim.

---

I Plaintiffs are submitting, concurrent with this Motion, two sets of stipulations, which identify the plaintiff landowners as of January, 2000.

1984, when plaintiff filed suit. The plaintiff did not acquire legal title to the property until after the physical events causing the taking had begun. However, the *Cooper* court, relying on *Dickinson,* found that the plaintiff could recover for all damages to the trees because the destruction of the trees did not sufficiently stabilize until after plaintiff acquired legal title to the property *Id.* at 764. The court held that the plaintiff was entitled to compensation for the entire value of the timber destroyed, because he had a property interest in the timber when the taking of the timber became complete. *Id.*

Like *Cooper,* in this case, the Plaintiffs did not acquire title to each of their respective properties until after the physical events causing the taking, i.e., the building of the jetties, began. However, the erosion resulting from the jetties, which is the taking in this case, did not sufficiently stabilize until January of 2000. As a result, like *Cooper,* the Plaintiffs in this case are entitled to compensation for all erosion damage to their respective properties attributable to the jetties (less any effective government mitigation). *Id.*

In *Hansen v. United States,* 65 Fed. Cl. 76 (2005), the owner of a ranch brought a takings action against the government, alleging that groundwater on his property was contaminated by pesticides from cans buried on adjacent Forest Service property. The Hansen court found that the contamination was a taking by a continuing physical process, and that the claim is ripe for adjudication if the government has caused a substantial invasion of the plaintiff's property and the extent of the harm caused by that invasion is foreseeable. *Id.* at 126. The Hansen court held that "a plaintiff may seek just compensation for harm to private property that has not occurred, so long as that harm is shown to be reasonably foreseeable." *Id.*

Banks Accrual Opinion, the Federal Circuit applied the stabilization doctrine in a gradual takings case and decided that the statute of limitations was no bar to plaintiffs' claim. Applegate I, 25 F.3d 1579, 1583-84 (Fed. Cir. 1994). On remand, the trial court acknowledged that the exact dates of the alleged takings may have remained "uncertain due to the gradual erosion of the beaches." Applegate v. United States (Applegate II), 35 Fed. CI. 406, 420 (1996).

The parties equate the date of the taking in this case with the date of stabilization, see Pls.' Mot. 7-9; Def.'s Rasp. 6, agreeing that for purposes of determining the plaintiffs to whom compensation is due, the taking in this case occurred in January 2000, see Pls.' Mot. 9; Def.'s Resp. 6. The court sees no reason to disagree. In a situation such as the one presented here, where plaintiffs arc individuals who acquired their interests in.the affected properties during the period of erosion prior to the date of stabilizatiOn, and continued to hold their property interests on the date of stabilization, there is no legal or practical difficulty with equating the date of the faking with the date of stabilization.[6]

    B.    Owners at the Time of the Taking Are Entitled to Compensation for All Damages, Past, Present, and Future

As the case law discussed below requires, the parties do not dispute that the only individuals entitled to compensation due to the government's taking are those individuals who were property owners at the time of the taking. Pls.' Mot. 7; Def.'s Resp. 4-5. However, the parties do dispute whether the property owners at the time of the taking are entitled to compensation for damage to their property that occurred before and after the periods of each respective property owner's ownership. Def.'s Resp. 13 (arguing that plaintiffs are entitled only to damages that occurred during their "periods of actual

---

that the filing by plaintiffs slightly before the subsequently determined date of stabilization is in any way impermissible. See Banks v. United States (Banks Accrual Opinion), 314 F.3d 1304, passim (Fed. Cir. 2003). Further, given the uncertainty of gradual erosion cases, the court finds the date of filing proper in the circumstances of this case. This is a practical approach. It is riot necessary, for example, to dismiss plaintiffs' action or require plaintiffs to refile their complaints. See Dickinson II, 331 U.S. at 748 ("The Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action' - when they are born, whether they proliferate, and when they die.").

  [6] The court can readily envision cases in which marking the date of the taking as the data of stabilization is contested by plaintiffs whose periods of ownership precede the date of stabilization, and who therefore institute an action on the basis that a taking occurred prior to the date of stabilization. Because plaintiffs in this case are individuals whose ownership as of the date of stabilization is uncontested by the parties, that issue is not presently before the court.

8

ownership"); Pls,' Reply 6-15 (arguing that plaintiffs are entitled to all damages to the eroding land, beginning in 1950 and including **all** reasonably foreseeable future loss). For the following reasons, the court finds that property owners at the time of the taking are entitled to compensation for "all damages, past, present, and prospective." Dickinson I, 152 F.2d at 867.

1.    General Rule: Compensation is Due to the Owner at the Time of the Taking

In Danforth v. United States (Danforth), the Supreme Court addressed the compensation due to a plaintiff-landowner following condemnation proceedings instituted against the landowner by the United States. Danforth, 308 U.S. 271, 276 (1939). In Danforth, the Supreme Court explained that because "compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment." Id. at 284; see also United States v. Dow (Dow), 357 U.S. 17, 20-21 (1958) (applying the Danforth rule to a physical possession case and stating that "it is undisputed that [because] compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment' (quoting Danforth, 308 U.S. at 284)).

The parties agree that individuals whose periods of ownership of the eroding properties ended prior to the date of the taking are not entitled to a compensation award, Pls.' Reply 15 ("[P]roperty owners who obtained and conveyed their interest in **the** property prior to January of 2000 . . . may not claim damages . . . ."); Def.'s Resp. 4 ("[A] plaintiff who fails to establish that he or she had an ownership interest in the property . . on the date of taking has no standing to assert a takings claim . . , and    no right to be awarded damages.").

The accrual date of a claim "fix[es] the government's alleged liability." See Hopland Band of Porno Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988) (stating that a claim accrues "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence"). In the case of physical takings of a continuous nature, the date of accrual of plaintiffs' claims is the date of stabilization. See Dickinson II 3.3.1 U.S. at 749; Banks Accrual Opinion, 314 F.3d at 1310; Banks Stabilization Opinion, 68 Fed. Cl. at 528-29. The stabilization date marks the date of the taking in this case for purposes of determining the individuals entitled to compensation. See supra Part II.A. Under the Supreme Court's nile in Danforth, individuals whose property interest in the eroding land ended prior to the date of taking do not receive payment. Danforth, 308 U.S. at 284 ("[T]he owner at [the] time [of the taking] . , . receives the payment."); see also Wyatt v. United States (Wyatt), 271 F.3d 1090, 1096-97 (Fed. Cir. 2001) (explaining that the government

IN ME UNTIED STATES COURT **OF FEDERAL** CLAIMS

No. 99-4451 L

c/w 99-4452L, 99-4453 L, 99-4454L, 99-4455L, 99-44561,, 99-4457L, 99-4458L, 99-4459L, 99-44510L, 99-44511L, 00-365L, 00-379L, 00-380L, 00-381L, 00-382L, 00-383L, 0O-384L, 00-385L, 00-386L, 00-3811,, 00-388L, 00-389L, 00-390L, U0-391L, 00-392L, 00-393L, 00-394L, 00-395L, 00-396L, 00-396L, 00-397L, 00-398L, 00-399L, 00-400L, 00-401L, 05-1353L, 05-1381L, 06-72L

| | | |
|---|---|---|
| JOHN H. BANKS, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | No. 99-4451 L |
| | ) | Chief Judge Emily C. Hewitt |
| v. | ) | |
| | ) | |
| THE UNITED STAPES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| EUGENE S. FRETT, as Trustee of the Victor J. | ) | |
| Horvath and Frances B. Horvath Trust dated | ) | |
| November 16, 1995 | ) | |
| | ) | No. 05-1353L |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF .AMERICA. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE. EVIDENCE OF NEARSHORE LA BED COMPOSITION

NOW COME the Plaintiffs, by their attorneys, John B. Ehret, Mark E. Christensen and Eugene J. Frett, pursuant to Rules 40.1 and 402 of the Federal Rules of Evidence, respectfully move this Honorable Court to enter a pretrial order: (1) excluding evidence regarding the composition of the nearshore lakebed adjacent to Plaintiffs' properties; (2) excluding evidence offered to prove that Plaintiffs' erosion damages may be reversed and/or mitigated after January

(Fed. Cir. 1988) ("Unlike the authority to reconsider its own rulings, a district court is without choice in obeying the mandate of the appellate court."); *Exxon Corp. v. United States,* 931 F.2d 874, 877 n.7 (Fed. Cir. 1991) (mandate constitutes law of the case on issues that were either explicitly or implicitly decided by the appellate tribunal); *Roane v._ United States,* 231 F.3d 1348, 1349 (Fed. Cir. 2000).

'An inferior court has no power or authority to deviate from the mandate issued by an appellate court"' *Northern Helex Co. v. United States,* 634 F.2d 557, 560 (Ct. Cl. 1980) (quoting *Briggs v. Pennsylvania KR.,* 334 U.S. 304, 306, 68 S, Ct. 1039, 92 L. Ed. 1403 (1995)). "After an appellate court has decided a case and remanded to a lower court, the latter court 9.5 bound by the decree as the law of the case; and must carry it into execution. . . . That court cannot vary it, or examine it for any other purpose than execution; . . . . or review it, even for apparent error, upon any matter decided on appeal.' *Northern Helex,* 634 F.2d at 560 (quoting *In re Sanford Fork & Tool Co.,* **160** U.S. 247, 255, 16 S. Ct, 291, 40 L. Ed. 414 (1895)).

In short, a trial court acting on a remand order, may not reexamine any issues that were addressed by the appellate court. "No litigant deserves an opportunity to go over the same ground twice." *Gindes v. United States,* 740 F.2d at 949.

**B.    The Law of the Case is that Plaintiffs' Erosion Damage Was "Permanent and Irreversible" as of January 2000**

In an earlier appeal in this case, the Federal Circuit Court expressly held that Plaintiffs' damages were stabilized following publication of the Corps' 1999 Report, when damage to Plaintiffs' land became "permanent and irreversible:"

> The Corps' mitigation operations at St, Joseph appeared to successfully stave off the damaging effects of the jetties. With the mitigation efforts underway, the accrual of plaintiffs' claims remained uncertain until the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that erosion was permanent and irreversible.

*Banks 11;314* F.3d at 1310,

7

As noted above, the Federal Circuit had the benefit of a well-developed factual record because the , Corps brought its motion to dismiss on the eve of the liability trial, after discovery had been completed and after the parties had submitted anticipated trial exhibits to the trial court. *Banks I,* 49 Fed. CL at 809, n. 4.

On remand, this Court expressly relied on and applied the Federal Circuit Court's finding in subsequent proceedings to set January 2000 as the stabilization date of Plaintiffs' claims:

> In this case, the date of stabilization marks the point at which it became certain that the damage to plaintiffs' properties was in fact "permanent and irreversible." Banks Accrual Opinion., 314 F.3d at 1310. In January 2000, plaintiffs here, like the plaintiffs in *Bailey,* experienced a "permanent removal of the property interest, which swapped a suit for compensation, or 'chose in action' not running with the land, in place of a real property interest." *Bailey,* 78 Fed. Cl. at 263 (a regulatory takings case in which the court undertakes an in-depth discussion of case law applied to takings by physical possession). Upon this permanent removal of plaintiffs' property interests in this case, "the property interest[s] in question [were] no longer [each] individual's to convey." *Id.* at 264 (footnote omitted).. Because plaintiffs in this case are individuals who owned the property at the time of the taking, they, under both applicable precedent and persuasive analysis in dicta, are entitled to compensation for the taking.

*Banks v. United States,* 88 Fed. CL at 674.

This Court has further expressly acknowledged that the Federal Circuit Court's ruling in *Banks H* is the law of this case:

> ...The issue is whether a reasonable and diligent plaintiff should have known of the mitigation efforts and interpreted them in such a way as to be justifiably uncertain about the permanency of the alleged taking until the issuance of the Reports. This was decided in *Banks II* when the Federal Circuit held that "[w]ith the mitigation efforts underway, the accrual of plaintiffs' claims remained uncertain until the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that erosion was permanent and irreversible." 314 F.3d at 1310. Thus "the claims were not time-barred." *Id.* Plaintiffs' subjective lialowledge may be new evidence, but defendant has failed to show how it is "material" to the question at hand. See Intergraph, 253 F.3d at 698. This court **is bound by the law of the case as set forth *in Banks H.*** Defendant cannot relitigate the issue of the statute of limitations at this juncture and before this court. See *In re Sanford Fork & Tool Co.,* 160 U.S. at 255; *Intergraph,* 253 F.3d at 698; see also W *Seattle Gen. Ilosp., Inc., 1*   a. at 746 [emphasis added].

*Banks v. United States,* 76 Fed. Cl. 686, 697 (CL Ct. 2007),

A.1866

Based on the foregoing, there can be no doubt that it is the law of this case that erosion damage to Plaintiffs' properties was permanent and irreversible as of January 2000. Consequently, this finding must be upheld in further proceedings in this case, including but not limited to, the trial on damages.

### C.     **The Law of the Case Doctrine Precludes a Finding That the Nearshore Lakebed Adjacent to Plaintiffs' Properties is Sandy as of January 2000.**

The law of the case doctrine "applies not only to issues decided explicitly, but also to everything decided by necessary implication.'" *In re Felt,* 255 F,3d 220, 225 (5th Cir. 2001) (citing *Browning v. Navarro,* 887 F.2d 553, 556 (5th Cir. 1989)); *see also Knotts v. United States,* 893 F.2d 758, 761 (5th Cir. 1990); *Gross v. United States,* 723 F.2d 609, 611 n.1 (8th Cir. 1983); *Bracewell v. Nicholson Air Services, Inc.,* 748 F.2d 1499, **1504 (11th** Cir. 1984); *Smelser v. United States,* 62 Fed. Cl. 768, 772 (Fed. Ct. Cl. 2004).

**In** *Smelser, supra,* the plaintiff brought a breach of contract claim against the Department of Energy ("DOE"), claiming that it had breached a settlement agreement by refusing to allow plaintiff to remove lithium and a chemical known as PDMCH, from a particular DOE facility. 62 Fed, Cl. at 769. During the course of the case, the trial court, in a decision affirmed by the Federal Circuit, **held** that plaintiff was not entitled to remove from the DOE's facility those items not declared "excess equipment" by the DOE but that should have been so designated. *Id.* at 771.

On remand, plaintiff sought partial summary judgment on his claims for lithium and PDMCH under the settlement agreement at issue. *Id.* **The** trial court applied the law of the case doctrine and refused to hear plaintiff's claims, holding that although lithium and PDMCH were not specifically referenced by name in the first proceeding, they were necessarily encompassed

A.1867

in the court's prior ruling that denied all of plaintiff's claims for equipment which the DOE should have declared excess. *Id.* at 772.

Similarly, in this case, the Federal Circuit Court's finding that damage to Plaintiffs' properties was "permanent and irreversible" as of January 2000, necessarily includes the finding that all of Plaintiffs' properties are adjacent to nearshore Iakebeds that are cohesive rather than sandy. This conclusion is compelled by the respective definitions of cohesive and sandy lakebeds, and the principle of standing that existed for each plaintiff to bring the cause of action.

It is undisputed in this case that erosion of cohesive lakebeds is permanent and irreversible. *Banks v. United States,* 78 Fed. Cl. at 622; *see also* USACE 2002, CEIV1 M-5-3 to 6; ACOE Geologic Effects on Behavior of Beach Fill and Shoreline Stability for Southeast Lake Michigan (technical Report CERC-96-10) dated June 1996 (PX-23) at 10 (`The sand cover may come and go (depending on the season, water level, and storm activity), but erosion of the cohesive layer is irreversible.    . Once this material is eroded by waves, it cannot reconstitute itself, and the cohesive form is lost forever."); ACOE Effectiveness of Beach Nourishment on Cohesive Shores, St. Joseph Lake Michigan (Technical Report CHL-97-15) dated July 1997 (PX-24) at 8 ("[E]rosion of the cohesive layer is irreversible,"); January 2000 Annual Report of the Section 111 each Nourishment Monitoring Program (PX41) at 3.

In contrast, erosion of sandy nearshore lakebeds "allows for the possibility of mitigation by replacement in kind of the sand removed." *Banks v. United States,* 78 Fed. Cl, at 624; *see also* USACE 2002, CEM 111-5-3 to 6 ("Erosion on a sandy shore is a potentially reversible process (i.e., due to natural processes), while erosion on a consolidated cohesive shore is irreversible."); Tr . 1215: 11- 16, 1296:4-10,

10

As set forth above, the law of this case is that erosion damage to Plaintiffs' properties was "permanent and irreversible" as of January 2000. *Banks II,* 314 F.3d at 1309-1310. This finding by the Federal Circuit necessarily precludes a subsequent finding by this Court that any of Plaintiffs' properties are adjacent to sandy lakebeds because by definition, damage to sandy lakebeds is not permanent and irreversible.

Further, if the erosion damages to Plaintiffs' properties in this case were not permanent and irreversible, then under the Federal Circuit's reasoning, Plaintiffs' claims would not yet have accrued and the dismissal by the trial court would have been affirmed by the Federal Circuit on appeal. "As a general rule, the federal appellate courts are obligated to uphold a lower court's determination, even though the lower court gave an incorrect reason for its action, if there is some other basis in the record for justifying that action." *Knotts v. United States, supra,* 893 F.2d at 761 (citing *Helvering v. Gowran,* 302 U.S. 238, 245 (1937)). In other words, if, as the government contends, the lakebed composition is sandy, then these Plaintiffs have no standing to bring this suit. But as we know, they do under *Banks H.*   Therefore, the entire government strategy to relitigate these issues through the opinions of a retained expert is nothing more than a collateral attack on the Federal Circuit's opinion in *Banks H.*

Therefore, in addition to the Federal Circuit's express determination that erosion damage to Plaintiffs' properties was permanent and irreversible as of January 2000, the law of this case also includes the necessary and implied finding that as of January 2000, the nearshore lakebeds adjacent to Plaintiffs' properties were cohesive, because only that type of lakebed is permanent and irreversible by definition. Consequently, this issue cannot be relitigated at the trial on damages and any inconsistent prior rulings must be reversed. See *Gindes v. United States,* 740 F.2e1 at 949 (11%110 litigant deserves an opportunity to go over the same ground twice.").

### D.    <u>Evidence of Sandy Shores and/or Mitigation of Erosion After January 2000 is Irrelevant and Inadmissible</u>

**Federal** Rule of Evidence 402 provides that only relevant evidence is admissible at trial ..[5] "Evidence which is not relevant is not admissible." Fed. R. Evid. 402. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be ˙without the evidence." Fed. R. Eva 401.

As set forth above, the law of this case is that erosion damage to Plaintiffs' properties was permanent and irreversible as of January 2000. The issue of whether erosion damage to Plaintiffs' properties can be reversed or mitigated after January 2000 cannot now be relitigated at the damages phase of trial. *Globe Say. Bank FSB,* T. *United States,* 74 Fed. Cl. at 740. Consequently, any evidence offered by the Corps to show mitigation of Plaintiffs' damages after January 2000 is irrelevant and inadmissible.

It is the further law of the case that Plaintiffs' properties are adjacent to cohesive nearshore lakebeds. Section TUC., *supra.* As a result, any evidence regarding the composition of nearshore lakebeds adjacent to Plaintiffs' properties is irrelevant, inadmissible **and should** be excluded at the damages trial.

---

[5] The Federal Rules of Evidence apply to proceedings before this Court, Fed. R. Evid. 1101(a).

A.1870

of the pleadings in order to establish jurisdictional facts, determining that "the accrual of plaintiffs' claims remained uncertain" for purposes of the statute of limitations until the Corps published three reports, which "collectively indicated that erosion was permanent and irreversible." Banks (accrual) II, 314 F.3d at 1310. However, plaintiffs cite no discussion in Banks (accrual) II indicating that the Federal Circuit determined, not only jurisdictional facts, but a major aspect of damages in this case. As the Federal Circuit has explained, an appellate court reviewing the disposition of a motion to dismiss does not examine the ultimate merits of the case. "That is what the trial judge will do on remand. Appellate courts do not do that, even if we had a record on which to do it." Henke v. United States, 60 F.3d 795, 801 n.5 (Fed. Cir. 1995). The issues of lakebed composition and the permanence of erosion have yet to be determined, despite expert testimony at the trial on the issue of liability held after the Federal Circuit's opinion in Banks (accrual) II. See Banks (liability), 78 Fed. CL at 628 (concluding that the issue would be addressed in future proceedings).

## IV. Conclusion

Because the court determined that additional evidence of lakeshore composition is necessary, see id., such evidence is relevant and may be presented at trial, see Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); Fed. R. Evid. 402 (stating that, with exceptions not applicable here, " [0]1 relevant evidence is admissible").

Plaintiffs' Motion is DENIED.


IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge

11